# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

AMERICA FIRST POLICY INSTITUTE; RONNY JACKSON; BETH VAN DUYNE; ELIJAH CRANE; BARRY LOUDERMILK; DANIEL MEUSER; THOMAS TIFFANY; JAMES DANIEL BISHOP; MATTHEW KRAUSE; BILAL ESSAYLI; FRANK LAROSE, in his official capacity as Ohio Secretary of State; CHRISTI JACOBSEN, in her official capacity as Montana Secretary of State; ROBERT GENETSKI, in his official capacity as County Clerk of Allegan County, Michigan; SUZANNE PINNOW, in her official capacity as Deputy Clerk of Thornapple, Wisconsin; FAIRFAX COUNTY REPUBLICAN COMMITTEE; MICHIGAN REPUBLICAN PARTY; REPUBLICAN PARTY OF GEORGIA, INC.; and UTAH REPUBLICAN PARTY,

*Plaintiffs,*

v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; MERRICK B. GARLAND, in his official capacity as Attorney General of the United States; DEBRA A. HAALAND, in her official capacity as Secretary of the Interior; XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; ADRIANNE R. TODMAN, in her official capacity as Acting Secretary of Housing and Urban Development; MIGUEL A. CARDONA, in his official capacity as Secretary of Education; ALEJANDRO N. MAYORKAS, in his official capacity as Secretary of Homeland Security; and the UNITED

Civil Action No.: 2:24-cv-00152-Z

STATES OF AMERICA,

                    *Defendants.*

## FIRST AMENDED COMPLAINT

Plaintiffs America First Policy Institute, Congressman Ronny Jackson, Congresswoman Beth Van Duyne, Congressman Elijah Crane, Congressman Barry Loudermilk, Congressman Daniel Meuser, Congressman Thomas Tiffany, Congressman James Daniel Bishop, Representative Matthew Krause, Assemblyman Bilal Essayli, Secretary Frank LaRose, Secretary Christi Jacobsen, County Clerk Robert Genetski, Deputy Clerk Suzanne Pinnow, Fairfax County Republican Committee, Michigan Republican Party, Republican Party of Georgia, Inc., and the Utah Republican Party share the goal of making it "easy to vote, but hard to cheat" for all Americans. Plaintiffs complain as follows against Defendants Joseph R. Biden, Jr., President of the United States; Attorney General Merrick B. Garland, Secretary of the Interior Debra A. Haaland, Secretary of Health and Human Services Xavier Becerra, Acting Secretary of Housing and Urban Development Adrianne R. Todman, Secretary of Education Miguel A. Cardona, Secretary of Homeland Security Alejandro N. Mayorkas, and the United States of America, who have usurped the role of States in registering voters and redirected federal resources to partisan voter mobilization efforts, in violation of federal law.

## INTRODUCTION

1.    Plaintiffs challenge an unlawful executive order issued by President Joseph Biden, Executive Order 14019, *Promoting Access to Voting*, 86 Fed. Reg.

2

13,623 (Mar. 7, 2021) (the EO).  For the reasons set forth below, the Court should enjoin Defendants from carrying out any administrative actions taken in furtherance of the unlawful EO, which was issued to achieve partisan objectives.

2.      The EO purports to make it easier for people of color to vote, and it suggests that the National Voter Registration Act ("NVRA") requires state and local election officials to partner with the Federal Government to promote voting and eliminate voting barriers.  The EO thus announces a *federal* policy of expanding *state* voter registration and access to information to "combat" what the federal government deems "misinformation."

3.      To achieve these ends, the EO requires the head of every federal agency to develop programs to register voters and to increase voter participation.  The EO further requires that those plans receive White House approval.

4.      The EO thus commandeers every federal agency—regardless of the agency's statutory purpose—to use taxpayer money to create voter-registration programs and to design get-out-the-vote (GOTV) initiatives.  Of course, as demonstrated below, this is a blatant and unlawful effort to use taxpayer money to help elect Democratic candidates, including Vice President Kamala Harris as the presumptive nominee of the Democratic Party for President.

5.      Together, the EO and its implementing agency actions violate federal law, including multiple violations of the Administrative Procedure Act (APA).

6.      The Constitution of the United States grants States primacy in elections.  Through the Elections Clause, the Electors Clause, and the Fourteenth,

Fifteenth, Nineteenth, and Twenty-Sixth Amendments, States play the primary role in conducting elections, with Congress playing a vital—but carefully circumscribed—secondary role.  The *only* role for the Federal Government is enacting and enforcing statutes regulating the time, place, and manner of congressional elections, appointing the day when presidential electors are chosen, and enforcing constitutional guarantees regarding due process, equal protection, and nondiscrimination on the basis of race, sex, and age.  Through the Tenth Amendment, *all* other aspects of elections remain entrusted to the States as co-equal sovereigns.  Noticeably absent here is any mention of a federal responsibility to engage in state voter registration or GOTV efforts.

7.      Moreover, the limited role for the Federal Government in elections is vested in Congress *alone*, not the President acting unilaterally without congressional authorization or appropriation.  No statute passed by Congress authorizes the EO, and the President has no inherent constitutional authority to issue it.

8.      The EO represents a radical expansion of the Federal Government's understanding of the National Voter Registration Act, 52 U.S.C. § 20501 *et seq.*, (NVRA).  It supersedes an earlier executive order that has always governed Executive Branch implementation of the NVRA since the passage of that legislation, Executive Order 12926, signed by President Bill Clinton.  *Implementation of the National Voter Registration Act*, Exec. Order 12926, 59 Fed. Reg. 47,227 (Sept. 12, 1994).  The EO replaces that run-of-the-mill implementation order with a scheme to tilt the playing

field ahead of the 2024 election in favor of Vice President Harris and the Democratic Party.

9.    The EO's scope is stunning.  The EO declared an all-of-government approach for federal agencies to engage in voter registration activities whenever interacting with the public.  For instance, approach the U.S. Department of Agriculture's Rural Development program about a grant—get pushed to register to vote.  Approach the Small Business Administration about a loan—get pushed to register to vote.  Contact U.S. Department of Health and Human Services about Head Start—get pushed to register to vote.  In fact, it may be that the Federal Emergency Management Agency even distributes voter-registration materials alongside disaster relief.  And as shown below, all such efforts are impermissibly tailored toward persons who are likely to vote Democratic if they were to register.

10.    But the EO does not stop there—it also tasks federal agencies with spending taxpayer funds on GOTV plans that will increase turnout for Vice President Harris and the Democratic Party.  To do so, the EO enlists a host of leftwing activist groups, who will receive federal money and resources to collaborate with President Biden, Vice President Harris, and the Democratic Party to increase Democratic turnout for the 2024 election.

11.    For instance, one such organization is Demos, which routinely litigates against election integrity measures nationwide.  *Litigation*, Demos, https://www.demos.org/what-we-do/litigation (last visited June 10, 2024).

12.     And the EO is structured to increase voting by noncitizens in 2024, likely including a significant number of illegal aliens, in violation of federal law.  *See* 18 U.S.C. § 611.

13.     Congress is now investigating the EO and the agency actions implementing the EO, collectively referring to these executive actions as "Bidenbucks," while subpoenaing records from fifteen Cabinet Secretaries.  *See, e.g.*, *Chairman Steil Subpoenas 15 Cabinet Members for Documents Related to 'Bidenbucks,'* COMM. ON H. ADMIN. (Jun. 13, 2024), https://tinyurl.com/euh6c7jj; *Chairs Steil, Foxx Blast 'Bidenbucks', New Policy Aimed to Tilt the Scales and Federalize Elections*, COMM. ON H. ADMIN. (Mar. 12, 2024), https://tinyurl.com/4fstpp5t.

14.     The purpose of the EO is deeply cynical.  Elections can be reduced to three basic steps.  Begin with the Citizen Voting Age Population (CVAP), which is the universe of eligible persons.  The first step is, within CVAP, *identify* the persons likely to vote for your candidate if those persons participated in the election.  Second, *register* those persons to vote.  And third, *mobilize* those persons to cast a ballot in the election.  The three basic steps of winning an election can be summed up with the words identification, registration, and mobilization.[1]

---

[1] Gone are the days when the third element of electioneering—mobilization—could be characterized as getting a person to cast a ballot on Election Day.  Now with early voting and mail-in-voting, there is a prolonged election season in the place of an Election Day.

15. This EO seeks to influence each of those elements. The EO negatively impacts CVAP insofar as agency actions implementing the EO open door for noncitizen voting, expanding the universe of potential election participants beyond CVAP. For *identification*, it takes advantage of known party preferences by targeting populations likely to vote for the Democratic Party. For *registration*, it orders a government-wide effort to register those voters using taxpayer funds. And for *mobilization*, on information and belief, the Biden-Harris Administration also plans to focus efforts to mobilize those voters once early voting and vote-by-mail windows open in key States.

16. Thus at every turn, the EO unlawfully encroaches on responsibilities that the Constitution leaves to the States. Were that all the EO did, it would still be a stunning violation of basic constitutional and statutory principles. But the EO is far more dangerous, as it shows the Administration's willingness to ignore legal limits for partisan gains. This lawsuit seeks to stop those unlawful actions.

## PARTIES

17. Plaintiff America First Policy Institute (AFPI) is a nonpartisan, nonprofit corporation established under the laws of the State of Texas, and recognized as an educational and legal organization under Section 501(c)(3) of the Internal Revenue Code. AFPI is domiciled in the Northern District of Texas.

18. Plaintiff Ronny Jackson is a Member of Congress in the U.S. House of Representatives. Congressman Jackson represents the 13th District of Texas in the House. That congressional district includes Amarillo, Texas, where Congressman

Jackson is a resident.  Congressman Jackson is domiciled in the Amarillo Division in the Northern District of Texas.  He is participating in this lawsuit in his capacity as a candidate for office, running for reelection.

19.     Plaintiff Elizabeth Van Duyne is a Member of Congress in the U.S. House of Representatives.  Congresswoman Van Duyne represents the 24th District of Texas in the House, and is domiciled in the Northern District of Texas.  She is participating in this lawsuit in her capacity as a candidate for office, running for reelection.

20.     Plaintiff Elijah Crane is a Member of Congress in the U.S. House of Representatives.  Congressman Crane represents the 2d District of Arizona in the House.  He is participating in this lawsuit in his capacity as a candidate for office, running for reelection.

21.     Plaintiff Barry Loudermilk is a Member of Congress in the U.S. House of Representatives.  Congressman Loudermilk represents the 11th District of Georgia in the House.  He is participating in this lawsuit in his capacity as a candidate for office, running for reelection.

22.     Plaintiff Daniel Meuser is a Member of Congress in the U.S. House of Representatives.  Congressman Meuser represents the 9th District of Pennsylvania in the House.  He is participating in this lawsuit in his capacity as a candidate for office, running for reelection.

23.     Plaintiff Thomas Tiffany is a Member of Congress in the U.S. House of Representatives.  Congressman Tiffany represents the 7th District of Wisconsin in

the House.  He is participating in this lawsuit in his capacity as a candidate for office, running for reelection.

24.     Plaintiff James Daniel Bishop is a Member of Congress in the U.S. House of Representatives.  Congressman Bishop represents the 8th District of North Carolina in the House.  Congressman Dan Bishop is also the Republican nominee for Attorney General in the State of North Carolina.  He is participating in this lawsuit in his capacity as a candidate for office.

25.     Plaintiff Matthew Krause formerly served in the Texas legislature, representing the 93d District in the Texas House of Representatives.  Representative Krause is the Republican nominee for Tarrant County Commissioner Precinct 3.  He is domiciled in the Northern District of Texas.  He is participating in this lawsuit in his capacity as a candidate for office.

26.     Plaintiff Bilal Essayli is an Assemblyman in the California legislature, representing 63d District in the California State Assembly,  He is participating in this lawsuit in his capacity as a candidate for office, running for reelection.

27.     Plaintiff Frank LaRose is the Secretary of State of the State of Ohio.  As such, Secretary LaRose is the chief election officer of Ohio, and his office thus bears part of the administrative burden of voter registration and the conduct of the election process in Ohio.  He is participating in this lawsuit in his official capacity as an election administrator.

28.     Plaintiff Christi Jacobsen is the Secretary of State of the State of Montana.  As such, Secretary Jacobsen is the chief election officer of Montana, and

her office thus bears part of the administrative burden of voter registration and the conduct of the election process in Montana.  She is participating in this lawsuit in her official capacity as an election administrator.

29.    Plaintiff Robert Genetski is the County Clerk of Allegan County in the State of Michigan.  As such, Mr. Genetski is the election administrator in his County, and his office thus bears part of the administrative burden of voter registration and the conduct of the election process in Allegan County.  He is participating in this lawsuit in his official capacity as an election administrator.

30.    Plaintiff Suzanne Pinnow is the Deputy Clerk and Chief Election Inspector of Thornapple, a town in Rusk County, Wisconsin.  As such, Ms. Pinnow conducts elections in Thornapple, including leading a team that counts ballots by hand.  She is participating in this lawsuit in her official capacity as an election administrator.

31.    The Fairfax County Republican Committee is the official body of the Republican Party in Fairfax County, which is the largest County in the Commonwealth of Virginia.

32.    The Michigan Republican Party is the official body of the Republican Party in the State of Michigan.

33.    The Republican Party of Georgia, Inc., is the official body of the Republican Party in the State of Georgia.

34.    The Utah Republican Party is the official body of the Republican Party in the State of Utah.

35.     Legislators Jackson, Van Duyne, Crane, Loudermilk, Meuser, Tiffany, and Essayli each has an interest in being re-elected to their current offices, while Bishop and Krause each has an interest in being elected to the offices for which they are candidates.

36.     LaRose, Jacobsen, Genetski, and Pinnow each has an interest in avoiding unnecessary costs or other increased administrative burdens resulting from unlawful federal agency actions, and has duties regarding the lawful, clean, and efficient administration of elections in their respective jurisdictions that safeguards the statutory and constitutional rights of their constituents.

37.     Republican parties in Virginia, Michigan, Georgia, and Utah have an interest in seeing the candidacies of the candidates nominated by their party not hindered by unlawful modifications to the election environment.

38.     Defendant Joseph R. Biden, Jr., is the President of the United States of America, and issued Executive Order 14019 giving rise to the agency actions at issue here.  He is sued in his official capacity.

39.     Defendant Merrick B. Garland is the Attorney General of the United States, who leads the United States Department of Justice (DOJ).  DOJ is a Cabinet-level agency of the Federal Government.  Various offices and components of DOJ are implicated in the facts of this suit, including the Office of the Associate Attorney General under now-former Associate Attorney General Vanita Gupta; the Civil Rights Division under Assistant Attorney General Kristen Clarke; and the Bureau of Prisons.  Under Attorney General Garland's direction, DOJ is implementing the EO,

including but not limited to the specific facts alleged in this Complaint.  He is sued in his official capacity.

40.    Defendant Debra A. Haaland is the Secretary of the Interior, who leads the United States Department of the Interior (DOI).  DOI is a Cabinet-level agency of the Federal Government.  Various offices and components of DOI are implicated in the facts of this suit, including the Bureau of Indian Education.  Under Secretary Haaland's direction, DOI is implementing the EO, including but not limited to the specific facts alleged in this Complaint.  She is sued in her official capacity.

41.    Defendant Xavier Becerra is the Secretary of Health and Human Services, who leads the United States Department of Health and Human Services (HHS).  HHS is a Cabinet-level agency of the Federal Government.  Various offices, components, and programs of HHS are implicated in the facts of this suit, including the Indian Health Service, Medicaid, and Head Start.  Under Secretary Becerra's direction, HHS is implementing the EO, including but not limited to the specific facts alleged in this Complaint.  He is sued in his official capacity.

42.    Defendant Adrianne R. Todman is the Acting Secretary of Housing and Urban Development, who leads the United States Department of Housing and Urban Development (HUD).  HUD is a Cabinet-level agency of the Federal Government.  Various offices and components of HUD are implicated in the facts of this suit.  Under Acting Secretary Todman's direction, HUD is implementing the EO, including but not limited to the specific facts alleged in this Complaint.  She is sued in her official capacity.

43.     Defendant Miguel A. Cardona is the Secretary of Education, who leads the United States Department of Education (ED).  ED is a Cabinet-level agency of the Federal Government.  Various offices, components, and programs of ED are implicated in the facts of this suit, including Head Start and Federal Work Study (FWS) programs.  Under Secretary Cardona's direction, ED is implementing the EO, including but not limited to the specific facts alleged in this Complaint.  He is sued in his official capacity.

44.     Defendant Alejandro N. Mayorkas is the Secretary of Homeland Security, who leads the United States Department of Homeland Security (DHS).  DHS is a Cabinet-level agency of the Federal Government.  Various offices and components of DHS are implicated in the facts of this suit, including the U.S. Citizenship and Immigration Services (USCIS).   Under Secretary Mayorkas's direction, DHS is implementing the EO, including but not limited to the specific facts alleged in this Complaint.  He is sued in his official capacity.

45.     The United States of America refers to the Departments and agencies of the United States Government in its Executive Branch, given that President Biden in the EO declared that he is tasking every agency in the Executive Branch with implementing the EO with an all-of-government approach, and that a comprehensive listing here would be impractical.  In addition to the Departments enumerated above, "United States of America" here includes all other federal agencies and officers in the United States Government taking, or planning to take, actions to implement the EO, including their agency components, divisions, and offices.  This list includes, but is

not limited to, the following agencies specifically named in the EO, or by White House publications informing the public regarding the EO, or documents obtained by public records requests, along with specific tasks those agencies are ordered to take:  U.S. Department of the Treasury (including the Internal Revenue Service), U.S. Department of Defense, U.S. Department of Agriculture, U.S. Department of Transportation, U.S. Department of Veterans Affairs, Office of Management and Budget, Office of Personnel Management, Social Security Administration, General Services Administration, Small Business Administration, Equal Employment Opportunity Commission, and Institute of Museum and Library Services.  The EO and related documents also direct specific officers of these agencies with executing specific tasks to implement the EO.

46.    Regarding the Department of Defense, however, Plaintiffs do not object to voter registration and voter assistance programs within the United States Military as those programs have historically been administered prior to President Biden's signing of the EO.  Plaintiffs acknowledge that there are longstanding Department practices, regarded by Congress as authorized uses of Defense Department funds, and regarded by States, political parties, state legislatures, election officials, and political candidates as lawful activities by the Pentagon.  Plaintiffs thus do not contest those longstanding efforts by the Department of Defense, but still allege that any changes to those practices subsequent to the EO's issuance are unlawful under the APA and must be enjoined.

47.     For all the federal agencies covered by this suit, the implicated federal officers and employees serving in these agencies are sued in their official capacities only.

## JURISDICTION AND VENUE

48.     This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the Constitution and laws of the United States, and 28 U.S.C. § 1346(a)(2) because Plaintiffs sue the United States, its agencies, and officers, for violating an Act of Congress.

49.     Plaintiffs have a cause of action under the Administrative Procedure Act (APA) pursuant to 5 U.S.C. §§ 702, 706 because the Plaintiffs are adversely affected or otherwise aggrieved by federal agency actions implementing the EO, which are final agency actions as defined by 5 U.S.C. § 704.  Plaintiffs seek equitable relief, having no other adequate remedy, and accordingly seek judicial review of these agency actions.

50.     Plaintiffs' claims for declaratory and injunctive relief seek remedies under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

51.     Venue is appropriate in this judicial district and division under 5 U.S.C. § 703 and under 28 U.S.C. § 1391(e)(1)(B), because the Defendants are agencies of the United States or officers thereof acting in their official capacities, and on information and belief, a substantial part of the events complained of herein occurred in this district and division as described below, as well as under 28 U.S.C. §

1391(e)(1)(C) because four of the Plaintiffs domicile in this district, one of whom is moreover a resident of this division.

## FACTUAL ALLEGATIONS

52.    The Constitution vests the primary responsibility for conducting elections in the States.

53.    The election of state and local officials is governed by state law, as modified only by the specific requirements of the Fourteenth, Fifteenth, Nineteenth, and Twenty-Sixth Amendments to the Constitution.

54.    The Elections Clause of the Constitution governs the election of Members of Congress to both chambers of the federal legislature, and provides that: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators."  U.S. CONST. art. I, § 4, cl. 1.[2]

55.    Congressional elections are thus primarily governed by state legislatures, with a secondary role for Congress.

56.    The Electors Clause of the Constitution governs the election of President of the United States and Vice President of the United States, and provides in relevant part:  "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and

---

[2] The method of electing Senators was modified in 1916 by the Seventh Amendment. *See* U.S. CONST. amend. XVII.  That Amendment's effect on the Elections Clause is not relevant to this lawsuit.

Representatives to which the State may be entitled in the Congress[.]"  U.S. CONST. art. II, § 1, cl. 2.[3]  Under this Clause, Congress is also empowered to set the date on which presidential electors are selected.  *Id.*  Congress has set that date on the same day as congressional elections.  3 U.S.C. § 1.

57.    State legislatures thus have even greater autonomy over presidential elections than they do over congressional elections, though as a practical matter federal elections are held using a unified ballot, so the mechanism for congressional elections establishes the baseline for both.

58.    States are constantly innovating to improve the election process.  In recent years, many States have focused on enacting laws that make it "easy to vote, but hard to cheat."  *See, e.g.*, Election Integrity Act of 2021, Georgia Senate Bill 202 (codified as amended in scattered subsections of GA. CODE. ANN. § 21); *see also* Patrick Marley, *New Voting Laws in Swing States Could Shape 2024 Election*, WASH. POST (Apr. 8, 2024), https://tinyurl.com/WP-Voting-Law-Summary.  These actions are fully consistent with the U.S. Constitution and federal law.

59.    One such federal law is the National Voter Registration Act, Pub. L. No. 103-31, 107 Stat. 77 (1993) (codified at 52 U.S.C. § 20501 *et seq.*) (NVRA).  The NVRA is a carefully crafted legislative compromise balancing ease of voter registration with specific election integrity safeguards.  Various NVRA provisions are relevant to this lawsuit, and are discussed below.

---

[3] The method of electing Presidents was modified in 1804 by the Twelfth Amendment. *See* U.S. CONST. amend. XII.  That Amendment's effect on the Electors Clause is not relevant to this lawsuit.

60.     After it was enacted, the NVRA was promptly implemented through Executive Order 12926, 59 Fed. Reg. 47227 (Sept. 12, 1994).

61.     The combination of the NVRA and Executive Order 12926 shows what the NVRA authorizes, and what it does not.  The statute was the product of a careful compromise.  This Clinton-era statute expanded access to the voter rolls, while also including a new mechanism to clean up those voter rolls now that the floodgates had opened.  *See* 52 U.S.C. § 20507.  This resulted in a significant net increase in voter registration, but it still required reasonable effort on the parts of voters, along with state and local officials, to achieve a careful balance of making it easy to vote, but hard to cheat.

### *Biden and Democrats Fail to Change Federal Election Law*

62.     That is, until the EO.  It is a brazen effort to upset the balance codified in the NVRA by changing the rules governing elections, in line with Democrats' thus-far unsuccessful efforts to achieve major policy change through the legislative process.  It is a circumvention of the legislative process and is being done for the partisan objective of securing political victories for one political party.

63.     Shortly after the EO, President Biden and Congressional Democrats attempted a sweeping federal takeover of elections, but that effort failed.  *See* H.R. 1, 117th Cong. (2021) (as passed by House, Mar. 3, 2021).

64.     After that failed, President Biden and Congressional Democrats attempted to make the District of Columbia a State, but couldn't clear the 50-50 Senate.  H.R. 51, 117th Cong. (2021) (as passed by House, Apr. 22, 2021).  Had they

succeeded, they might have been able to pass H.R. 1, with its attendant takeover of federal elections.

65.     President Biden and his supporters have also tried to achieve their electoral ends by calling for widespread amnesty for illegal aliens with a path to citizenship for these illegal aliens.  Andrea Castillo & Cindy Carcamo, *Biden to Offer Legal Status to 11 Million Immigrants, Plans to Stop Border Wall Construction*, L.A. TIMES (Jan. 20, 2021), https://tinyurl.com/LA-Times-Immigration-Plan.  Had that legislation passed, those noncitizens would have become lawful citizens with the legal right to vote.  But that legislation failed, and it is unlawful to replicate the would-be result through executive action.

66.     Many of these illegal aliens would be expected to vote for Vice President Harris and the Democratic Party if they had the opportunity to cast votes.  *See* Eileen Patten & Mark Hugo Lopez, *Are Unauthorized Immigrants Overwhelmingly Democrats?*, PEW RSCH. CTR. (July 22, 2013), https://tinyurl.com/Pew-Alien-Polls.  If Congress and the President would enact legislation conferring citizenship, then those new citizens would have the legal right to vote for whomever they choose.  But without legislation, those individuals remain noncitizens, and therefore cannot vote.

### *President Biden Opts for Executive Action*

67.     Each of these legislative attempts failed.  Even before it was clear no legislation would pass Congress, President Biden's EO became an attempt to partially achieve the same federal election takeover with pen-and-phone that the American people's elected representatives rejected.

19

68.    To accomplish these goals, the EO imposes many requirements on federal agencies.  For instance, the EO directs the head of each federal agency to "promote voter registration and voter participation."  *Id.* § 3(a).  To do so, the EO directs all agencies to increase voter registration, including "soliciting and facilitating approved, nonpartisan third-party organizations and State officials to provide voter registration services on agency premises."  *Id.* § 3(a)(iii)(C).

69.    The EO also directs federal agencies to promote voting by mail.  *Id.* §§ 3(a)(i), (iii), (iii)(A), (iii)(C).

70.    The EO further directs federal agencies to work directly with applicants in requesting vote-by-mail ballots.  *Id.* § 3(a)(iii)(B).  The EO directs all agencies to engage in GOTV activities and programs, including with federal employees.  *Id.* § 3(a) ("The head of each agency shall … promote … voter participation"); *see also id.* § 6 (federal employee participation).

71.    The EO also directs the Attorney General to encourage incarcerated criminals—many of whom are ineligible to cast ballots—to vote.  *Id.* § 9.[4]

72.    The EO directs the Attorney General to encourage felons who are no longer incarcerated—many of whom are ineligible to cast ballots—to vote.  *Id.* § 9.

73.    The EO directs all agencies to submit their plans for implementing the EO to the White House by September 23, 2021, for approval.  *See id.* § 3(b).

---

[4] Although the EO's language is limited to "eligible individuals," the agency actions implementing it creates the risk of a significant number of ineligible individuals actually registering.

20

### *Impact on States*

74.     Through the EO, federal agencies have caused many individuals in Texas to register to vote.

75.     These agency actions taken pursuant to the EO have occurred in Texas and they have substantially influenced the operation of elections in Texas.

76.     But Texas's voter registration system does not include any role for the President or the Executive Branch of the Federal Government to participate in or engage with voter registration in the State of Texas.[5]

77.     Individuals in Ohio and Wisconsin have likewise been registered to vote as a result of agency actions implementing the EO.

78.     The EO has resulted in agency actions by Defendants that have substantially influenced the operation of elections in Ohio and Wisconsin.

79.     Defendants have implemented their voter-registration programs throughout the Nation, including Texas, Ohio, and Wisconsin.

80.     But, as with Texas, the voter registration systems in Ohio and Wisconsin do not include any role for the President or the Executive Branch of the Federal Government—with the exception of voter registration efforts in military recruiting offices—to participate in or engage with voter registration in the States of Ohio and Wisconsin.

---

[5] The only limited exception here is for voter registration efforts in military recruiting offices.

81.     On information and belief, besides infringing on State responsibilities, many of the agency actions resulting from the EO have increased the administrative burden on States, election administrators, candidates for office, and political parties.

82.     The U.S. Election Assistance Commission (EAC) "is an independent, bipartisan commission whose mission is to help election officials improve the administration of elections and help Americans participate in the voting process." *About the EAC*, U.S. Election Assistance Comm'n, https://www.eac.gov/about. Congress created the EAC in the Help America Vote Act of 2002, Pub. L. No. 107-252, 116 Stat. 1666 (HAVA).

83.     The EAC has issued an advisory opinion stating that election officials are prohibited from using federal funds to conduct "voter registration drives." Neither Sections 101 nor 251 of the EAC's advisory opinion provides that "funds may be used to conduct voter registration drives or get out the vote efforts; including advertising for the event, setting up booths, and paying salaries of employees who register new voters."   U.S. Election Assistance Commission Funding Advisory Opinion  FAO-08-005,  https://www.eac.gov/sites/default/files/document_library/files/ FAO-08-005_EAC_1.pdf.

### *Biden-Harris Administration's Ideologically Partisan Partners*

84.     The EO requires federal agencies to identify and partner with ideologically partisan third-party organizations chosen by the Biden-Harris

Administration, many of whose names and roles are willfully withheld from the public.[6]

85.     Although these names are withheld, public reporting confirms that the Administration is working with left-leaning organizations.  For instance, one media report states that:  "On July 12, 2021, the Justice Department held a 'listening session' with outside activists working on voting rights.  The group included dozens of people, all of them from left-leaning groups.  There were 10 from the American Civil Liberties Union, five from the Campaign Legal Center, three from Demos, three from the Southern Poverty Law Center, five from the Leadership Conference on Civil Rights, two from Black Lives Matter, and many others."  Byron York, *Joe Biden's secret voter plan*, WASH. EXAMINER (Sept. 12, 2022), https://tinyurl.com/zks6vafw (citing FOIA email, https://thefga.org/wp-content/uploads/2022/09/CRT-9-8-22-Production-FGA_section-17.pdf).

86.     Additionally,  "the  White  House  announced  that  an interagency Information Integrity Research and Development Working Group will develop and release a first-of-its-kind strategic plan concerning government-wide research and development to better understand the full information ecosystem; design strategies for preserving information integrity and mitigating the effects of information manipulation, including mis- and disinformation; support information

---

[6] While many of these organizations are nominally nonpartisan because of their nonprofit status, they are clearly and openly aligned with advancing the election of leftwing Democrats, openly adhering to ideologies of the more liberal elements of the Democratic Party.

awareness and education; and foster a multi-disciplinary and collaborative research environment." Ex. A, The White House, *FACT SHEET: The Biden-Harris Administration is Taking Action to Restore and Strengthen American Democracy* (Dec. 8, 2021) ("*Dec. 2021 Fact Sheet*"), https://www.whitehouse.gov/briefing-room/statements-releases/2021/12/08/fact-sheet-the-biden-harris-administration-is-taking-action-to-restore-and-strengthen-american-democracy/.

87.    Federal campaign finance laws apply to private parties' voter-registration activities.  11 C.F.R. § 100.133.

### *Vice President Harris Admits Democrats' Agenda for EO*

88.    Notwithstanding the efforts of the Administration to obfuscate and conceal agency actions to implement the EO, numerous details have emerged regarding specific agency actions, many of which violate the APA.

89.    For instance, Vice President Kamala Harris recently admitted that the purpose of the EO is "to try to boost turnout among key voting blocs this November," flatly admitting that the EO and its implementing agency actions are to give Democrats—including Vice President Harris—a partisan advantage.  Eugene Scott, *VP Harris to announce Biden team's plans to boost voting access*, AXIOS (Feb. 27, 2024), https://tinyurl.com/nu77tch6.

90.    The "Democratic plan"—Axios's description when conferring with sources for the article—is to counteract recent Supreme Court decisions that uphold the rule of law, but which President Biden and Vice President Harris consider unfavorable to Democrats.  *See id.*

24

91.    For instance, the EO encourages and facilitates voting among individuals who are not proficient in English.  *Id.*

92.    Statistically, such voters favor Democrats.  Ambreen Ali, *Parties Contest Election-Monitoring Techniques*, ROLL CALL (Nov. 28, 2011), https://tinyurl.com/4vzwtjzp ("[N]on-English speakers … tend to back Democrats at the polls.").

93.    Additionally, the Biden-Harris Administration "will allow federal employees to take off work on Election Day" or give them time off to do so prior to Election Day.  *Id.*; *accord* EO § 6.

94.    Statistically, many civilian federal employees vote for Democrats.  *Cf.* Robert Schmad, *Federal Employees' Political Donations Largely Went to Biden, Other Democrats in 2023*, DAILY SIGNAL (Jan. 5, 2024), https://tinyurl.com/DS-Emp-Donation-Comparison.  While employees can vote for whomever they choose, that partisan preference means that this provision of the EO would provide an advantage to the Democratic Party.

95.    The Biden-Harris Administration's ideological partners estimate that the EO will result in 3.5 million additional voters based on the likely efforts of just seven agencies.  Demos, *Federal Agency Voter Registration Estimates of Annual Impact*, 1 (Feb. 2023), https://tinyurl.com/Demos-FAVREOAI-Archive.

### *Pre-Inauguration Origins of the EO*

96.    The partisan nature of the EO is no surprise, as planning for the EO began before President Biden and Vice President Harris even took office, with

25

partisan and ideological organizations leaking details of their discussions and planning with the incoming Biden-Harris Administration.

97.     One such organization is Demos, a liberal organization that pushes for election policies that favor the Democratic Party.   For example, Demos litigates against election-integrity measures like cleaning up voter rolls under NVRA § 8.  *See, e.g.*, *Bellito v. Snipes*, 935 F.3d 1192 (11th Cir. 2019).   Former President Barack Obama is a founding board member of Demos.   Barbara J. Lucas, *Unabashed Radicals: The Mission of Demos, Elizabeth Warren's Favorite Left-wing Group*, CAPITAL RSCH. CTR. (July 3, 2014), https://tinyurl.com/CRC-Demos-Mission-Summary.   Demos receives money tied to megadonor George Soros, well known for supporting leftwing causes.    *See Demos*, INFLUENCE WATCH, https://www. influencewatch.org/non-profit/demos/ (last visited June 10, 2024).

98.     On December 3, 2020, Demos published a strategy proposal for coordinated executive actions regarding elections.  *See Executive Action to Advance Democracy: What the Biden-Harris Administration and the Agencies Can Do to Build a More Inclusive Democracy*, DEMOS (Dec. 3, 2020), https://tinyurl.com/Demos-EO-Recommend (last accessed to May 5, 2024).

99.     This document is a "road map" for how executive power could be used to advance the Left's agenda.   Heritage Oversight Project, *Memorandum: New Document Highlights Partisan Application of Biden's FedGov Get-Out-The-Vote Operation* 1, HERITAGE FOUND. (May 1, 2024), Ex. B.

100.    Demos claims credit for the EO, stating: "Today's Executive Order is an important step forward on an initiative Demos promoted as a priority for the Biden-Harris administration during the presidential transition and has been a focal point of our work for years." @Demos.org, X (formerly Twitter) (Mar. 7, 2021, 12:24 PM), https://twitter.com/Demos_Org/status/1368613436318511109 (last accessed May 5, 2024), Ex. C.

101.    Demos added: "Demos' work with state agencies provides clear evidence of the potential impact of agency-based registration.  It can add *millions* of eligible persons to the voting rolls." @Demos.org, X (formerly Twitter) (Mar. 7, 2021, 12:24 PM), https://twitter.com/Demos_Org/status/1368613080754700288 (emphasis added) (last accessed May 5, 2024), Ex. D.

102.    On March 7, 2024, Demos indicated that the agencies implementing the EO were on track to deliver Democrat votes per the 2021 strategy, highlighting that it would target "people of color, people with low incomes, students and young people, and Native communities."  Ashley Tjhung, *Expanding Voter Registration: Reflections on the Voting Access Executive Order*, DEMOS BLOG (Mar. 7, 2024), https://www.demos.org/blog/expanding-voter-registration-reflections-voting-access-executive-order.

103.    Demos cites as "examples of progress on the executive order," Indian Health Services' ("IHS") designating a facility in Arizona as one of five pilot voter registration locations, and ED's issuing a Toolkit for Promotion of Voter Registration for Students.  *Id.*

104.    Arizona is a target State for the Harris campaign.   *See* Hadriana Lowenkron, *Biden Aims to Defend Nevada, Arizona in Western Campaign Swing*, BLOOMBERG (Mar. 18, 2024), https://tinyurl.com/B-Arizona-Campaign.

### ***Key Players Installed at the Justice Department***

105.    Another private organization working with the Biden-Harris Administration in the development and implementation of the EO is the Leadership Conference on Civil and Human Rights.   Ex. B, Heritage Oversight Project, *Memorandum: New Document Highlights Partisan Application of Biden's FedGov Get-Out-The-Vote Operation*, App. 117 HERITAGE FOUND. (May 1, 2024) [Heritage App.].

106.    Now-former Associate Attorney General Vanita Gupta is also the former Chief Executive Officer of the Leadership Conference on Civil and Human Rights. *Former Associate Attorney General Vanita Gupta*, DEP'T OF JUST., https://tinyurl.com/Gupta-Justice-Profile (last visited June 10, 2024).

107.    Biden-Harris Administration emails and records obtained under the Freedom of Information Act (FOIA) reveal that DOJ officials in the Office of the Associate Attorney General were involved in the implementation of the EO, led by an official who formerly led one of these leftwing organizations.   Ex. B Heritage App. 118.

108.    Another private organization working with the Biden-Harris Administration in the development and implementation of the EO is the Lawyers' Committee for Civil Rights.   Ex. B Heritage App. 117.

109.   Assistant Attorney General for Civil Rights Kristen Clarke is the former Chief Executive Officer of the Lawyers' Committee for Civil Rights, yet another of these leftwing organizations. *Assistant Attorney General Kristen Clarke*, DEP'T OF JUST., https://www.justice.gov/crt/meet-assistant-attorney-general (last visited June 10, 2024).

110.   Biden-Harris Administration emails and records obtained under the Freedom of Information Act (FOIA) reveal that DOJ officials in the Civil Rights Division were involved in the implementation of the EO.  Ex. B Heritage App. 118.

111.   The Biden-Harris Administration (including the Executive Office of the President and DOJ) held a "listening session" on the implementation of the EO on July 12, 2021.  York, *supra*, ¶ 85.

### *Leftwing Coalition Targets Key Agency Programs for Partisan Gain*

112.   In addition to Demos, the Leadership Conference on Civil and Human Rights, and the Lawyers' Committee for Civil Rights, other participants in this "listening session" included: American Civil Liberties Union (ACLU); AFL-CIO; AFSCME; Black Voters Matter; Brennan Center for Justice at NYU; Campaign Legal Center; Common Cause; Democracy Fund; End Citizens United/Let America Vote; Fair Elections Center; FairVote; League of Women Voters; NAACP; National Action Network; National Education Association; National Urban League; Open Society Policy Center; People for the American Way; Southern Poverty Law Center (SPLC); and UnidosUS.  Ex. B, Heritage App. 114–16.

113.    The agenda for this meeting included the item "Brnovich fixes," as in *Brnovich v. DNC*, 141 S. Ct. 2321 (2021).  Ex. B, Heritage App. 117.

114.    *Brnovich* was a major defeat for the Democratic Party's preferred election policies, preferred because they gave that party political advantages.  *See* Ex. B, Heritage App. 5.

115.    Another agenda item was "Voting rights for those incarcerated in federal custody," Ex. B, Heritage App. 117.  Participants discussed targeting incarcerated criminals for registration and voting.  *Id.* at 3 & App. 1.  Felons statistically are more likely to vote Democratic.  Christopher Uggen & Jeff Manza, *Democratic Contraction? Political Consequences of Felon Disenfranchisement in the United States*, 67 AM. SOCIOLOGICAL REV. 777, 787 tbl.1 (2002).

116.    Under "Affirmative opportunities for voter registration," a speaker for the ACLU addressed pushing registration through HHS, the Internal Revenue Service, and the Social Security Administration; while a speaker for Demos addressed pushing registration through federal immigration services, HUD, and IHS.  Ex. B, Heritage App. 5–6.

117.    Head Start is a welfare program administered by HHS for low-income families.  *Head Start Services*, DEP'T OF HEALTH & HUM. SERVS. (June 30, 2023), https://www.acf.hhs.gov/ohs/about/head-start.  The ACLU advocated targeting Head Start participants for voter registration efforts.  Ex. B, at 3 & App. 5.

118.   The ACLU also advocated targeting Social Security beneficiaries for voter registration efforts because "[t]hey are lower-income and have disabilities."  Ex. B, Heritage at 3 & Heritage App. 5.

119.   First-generation naturalized immigrants are more likely to vote Democrat.  Anna Maria Mayda, Giovanni Peri & Walter Steingress, *Immigration to the U.S.: A Problem for the Republicans or the Democrats?* 5 (Nat'l Bureau of Econ. Rsch., Working Paper No. 21941, 2016).

120.   HUD housing beneficiaries are more likely to vote Democrat.  *See* Benedictis-Kessner, Daniel Jones & Christopher Warshaw, *How Partisanship in Cities Influences Housing Policy*, AM. J. POL. SCI. 7 n.7 (Mar. 23, 2024), https://onlinelibrary.wiley.com/doi/10.1111/ajps.12856 ("[L]eft-leaning local elected officials strategically increase the number of left-leaning voters, largely by building more public housing."); Emily Ekins, *What Americans Think About Poverty, Wealth, and Work* 78, CATO INST. (2019), https://tinyurl.com/CATO-PWW-Study (polling welfare recipients).

121.   Demos advocated targeting HUD beneficiaries for voter registration efforts because they are low-income.   Ex. B, Heritage Oversight Project, Memorandum, at 3 & Heritage App. 6.

122.   American Indians (meaning Native Americans or indigenous people) are more likely to vote Democrat.  Gabriel R. Sanchez & Raymond Foxworth, *Native Americans Support Democrats over Republicans Across House and Senate Races*, BROOKINGS (Nov. 15, 2022), https://tinyurl.com/24yfz7ae. .

31

123.    A Native American Rights Fund spokesperson recommended targeting Native American food distribution sites for voter registration.  Ex. B, Heritage Oversight Project, Memorandum, at 3 & Heritage App. 4.

### *Experts Analyze EO and its Proponents*

124.    As the Heritage Foundation noted, "Every participant whose party affiliation or political donation history could be identified by the Oversight Project was identified as a Democrat except for one Green Party member."  Ex. B, Heritage Oversight Project, Memorandum, at 2.[7]

125.    The Heritage Foundation concludes "that the E.O. is a partisan voter mobilization effort by the Biden-Harris Administration to use the Federal Government and its resources in order to support targeted, partisan voter mobilization efforts and get-out-the-vote (GOTV) operations—an attempt to influence the outcome of future elections through the use of federal resources, infrastructure, and reach."  Ex. B, Heritage Oversight Project, Memorandum, at 3.

126.    GOTV efforts are thus inherently political on a practical level, and thus ineluctably favor one party over another rather than generically increase voter participation in a neutral manner.  Studies show that "outreach activity by political

---

[7] For examples by way of contrast, participants did not include the National Rifle Association, which might be helpful in registering gun owners to vote, nor the Family Research Council, which could have supported voter registration efforts in Evangelical churches, nor the Business Roundtable, which might be helpful in enlisting the help of business leaders.  The list of participants did not include advocates of religious freedom like First Liberty Institute, nor proponents of reducing regulations like the Club for Growth, nor proponents of reducing taxes like the National Taxpayers Union, nor those who educate the Nation on the importance of secure borders like America First Policy Institute (AFPI)—a Plaintiff here.

campaigns, including door to door canvassing, phone banking, direct mail, and even advertising, has basically no effect on voters' choice of candidate in general elections." Dylan Matthews, *A massive new study reviews the evidence on whether campaigning works. The answer's bleak.*, VOX (Sept. 28, 2017 8:00 AM), https://tinyurl.com/4nn9z28f (citing Joshua Kalla & David E. Broockman, *The Minimal Persuasive Effects of Campaign Contact in General Elections: Evidence from 49 Field Experiments*, 112 AM. POL. SCI. REV. 148 (2017)).

127.   Instead, the Kalla & Broockman study claims that GOTV programs boost turnout by "voters whose minds are already made up." *Id.*

128.   In other words, if GOTV resources are devoted to a county where Democrats significantly outnumber Republicans, then the GOTV activities will generate proportionately more Democrat votes than Republican votes, and thus increase Democrats' advantage statewide (or districtwide for elections that are not statewide in scope), because only equal resources in equally Republican-majority counties would offset the partisan advantage to restore parity across the relevant electorate.

### *"Zuckbucks" Convert Plan into Practice*

129.   Take as one example GOTV efforts from one nonprofit organization, the Center for Tech and Civic Life (CTCL).   That organization is funded by Mark Zuckerberg, the founder of Facebook.   Editorial, *Zuckerbucks Shouldn't Pay for Elections*, WALL ST. J. (Jan. 3, 2022), https://tinyurl.com/WSJ-Zuckerburg-CTCL [hereafter *Zuckerbucks*].

33

130.   A key strategist in Zuckerberg's universe is David Plouffe.  Plouffe was the campaign manager of President Barack Obama's 2008 election campaign.  *David Plouffe*, OBAMA PRES. CTR., https://www.obama.org/about/leadership/david-plouffe/ (last visited June 10, 2024).  Between his success with the Obama campaign and his taking a senior role at CTCL, in 2015, Plouffe authored a book, *A Citizen's Guide to Beating Donald Trump* (2020), which explained how to target voter registration and GOTV efforts to give the Democratic Party an advantage over the Republican Party, especially in key swing States in the presidential election.  Then from 2017–19, Plouffe was head of policy and advocacy for the organization named for Zuckerberg and his wife, the Chan Zuckerberg Initiative.  *CZI Announces David Plouffe to Lead Policy and Advocacy Work*, Chan Zuckerberg Initiative (Jan. 20, 2017), https://tinyurl.com/yc7d28ux.  In 2019, he stepped down to a part-time role as a strategist.  Kurt Wagner, *David Plouffe Moves to Part-Time Role at Zuckerberg Philanthropy*, BLOOMBERG (Oct. 10, 2019), https://tinyurl.com/3w9w2tkv.

131.   In 2020, the Chan Zuckerberg Initiative cumulatively donated around $300,000 to CTCL, which was spent on election administration.  Michael Scherer, *Mark Zuckerberg and Priscilla Chan Donate $100 Million More to Election Administrators, Despite Conservative Pushback*, WASH. POST (Oct. 13, 2020), https://tinyurl.com/3yrn9wn6; Tom Scheck, Geoff Hing, Sabby Robinson & Gracie Stockton, *How Private Money From Facebook's CEO Saved The 2020 Election*, Nat'l Pub. Radio (Dec. 8, 2020), https://tinyurl.com/yc2s83wt.

132.   As the Attorneys General for sixteen States (West Virginia, Indiana, Arkansas, Georgia, Idaho, Iowa, Kansas, Mississippi, Montana, Nebraska, North Dakota, South Dakota, South Carolina, Oklahoma, Texas, and Utah) explained as an example in a letter objecting to the EO:

> In Georgia, CTCL gave grants to election offices in counties that went to President Biden and counties that went to President Trump, favoring no one.  But CTCL's 10 biggest grants per capita all went to counties that Biden won, 6 of which are part of the greater Atlanta metropolitan area.  Not surprisingly, these 10 counties gave Biden 60 percent (1.49 million votes) of his statewide total in Georgia, and nearly 378,000 votes over 2016 Democrat turnout.  Trump, however, only received 691,000 votes in these counties in 2020, an increase of just 92,000 votes over his 2016 performance.  Funding disparities seem to have achieved similar results in other battleground states.   So CTCL's non-partisan designation seems like a lie because it concentrated in areas that helped Democrats most.

Ex. E, Letter from W. Va. Att'y Gen. Patrick Morrisey *et al.* to Asst. Sec. Nasser H. Paydar, Off. Postsecondary Educ., U.S. Dep't of Educ. (Apr. 2, 2024), https://ago.wv.gov/Documents/Correspondence%20re%20Work%20Study%20Guidance.pdf (footnotes and internal quotation marks omitted) (AG Ltr.)

133.   As the Attorneys General conclude: "In other words, laudable activities like encouraging voter turnout and registering voters have to happen somewhere, and that somewhere decides elections." *Id.*

134.  Such private funding is often referred to as "Zuckerbucks" or "Zuckbucks" because of the significant impact that CTCL had in the 2020 election with Mark Zuckerberg's financial support. *Zuckerbucks*, *supra,* ¶ 116.

135.    After investigating this issue, at least twenty-seven States have banned private dollars being used to fund election activities, both for voter registration activities and GOTV activities.  Matt Vasilogambros, *28 States Have Banned or Restricted Private Funds for Elections*, GOVERNING (Apr. 29, 2024), https://tinyurl.com/Ban-Private-Funds-Elections.

136.    The EO and agency actions implementing it are a massive expansion of Zuckbucks, replacing privately paid workers with taxpayer-funded federal government employees and contractors, using the vastly superior reach, resources, and credibility of the Federal Government.  As explained below, such actions provide a partisan advantage to Vice President Harris and the Democratic Party in elections.

137.    GOTV programs consume tremendous resources, with one cost estimate at $60 per vote resulting from the efforts.  AG Ltr., *supra*, ¶ 132.

138.    In Congress, the House Committee on Oversight and Accountability is demanding answers and documentation from the Biden-Harris Administration, asserting that the Administration does not have legal authority to implement this EO.  *See* Ex. F, Letter from Chairman James Comer, House Oversight Comm., et al. to Dir. Shalanda Young, Off. Mgmt. & Budget (May 13, 2024), https://oversight.house.gov/wp-content/uploads/2024/05/Letter-to-OMB-Biden-EO-051324.pdf.

139.    The concerns in that letter remain unresolved.

### *Growing Danger of Noncitizen Voting*

140.    Another significant danger posed by the EO is noncitizens participating in U.S. elections, quite possibly altering the outcome of close races.

141.    Since President Biden and Vice President Harris took office, "at least 11 million illegal aliens have entered the United States."  Ex. G, Letter from Amb. J. Kenneth Blackwell & Michael D. Berry, Am. First Pol. Inst. (AFPI), to Ohio Sec. of State Frank LaRose (May 20, 2024) (thanking Secretary LaRose for addressing this issue) (AFPI Ltr.))

142.    Media outlets report that forty-nine States provide voter registration forms to migrants without requiring proof of citizenship.  Josh Christenson, *How Non-Citizens Are Getting Voter Registration Forms Across the US—and How Republicans Are Trying to Stop It*, N.Y. Post (June 14, 2024), https://tinyurl.com/334s6da7.

143.    At least nineteen States—plus Washington, D.C.—allow illegal aliens to obtain driver's licenses.  Nat'l Conf. of State Legislatures, *States Offering Driver's Licenses to Immigrants*, (updated Mar. 13, 2023), https://www.ncsl.org/immigration/states-offering-drivers-licenses-to-immigrants.

144.    DHS admits that under the Biden-Harris Administration's current policies, illegal aliens in this Nation from certain countries can be granted parole status, and Attorney General Garland is granting that parole status to many of them. *Texas v. Dep't of Homeland Security*, Civ. No. 6:23-cv-7, 2024 WL 1021068, at *3–4 (S.D. Tex. Mar. 8, 2024).

145.   Receiving parole status allows those noncitizens to obtain a Social Security Number (SSN) and driver's license.  Ex. G, AFPI Ltr.; *see also Texas*, 2024 WL 1021068, at *9–10.

146.   The Help America Vote Act, Pub. L. No. 107-252, 116 Stat. 1666 (2002) (codified at 52 U.S.C. § 20901 *et seq.*) (HAVA), provides that either an SSN or a driver's license is sufficient identification to register to vote.  52 U.S.C. § 21083.

147.   It is illegal for noncitizens to cast ballots in a statewide election, but there is no enforcement mechanism to enforce that prohibition.  Ex. G, AFPI Ltr.

148.   This lack of enforcement capability is due in part to the Biden-Harris Administration's not providing States with unrestricted access to comprehensive federal resources like SAVE, a database on immigration status maintained by the U.S. Citizenship and Immigration Services, a component of DHS.  SAVE, U.S. Citizenship & Immigration Servs., https://www.uscis.gov/save.

149.   Consequently, these actions, when coupled with other noncitizen eligibility agency actions discussed herein, create the result that the EO virtually guarantees that noncitizens—including aliens who are in this Nation unlawfully—are on the voter rolls in unknown numbers, increasing those numbers above what they would be but for the EO and federal agencies' implementing actions.

### *Agency Actions Implementing EO*

150.   As demonstrated below, many federal agencies have taken final actions to implement the EO, thereby violating federal law and the Constitution.

### Department of Agriculture (USDA)

151.   The U.S. Department of Agriculture's (USDA's) "Rural Housing Service will encourage the provision of nonpartisan voter information through its borrowers and guaranteed lenders, who interface with thousands of residents in the process of changing their voting address every year." Ex. H, The White House, *FACT SHEET: Biden-Harris Administration Promotes Voter Participation with New Agency Steps* (Sept. 28, 2021) ("*Sept. 2021 Fact Sheet*"), https://www.whitehouse.gov/briefing-room/statements-releases/2021/09/28/fact-sheet-biden-administration-promotes-voter-participation-with-new-agency-steps/.

152.   USDA's "Rural Development agencies—which are spread throughout field offices across the country where rural Americans can apply for housing, facilities, or business assistance—will take steps to promote access to voter registration forms and other pertinent nonpartisan election information among their patrons." Ex. H, *Sept. 2021 Fact Sheet*.

153.   USDA "will enhance efforts to promote access to voting by encouraging all USDA agency field offices to make nonpartisan information about voter registration available in customer service locations, which exist across the country in thousands of rural, suburban, and urban communities." Ex. I, The White House, *FACT SHEET: The Biden-Harris Administration Continues to Promote Access to Voting*, (Mar. 5, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/05/fact-sheet-the-biden-harris-administration-continues-to-promote-access-to-voting/ (*Mar. 2023 Fact Sheet*).

154. The USDA is engaged in voter registration outreach through its child nutrition programs, including SNAP and WIC. Tina Namian, U.S. Dep't of Agric., *Promoting Access to Voting through the Child Nutrition Programs*, Pol'y & Program Dev. Div. (Mar. 23, 2022), https://fns-prod.azureedge.us/sites/default/files/resource-files/SP07-2022CACFP06-2022SFSP02-2022os.pdf.

155. In response to the EO, the USDA has issued letters to state agencies administering SNAP and WIC programs, including those located in the State of Texas, instructing them to carry out voter-registration activities with federal funds. *See* Ex. M, The White House, *Fact Sheet: Biden-Harris Administration Releases Report on Native American Voting Rights* (Mar. 24, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/03/24/fact-sheet-biden-harris-administration-releases-report-on-native-american-voting-rights/ (*Mar. 2022 Fact Sheet*).

156. SNAP recipients are lower-income and tend to vote for Democrats. Rich Morin, *The Politics and Demographics of Food Stamp Recipients*, Pew Rsch. Ctr. (July 12, 2013), https://tinyurl.com/Pew-FS-Partisanship.

157. Moreover, many noncitizens are eligible to receive SNAP benefits. U.S. Dep't of Agric., *SNAP Eligibility for Non-Citizens*, Food & Nutrition Serv., https://www.fns.usda.gov/snap/recipient/eligibility/non-citizen (last visited July 10, 2024).

158. USDA's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

### *Department of Defense (DOD)*

159.   DOD has traditionally provided distinctive support for voter registration and absentee ballot processing for uniformed military personnel.  Plaintiffs do not contest the legality of such programs as they existed prior to the EO.

160.   However, Plaintiffs contest DOD actions implementing the EO, extending the aims of the EO throughout the Department.

161.   As one example, DOD says it "will support a comprehensive approach to information and voting awareness for servicemembers and civilian personnel voting at home, in addition to the structure currently assisting members of the military stationed away from home and citizens overseas." Ex. H, *Sept. 2021 Fact Sheet*.

162.   "The Department will develop materials in additional languages and send nonpartisan information at regular intervals before federal elections to ensure that eligible servicemembers and their families—particularly first-time voters—have opportunities to register and vote if they wish." Ex. H, *Sept. 2021 Fact Sheet*.

163.   "The Federal Voting Assistance Program, which works to ensure Service members and overseas citizens have access to voting, will make the Federal Post Card Application (FPCA) for voter registration or ballot request and the Federal Write-in Absentee Ballot (FWAB) available in seven languages." Ex. I, *Mar. 2023 Fact Sheet*.

164.   "Additionally, in February 2023, the Department began the Effective Absentee Systems for Elections (EASE) grant program to provide state and local election offices with funding to increase the percentage of ballots successfully returned by Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA)

voters, reduce the failure rates for UOCAVA voters, and establish and maintain a pipeline of ideas, techniques, and best practices of election officials and the services they provide for UOCAVA voters." Ex. I, *Mar. 2023 Fact Sheet*.

165.    For the reasons explained elsewhere in this Complaint, Plaintiffs challenge the legality of GOTV plans at DOD, which apparently are not yet accessible by the public.

166.    DOD's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

### *Department of Education (ED)*

167.    ED has prepared "a tool kit of resources and strategies for increasing civic engagement at the elementary school, secondary school, and higher education level, helping more than 67 million students—and their families—learn about civic opportunities and responsibilities." Ex. H, *Sept. 2021 Fact Sheet*.

168.    ED prepared a toolkit entitled "Promotion of Voter Participation for Students" that focuses on both postsecondary and secondary institutions.  Ex. J, *U.S. Dep't of Educ. Toolkit for the Promotion of Voter Participation for Students* (Feb. 26, 2024), ("*ED Toolkit*"), https://www2.ed.gov/documents/press-releases/student-voter-toolkit.pdf?emci=4c608cc8-ded4-ee11-85f9-002248223794&emdi=0e9b3148-f0d4-ee11-85f9-002248223794&ceid=3370209.

169.    Claiming that "facilitating the voting process for all students in their postsecondary educational experience" is properly part of ED's operations and an appropriate use of ED funding, ED is promoting a "toolkit" focused on helping

"students, especially students of color, Native American students, English learners, students with disabilities, and other underserved students," asserting that such students "confront significant obstacles to exercising this fundamental right." Ex. J, *ED Toolkit*.

170.   Statistically, the groups singled out for special attention by that letter vote mostly for Democrats, providing a partisan advantage to the Democrat Party and its candidates (including Vice President Harris).   *Cf. Changing Partisan Coalitions in a Politically Divided Nation*, PEW RSCH. CTR., 13–23 (Apr. 9, 2024), https://tinyurl.com/Pew-Changing-Coalitions.

171.   ED adds, "The Department will also remind educational institutions of their existing obligation and encourage institutions to identify further opportunities to assist eligible students with voter registration." Ex. H, *Sept. 2021 Fact Sheet*.

172.   Liberal groups are criticizing ED's lack of speed in implementing the EO, suggesting that ED has "fail[ed] to commit to integrate voter registration into the Free Application for Federal Student Aid (FAFSA) process and [has] fail[ed] to follow through on some of the more modest commitments it already made."  Ex. K, ACLU, *Strengthening Democracy: A Progress Report on Federal Agency Action to Promote Access to Voting* 8 (Mar. 1, 2023) ("*ACLU Progress Report*"), https://civilrights.org/wp-content/uploads/2023/03/ProgressReport_VotingAccess.pdf.

173.   The Biden-Harris Administration acknowledges that they are targeting college students.  For example: "By the end of March [2023], the Department of Education will use StudentAid.gov to help connect borrowers to voter registration

services by linking to vote.gov.  StudentAid.gov is the Department's primary customer website about postsecondary education.  With more than 355 million visits in 2022, StudentAid.gov provides critical information and tools for students, families, and borrowers as they prepare and plan for college, apply for and receive federal student aid, and repay student loans.  Building off guidance issued in April 2022, the Department continues to encourage colleges and career schools to make good-faith efforts to register students to vote."  Ex. I, *Mar. 2023 Fact Sheet*.

174.   The Department "added a link to vote.gov on the Federal Student Aid website to make information about voting more accessible to college students."  Ex. J, *ED Toolkit*.

175.   Both college students and student loan borrowers are more likely to vote Democrat.  Phillip J. Ardoin, C. Scott Bell, & Michael Ragozzino, *The Partisan Battle Over College Student Voting: An Analysis of Student Voting Behavior in Federal, State, and Local Elections*, 96 SOC. SCI. Q. 1178, 1178 (2015); Mike Brown, *Survey: Which Presidential Candidate is Best Suited to Tackle Student Debt & the Cost of Higher Education?*, LENDEDU (July 24, 2019), https://tinyurl.com/3x53mvmh.

176.   ED's efforts also target the areas surrounding campus:  "In April 2022, the Department issued a Dear Colleague Letter to remind institutions of higher education of the Federal requirements regarding voting that are tied to participation in Federal student aid programs.  In that guidance, we made clear that Federal Work Study (FWS) funds could be used to compensate a student who is employed directly

44

by a postsecondary institution for employment involving voter registration activities that take place on or off-campus." Ex. J, *ED Toolkit*.

177. ED has "provided guidance stating that current law allows institutions to use FWS funds for employment by a Federal, state, local, or Tribal public agency for nonpartisan election-related work that is not associated with a particular interest or group. This work can include supporting broad-based get-out-the-vote activities, providing voter assistance at a polling place or through a voter hotline, or serving as a poll worker." Ex. J, *ED Toolkit*.

178. ED sent a "Dear Colleague" letter to universities, including those located in the State of Texas, directing them to use Federal Work Study funds "to support voter registration activities," whether they occur "on or off-campus." Federal Student Aid, *(GEN-22-05) Requirements for Distribution of Voter Registration Forms*, (Apr. 21, 2022) https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2022-04-21/requirements-distribution-voter-registration-forms.

179. ED's efforts are to "encourage students to participate in elections," meaning GOTV efforts. Evie Blad, *Help Students Register to Vote, Education Department Urges Schools*, EDUCATIONWEEK (Feb. 27, 2024), https://tinyurl.com/ym5ej92u.

180. However, the Attorneys General for sixteen States sent a letter objecting to ED's implementation of the EO. AG Ltr., *supra,* ¶ 132. As those Attorneys General note in quoting federal law and regulations in their letter to ED, FWS programs must "benefit the Nation." 20 U.S.C. § 1087-51. It is mandatory that the students' work

be "in the public interest." *Id.* § 1087-53.    "Work is not in the public interest if …

[i]t involves any partisan or *nonpartisan* political activity."   34 C.F.R. § 675.22(b)(5)

(emphasis added).

181.    That last item is key, in that it shows current federal regulations

prohibit FWS funds from going to *any* political activity, even if they are nonpartisan.

182.    Voter registration and GOTV efforts are political activities.

183.    For the reasons explained above, *see supra* ¶¶ 124–27, GOTV efforts

always increase the partisan advantage of whichever party has a greater percentage

support in the geographical area wherein the efforts are being conducted.

184.    University administrators who favor liberals outnumber those who

favor conservatives by a twelve-to-one ratio.   Samuel J. Abrams, *One of the Most*

*Liberal   Groups   in   America*, INSIDEHIGHERED.COM   (Nov.   7,   2018),

https://tinyurl.com/4utz8zsv.

185.    This is just one illustration of a broader point:   College towns generally

favor Vice President Harris and the Democratic Party, often by significant margins.

Charlie Mahtesian & Madi Alexander, *'This Is a Really Big Deal': How College Towns*

*Are Decimating the GOP*, POLITICO (July 21, 2023), https://tinyurl.com/College-Town-

Polling.

186.    Therefore, ED's FWS dollars going to GOTV will benefit Vice President

Harris and the Democratic Party.

187.    ED's agency actions implementing the EO did not comply with the

requirements of the APA, and therefore violate the law.

### General Services Administration (GSA)

188.   The GSA "will ensure <u>vote.gov</u> is a user-friendly portal for Americans to find the information they need most to register and vote.  Available in over ten languages and in a format accessible for voters with disabilities, <u>vote.gov</u> will make it easier for eligible users to register to vote or confirm their registration status.  Agencies across the federal government will link to <u>vote.gov</u> to encourage Americans to participate in the electoral process." Ex. H, *Sept. 2021 Fact Sheet*.

189.   The GSA "ma[de] modest progress on updating Vote.gov in order to provide better disability and language access and be more user friendly, but … still has a long way to go." Ex. K, *ACLU Progress Report* 8.

190.   The GSA "has issued guidance to managers of federally owned public buildings, explaining the conditions under which federal space may be made available for nonpartisan voter registration drives by 501(c)(3) nonprofit organizations." Ex. L, The White House, *How the Biden-Harris Administration is Continuing to Promote Voting Access* (Sept. 20, 2022) ("*Sept. 2022 WH Press Release*"), https://www.whitehouse.gov/briefing-room/blog/2022/09/20/how-the-biden-harris-administration-is-continuing-to-promote-voting-access/.

191.   As of March 2023, "Vote.gov is now accessible in twelve languages, with more translations coming online soon, and GSA will continue working to enhance the website to make it easier for Americans to register to vote and obtain nonpartisan information about voting." Ex. I, *Mar. 2023 WH Press Release*.

192.    In response to the EO, GSA announced that federally owned buildings, including those located in the State of Texas, are now available for voter registration drives by third-party organizations, regardless of whether the agency or agencies that own or operate out of those buildings have received an NVRA designation for registration activities. *See* GSA, *Federal Meeting Facilities: Use by federal agencies*, https://www.gsa.gov/policy-regulations/policy/real-property-policy-division-overview/federal-meeting-facilities#vote; Memo from A. Heller, Ass't Comm'r, GSA, *Operational Guidance for Voter Registration Event Requests in Federally Owned Facilities Controlled by GSA* (Feb. 28, 2022), https://www.gsa.gov/system/files/Memo_Operational_Guidance_for_Voter_Registration_-_508.pdf.

193.    GSA's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

### *Department of Health and Human Services (HHS)*

194.    HHS is engaged in voter registration outreach. U.S. Health Hum. Servs., Health Res. & Servs. Admin. (HRSA), *Voter Registration and Health Centers* (March 2022), https://bphc.hrsa.gov/compliance/scope-project/voter-requirements.

195.    HHS's "Administration for Community Living will launch a new voting access hub to connect older adults and people with disabilities to information, tools and resources to help them understand and exercise their right to vote." Ex. H, *Sept. 2021 Fact Sheet.*

48

196.   "The Indian Health Service will offer its patients assistance with voter registration." Ex. H, *Sept. 2021 Fact Sheet*.

197.   The Indian Health Service "initially commit[ed] to providing voter registration to patients at its facilities, but … shows no signs of follow-through on this commitment."  Ex. K, *ACLU Progress Report* 8.

198.   The Indian Health Service "will promote access to voting in Indian Country by piloting high-quality voter registration services to patients across five HIS facilities by the end 2023."  Ex. I, *Mar. 2023 Fact Sheet*.

199.   On October 14, 2023, the Indian Health Service designated an Arizona-based facility as an official voter registration hub.  Four more IHS facilities are set to be designated by the end of the year.  Gabriel Pietrorazio, *Native Health becomes 1st IHS facility to receive voter registration agency status in U.S.* (Oct. 17, 2023), https://tinyurl.com/p4racukv.

200.   Native Americans are more likely to vote Democrat.   Sanchez & Foxworth, *supra*, ¶ 122.

201.   "The President's Budget also requests a 25% increase in grants for the Administration for Community Living to distribute to state Protection and Advocacy systems, to provide a range of services that ensure that people with disabilities can fully participate in the electoral process."  Ex. H, *Sept. 2021 Fact Sheet*.

202.   HHS "ma[de] a strong initial commitment to integrate voter registration into Healthcare.gov, but … has not yet followed through on that promise."  Ex. K, *ACLU Progress Report* 8.

203.    The HHS's Centers for Medicare & Medicaid Services (CMS) "will make it easier for consumers using HealthCare.gov to connect to voter registration services and receive assistance.  CMS will also work with States on improving access to voter registration."  Ex. A, *Dec. 2021 Fact Sheet*.

204.    HHS announced that federal health centers nationwide, including in the State of Texas, "have discretion to participate in activities, including voter registration activities, that are outside the scope of the Health Center Program project, so long as the health centers' efforts in carrying out the Health Center Program project are not impaired."  HRSA, Voter Registration and Health Centers (Mar.    2022),    https://bphc.hrsa.gov/compliance/scope-project/voter-requirements. "Such voter registration activities may include making available voter registration materials to patients, encouraging patients to register to vote, assisting patients with completing registration forms, sending completed forms to the election authorities, providing voter registration materials in waiting rooms, and allowing private, non-partisan organizations to conduct on-site voter registration."  *Id.*

205.    Through HHS, the Biden-Harris Administration has expanded access to health insurance exchanges under the Affordable Care Act (ACA) to noncitizens who are beneficiaries of the Deferred Action for Childhood Arrivals (DACA) amnesty program for illegal aliens. *Biden-Harris Administration Finalizes Policies to Increase Access to Health Coverage for DACA Recipients*, U.S. Dep't of Health & Hum. Servs. (May   3,   2024),   https://www.hhs.gov/about/news/2024/05/03/hhs-finalizes-policies-increase-access-health-coverage-daca-recipients.html.

206.   Vice President Harris announced in February 2024 that HHS "will email voter registration information to every person–more than 20 million last year–who signs up for health insurance through the Affordable Care Act." Scott, *VP Harris*, *supra*, ¶ 89.

207.   Insurance offered through the Affordable Care Act (ACA) are insurance exchanges designed for lower-income individuals. *See King v. Burwell*, 576 U.S. 473, 482 (2015).

208.   Statistically, such voters favor Democrats. *Changing Partisan Coalitions*, *supra*, ¶ 170 at 41.

209.   HHS's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

### *Department of Homeland Security (DHS)*

210.   DHS "will invite state and local governments and nonpartisan nonprofit organizations to register voters at the end of naturalization ceremonies for the hundreds of thousands of citizens naturalized each year, and will develop a new online resource on voting for recently naturalized citizens." Ex. H, *Sept. 2021 Fact Sheet*.

211.   "The Department will also provide information and resources for voters impacted by a disaster or emergency event through its training preparedness initiatives." Ex. H, *Sept. 2021 Fact Sheet*.

212.   The Department has "fail[ed] to make changes within its capacity that would improve the provision of voter registration services to the hundreds of thousands of new citizens it naturalizes every year." Ex. K, *ACLU Progress Report* 8.

213.   The Department's Citizenship and Immigration Services (USCIS) "strives to ensure all newly naturalized citizens … have the opportunity to register to vote following their naturalization ceremony.  To improve and strengthen these efforts, USCIS will issue updated policy guidance to its 88 field offices to standardize and lift up best practices for voter registration services, including providing a clear roadmap for how to successfully partner with state and local election administration officials and nonpartisan organizations to provide voter registration applications to all new Americans.  In Fiscal Year 2022, USCIS administered the Oath of Allegiance for 967,400 new Americans, across more than 20,000 naturalization ceremonies."  Ex. I, *Mar. 2023 Fact Sheet*.

214.   First-generation immigrants tend to vote Democrat.  Mayda, Peri & Steingress, *supra*, ¶ 119.  USCIS's efforts in the naturalization process are directed toward first-generation immigrants.

215.   DHS's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

### *Department of Housing and Urban Development (HUD)*

216.   HUD "will communicate with public housing authorities (PHAs)—more than 3000 authorities, managing approximately 1.2 million public housing units— through a letter to Executive Directors that provides useful information to PHAs

about permissible ways to inform residents of non-partisan voter registration information and services." Ex. H, *Sept. 2021 Fact Sheet*.

217. "The Department will also assist relevant HUD-funded service providers by highlighting and sharing promising practices that improve non-partisan voting registration and voting access for people experiencing homelessness." Ex. H, *Sept. 2021 Fact Sheet*.

218. HUD directed over 3,000 public housing authorities, which manage approximately 1.2 million housing units, nationwide, including in the State of Texas, to run voter registration drives in those units. *See* Fred Lucas, *HUD Pushes Voter Registration Drives in Public Housing Under Biden's Executive Order*, DAILY SIGNAL (Apr. 27, 2022), https://tinyurl.com/3j93r83m. HUD also advised these local agencies on how to become a "voter registration agency under the National Voter Registration Act," and how to set up drop boxes for ballots on the premises. *Id.*

219. Those who live in public housing tend to vote Democrat. *See* Benedictis-Kessner, Jones & Warshaw, *supra*, ¶ 120; Ekins, *supra*, ¶ 120.

220. HUD's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

### *Institute of Museum and Library Services*

221. The Institute of Museum and Library Services "will create and distribute a toolkit of resources and strategies that libraries, museums, and heritage and cultural institutions can use to promote civic engagement and participation in the voting process." Ex. H, *Sept. 2021 Fact Sheet*.

222.    The Institute's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

### Department of the Interior (DOI)

223.    DOI "will disseminate information on registering and voting, including through on-site events, at schools operated by the Bureau of Indian Education and Tribal Colleges and Universities, serving about 30,000 students." Ex. H, *Sept. 2021 Fact Sheet*.

224.    "The Department will also, where possible, offer Tribal College and University campuses for designation by states as voter registration agencies under the National Voter Registration Act." Ex. H, *Sept. 2021 Fact Sheet*.

225.    The Department "ma[de] and follow[ed] through on a strong commitment to offer high-quality voter registration services at the tribal colleges and universities it operates through NVRA designations." Ex. K, *ACLU Progress Report* 8.

226.    "In May [2022], Kansas designated the Haskell Indian Nations University, operated by the Department of the Interior, as an NVRA voter registration agency—the first federal program ever designated this way by a state." Ex. L, *Sept. 2022 WH Press Release*.

227.    Many States have not provided these designations pursuant to NVRA § 7.

228.    "In July [2022], followed by a formal proclamation in September, New Mexico designated Southwestern Indian Polytechnic Institute, also operated by

Interior as a Bureau of Indian Education post-secondary institution, as an NVRA voter registration agency, making it the second federal program ever designated in this fashion. These designations will ensure that students at each institution of higher education are also able to register to vote—smoothly, accurately, and securely—at the same time as they enroll in school." Ex. L, *Sept. 2022 WH Press Release*.

229. "In 1993, Congress passed the National Voter Registration Act, which authorized states to request that federal agencies provide voter registration services. For nearly 30 years, no federal agency was designated as a voter registration agency. Last year, the Department of the Interior became the first agency to be designated as voter registration agency when two Bureau of Indian Education-operated post-secondary institutions—Haskell Indian Nations University in Kansas and the Southwestern Indian Polytechnic Institute in New Mexico—formed partnerships with state election authorities to provide the opportunity to register to vote." Ex. I, *Mar. 2023 Fact Sheet*.

230. "[B]ecause federal public lands are one of the most common touch points between the federal government and the American people, the Department will explore options to expand access to voter registration on public lands across the country." Ex. I, *Mar. 2023 Fact Sheet*.

231. DOI "will display Vote.org signage in national park entrances and visitor centers across the country." Scott, *VP Harris*, *supra*, ¶ 89.

232.   Personnel from DOI's Bureau of Indian Education (BIE) are encouraging students at "K-12 schools to carry voter registration cards home to their parents."  M.D. Kittle, *'Bidenbucks' Plan Uses Native American School Children in Voter Registration Scheme*, THE FEDERALIST (July 31, 2024), https://tinyurl.com/bdm43vhk.  BIE "oversees 183 schools on more than 60 Indian reservations in 23 states." *Id.*

233.   DOI's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

### Department of Justice (DOJ)

234.   DOJ "has created an online resource for the public that will provide links to state-specific information about registering and voting; detail the Department's enforcement of federal voting rights laws and guidance it has issued to jurisdictions on the scope of those laws; and explain how to report potential violations."  Ex. H, *Sept. 2021 Fact Sheet.*

235.   "The Department will also provide information about voting to individuals in federal custody, facilitate voting by those who remain eligible to do so while in federal custody, and educate individuals before reentry about voting rules and voting rights in their states."  Ex. H, *Sept. 2021 Fact Sheet.*

236.   "And after the Census Bureau determines localities with specific responsibilities for language access, the Department will deliver guidance and conduct outreach to each covered jurisdiction to facilitate compliance."  Ex. H, *Sept. 2021 Fact Sheet.*

237.   DOJ's U.S. Marshals Service (USMS) "ma[de] progress on renegotiating their contracts with state and private jail facilities to ensure eligible voters in federal pre-trial custody can exercise their voting rights, and [is] ensuring that new contracts include those requirements, but … has not committed to other effective activities, such as opening the door to polling places in its contracting facilities, and leveraging its contracts to ensure ballot access for all eligible voters, not just those in federal custody." Ex. K, *ACLU Progress Report* 8.

238.   USMS has initiated a process to ensure those in its custody are offered the chance to register to vote. U.S. Dept. of Justice, U.S. Marshals Service, *United States Marshals Service FY 2022 Annual Report* (April 2023), *available at* https://www.usmarshals.gov/sites/default/files/media/document/PUB-2-2022-Annual-Report.pdf.

239.   Mississippi Secretary of State Michael Watson claims that USMS is "currently modifying 936 intergovernmental agreements and jail contracts," and that he has "received a copy of one from El Paso." Michael Watson, *Opinion Column: "A Republic, if you can keep it."* Miss. Sec'y of State Press Releases & Columns (Apr. 10, 2024), https://www.sos.ms.gov/press/opinion-column-republic-if-you-can-keep-it.

240.   DOJ's Bureau of Prisons (BOP) "ma[de] a strong commitment to providing voter registration services to eligible people in federal prisons, but … has been very slow to implement this commitment." Ex. K, *ACLU Progress Report* 8.

241.   BOP "has partnered with and regularly consults on voting issues with the League of Women Voters, the American Civil Liberties Union, the Campaign

Legal Center, and the Washington Lawyers' Committee." Fred Lucas, *Exclusive: How Biden Pushes Inmate Voting with Help From Interest Groups*, DAILY SIGNAL (Jan. 30, 2024) ("*Biden Pushes Inmate Voting*").

242.   Emery Nelson, spokesperson for BOP, confirmed the arrangement to *The Daily Signal*: "The FBOP meets quarterly with the D.C. Board of Elections, the League of Women Voters, the American Civil Liberties Union, the Campaign Legal Center, Disability Rights D.C., The Sentencing Project, and the Washington Lawyers' Committee." *Id.*

243.   Nelson acknowledged that: "The League of Women Voters is helping the prison agency to distribute an informational voting video that is "scheduled for completion by the end of February 2024." *Id.* The "civic/voter education class … is expected to be launched at FCC Hazelton [West Virginia] in February and will be offered throughout the FBOP." *Id.*

244.   Nelson also admitted in an email that "in 2023, the FBOP partnered with the League of Women Voters (LWV) and the District of Columbia Board of Elections (DCBOE) to offer civics education classes and voter registration drives at the Federal Correctional Institution (FCI) Cumberland [Maryland] and the Federal Correctional Complex (FCC) Petersburg [Virginia], two of the institutions with the highest number of D.C. residents." *Id.*

245.   Nelson also admitted that BOP "sent letters to all states that allow eligible incarcerated individuals to vote." *Id.*

246.    Nelson said that BOP "is partnering with Chicago Votes to bring voter education and registration to MCC Chicago [Illinois]." *Id.*

247.    Nelson said that "In November of 2023 … the FBOP partnered with the DCBOE [District of Columbia Board of Elections] to offer a presentation to a Topeka, Kansas, high school voting club regarding incarcerated individuals voting rights." *Id.*

248.    Nelson said the Bureau "is working with Los Angeles County to engage individuals in the Metropolitan Detention Center (MDC) Los Angeles and FCI Terminal Island [also in Los Angeles] to continue to strengthen their partnership with the FBOP." *Id.*

249.    Top elections officials are alarmed.  Secretary Watson, for one, requested that Attorney General Garland prevent ineligible felons from registering to vote and casting ballots.  Ex. O, Letter from Sec'y Michael Watson to Att'y Gen. Merrick Garland, U.S. Dep't of Just. (Mar. 6, 2024).

250.    The Attorney General has not provided the assurances Secretary Watson requested.  Watson, *Opinion Column, supra*, ¶ 239.

251.    Instead, DOJ has "doubl[ed] the number of voting rights attorneys, taking steps to ensure compliance with voting rights statutes, and issuing guidance on (1) the civil and criminal statutes that apply to post-election audits, (2) methods of voting, including early voting and voting by mail, and (3) the vote-dilution protections that apply to all jurisdictions under Section 2 of the Voting Rights Act as they engage in redistricting."  Ex. A, *Dec. 2021 Fact Sheet*.

252.    DOJ is going to great lengths to make it as easy as possible for convicted criminals to vote, "produc[ing] an accessible, plain-language guide for 50 states and the District of Columbia, which also describes each state's voting rules for individuals with criminal convictions.  The guide walks readers through a series of questions to help them understand how each state's laws work and gives information about how to reach officials in a particular state to register to vote and to ask questions." Ex. L, *Sept. 2022 WH Press Release.*

253.    DOJ is even suggesting additional resources to criminals so they can vote, "produc[ing] a plain-language guide to federal voting rights laws.  This guide provides basic information about the voter registration process, describes some rights available to voters under federal law, and identifies additional resources for voters seeking more information about how federal law protects the right to vote." Ex. L, *Sept. 2022 WH Press Release.*

254.    DOJ wants to ensure that if a criminal can vote, he has every resource to do so, "develop[ing] a program to educate individuals about their voting rights, specific to each state and territory." Ex. I, *Mar. 2023 WH Press Release.*

255.    President Biden's DOJ is especially interested in the votes of incarcerated federal felons, "promoting access to voting for those who remain eligible to vote while in federal custody, including by putting in place procedures to facilitate voter registration and voting."  Ex. I, *Mar. 2023 WH Press Release.*

256.    DOJ is filing statements of interest in ongoing litigation that federal laws "require the right to absentee ballot return assistance," including in ongoing

Wisconsin litigation. *The Americans with Disabilities Act and Other Federal Laws Protecting the Rights of Voters with Disabilities*, DEP'T OF JUST. (Apr. 18, 2024), https://www.ada.gov/resources/protecting-voter-rights/.

257.    Wisconsin is a targeted State for Vice President Harris's campaign.

258.    Wisconsin is a targeted State for majority control of the U.S. Senate, with Democrat Senator Tammy Baldwin in a difficult election fight.

259.    Convicted criminals are more likely to vote Democrat. *See* Uggen & Manza, *supra*, ¶ 115 (polling disenfranchised felons).

260.    DOJ's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

### *Department of Labor (DOL)*

261.    DOL "will issue guidance encouraging states to designate the more than 2,400 American Job Centers, which provide employment, training, and career services to workers in every state, as voter registration agencies under the National Voter Registration Act." Ex. H, *Sept. 2021 Fact Sheet*.

262.    "The Department of Labor will continue to require Job Corps centers to implement procedures for enrollees to vote, and where local law and leases permit, encourage Job Corps centers to serve as polling precincts." Ex. H, *Sept. 2021 Fact Sheet*.

263.    "The Department will also provide guidance that grantees can use federal workforce development funding, where consistent with program authority, to

conduct nonpartisan voter registration efforts with participants." Ex. H, *Sept. 2021 Fact Sheet*.

264.    The Department "reminded state workforce development agencies about its guidance and technical assistance to states seeking NVRA designation for American Job Centers and the other ways in which programs funded by the Department may assist with voter registration. The reminder further highlighted Indiana — which designated American Job Centers as voter registration agencies years ago — as an example to help others follow suit." Ex. L, *Sept. 2022 WH Press Release*.

265.    DOL's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

### *Railroad Retirement Board (RRB)*

266.    The Chicago-based RRB plans to distribute flyers and posters, keep metrics on directing individuals to Vote.gov, and work with an "equity team" to boost voting among non-English speakers.

267.    RRB is contemplating turning some of its fifty-three field offices across the country into "voter registration agencies," but a spokesperson says that the Board lacks necessary resources to do so.

268.    RRB's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

### Small Business Administration (SBA)

269.   SBA has been especially aggressive with its implementation of the EO. It "became the first federal agency to request designation as a voter registration agency pursuant to the National Voter Registration Act, committing to offer Americans seeking services at the agency's District Field Offices the opportunity to register to vote."  Ex. A, *Dec. 2021 Fact Sheet*.

270.   On March 19, 2024, SBA Administrator Isabel Casillas Guzman entered into a Memorandum of Understanding (MOU) with Michigan Secretary of State Jocelyn Benson to implement the EO.  Press Release 24-23, *SBA Administrator Guzman Announces Agency's First-Ever Voter Registration Agreement with Michigan Department of State*, Small Bus. Admin. (Mar. 19, 2024), https://tinyurl.com/4dbptaws.

271.   Under this MOU, Benson will create a URL to which SBA will drive its members to register to vote.  *Id.*

272.   Once SBA captures this information, it could also use it for GOTV efforts.

273.   U.S. Senator Joni Ernst of Iowa, Ranking Member on the Senate Small Business Committee, has demanded answers from Guzman, writing in a letter that Guzman's "senior advisor indicates you and your team are participating in politically motivated travel with taxpayer dollars…. and that your official travel is purposefully

targeted to 'indirectly campaign for Joe Biden ....'"[8]   The letter continued, "Your alleged travel is particularly questionable in light of the SBA's recent announcement that it finalized the agency's first-ever voter registration agreement with Michigan Department of State....   The SBA's mission is to aid the interests of small businesses, not to swing votes."  Letter from Sen. Joni Ernst to Adm'r Guzman (Apr. 19, 2024), https://tinyurl.com/46kukpzm.

274.   From January through April 2024, twenty-two out of twenty-five SBA outreach events in Michigan took place in counties with the highest population of Democratic National Committee (DNC) target demographics.  *See* Ex. N, Maps, *Weaponizing Federal Resources: Exposing the SBA's Voter Registration Efforts: Hearing Before the H. Comm. on Small Business*, 118th Cong. (June 4, 2024) ("SBA, *Highest VR Increase*").

275.   Similarly, eleven of fifteen Michigan counties that showed the largest voter registration increases over the last year have ranked highest in population among young voters and Black voters, which are top Democratic Party targets.  *See* Ex. N, SBA, *Highest VR Increase*.

276.   SBA's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

---

[8] This Court should now regard the Senator's concern as the SBA official indirectly campaigning for Vice President Harris.

### Social Security Administration (SSA)

277.    SSA will put up signage highlighting Vote.gov in its 1,200 offices, which are visible to the 6 million people who visit them each year.  Scott, *VP Harris*, *supra*, ¶ 89.

278.    During one White House listening session, one group encouraged targeting Social Security beneficiaries who receive financial assistance because they are low-income, *see supra* ¶ 118, evidently with the expectation that they would vote Democrat.

279.    SSA's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

### Department of State (DOS)

280.    DOS is also expending federal resources on voter registration and GOTV.  "Travel.state.gov now reflects up-to-date information on absentee voting and registration for U.S. citizens abroad.  This coming year, the Department will promote Vote.gov in the waiting rooms of its 26 public passport agencies."  Ex. I, *Mar. 2023 Fact Sheet*.

281.    DOS's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

### U.S. Trade Representative (USTR)

282.    USTR "will develop annual social media posts on key dates that are important to voting engagement including: National Voter Registration Day (4th Tuesday in September); Election Day (1st Tuesday in November); 15th Amendment

anniversary re: Black men suffrage (February 3rd); 19th Amendment Anniversary (August 18th); and National Voter Registration Act (May 20th)." Email re U.S. Trade Representative Strategic Plan (Sept. 23, 2021), https://tinyurl.com/yuzbht24.

283.    USTR "will seek to partner with nonpartisan, public service and civic engagement organizations (*e.g.*, Asian Americans Advancing Justice, Mexican American Legal Defense and Educational Fund, National Pan-Hellenic Council, Brennan Center for Justice) in developing and amplifying content for these online engagements." Email re U.S. Trade Representative Strategic Plan (Sept. 23, 2021), https://tinyurl.com/yuzbht24.

284.    As noted above, many if not all of those groups support the Democratic Party. *See supra* ¶¶ 112, 124.

285.    USTR's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

### *Department of Transportation (DOT)*

286.    The DOT "will communicate guidance to transit systems—including more than 1,150 rural public transit systems and more than 1,000 urban public transit systems—to consider providing free and reduced fare service on election days and consider placing voter registration materials in high-transit stations." Ex. H, *Sept. 2021 Fact Sheet*.

287.    "The Department will also work with state and local entities seeking to mitigate traffic and construction impacts on routes to the polls, particularly in underserved communities." Ex. H, *Sept. 2021 Fact Sheet*.

288.    Persons who use public transportation are more likely to vote Democrat. Emily Badger, *Liberals are More Likely to Use Public Transit than Conservatives*, WASH. POST (June 30, 2014), https://tinyurl.com/WP-Transport-Poll-Summary.

289.    DOT's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

### *Department of the Treasury*

290.    Treasury "will include information about registration and voter participation in its direct deposit campaigns for Americans who receive Social Security, Veterans Affairs, and other federal benefit payments." Ex. H, *Sept. 2021 Fact Sheet*.

291.    Treasury "ma[de] a concerted effort to promote voter registration access to the low-income clients of its voluntary tax preparation clinics, and shar[ed] information about voter registration with millions of Americans through the taxpaying process." Ex. K, *ACLU Progress Report* 8.

292.    "In addition to supporting the third-party Volunteer Income Tax Assistance (VITA) partners in offering voter registration services to individuals who seek tax assistance, Treasury is now providing information about voter registration in the instructions for IRS Form 1040 and in direct mail pieces delivered to approximately 900,000 Americans who receive Social Security Benefits, Railroad Pension benefits, and federal retirement benefits." Ex. I, *Mar. 2023 Fact Sheet*.

293.    Treasury's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

### *Department of Veterans Affairs (VA)*

294.    VA "will provide materials and assistance in registering and voting for tens of thousands of inpatients and residents, including VA Medical Center inpatients and residents of VA nursing homes and treatment centers for homeless veterans." Ex. H, *Sept. 2021 Fact Sheet*.

295.    VA "will also facilitate assistance in registering and voting for homebound veterans and their caregivers through VA's home-based and telehealth teams." Ex. H, *Sept. 2021 Fact Sheet*.

296.    VA has "ma[de] progress toward integrating a high-quality voter registration opportunity at its health facilities by working to implement NVRA designations in three states." Ex. K, *ACLU Progress Report* 8.

297.    The Department "will provide materials and assistance in registering and voting for tens of thousands of inpatients and residents, including VA Medical Center inpatients and residents of VA nursing homes and treatment centers for homeless veterans." Ex. A, *Dec. 2021 Fact Sheet*.

298.    "The Department will also facilitate assistance in registering and voting for homebound veterans and their caregivers through VA's home-based and telehealth teams." Ex. A, *Dec. 2021 Fact Sheet*.

299.    The Department "announc[ed] a pending partnership with three states to provide voter registration assistance and information to veterans and their families and caregivers while they access services at VA healthcare facilities." Ex. L, *Sept. 2022 WH Press Release*.

300.    In September 2022, VA prepared "to accept designation as an NVRA Voter Registration Agency requested by Kentucky and Michigan, and will serve as a Voter Registration Distribution Agency in Pennsylvania to provide voter registration materials and information to veterans, their families, and caregivers." Ex. L, *Sept. 2022 WH Press Release.*

301.    VA's agency actions implementing the EO did not comply with the requirements of the APA, and therefore violate the law.

### ***Lack of Notice and Comment Opportunity***

302.    For each agency action outlined above, none was announced through the regular notice-and-comment process for announcing and formulating agency actions. Had Plaintiffs received an opportunity to participate in the standard procedure required by the APA, Plaintiffs would have had an opportunity to file comments objecting to these proposed courses of action and explaining why these actions are legally infirm.  This deprived Plaintiffs and the general public of the opportunity to weigh in on these proposed agency actions.  This is despite the policies having a significant impact on the rights and obligations of tens of millions of Americans and relevant organizations, like Plaintiffs.

303.    "Voter registration information is now available in nearly 20 languages, including Chinese, Arabic and Navajo—up from just English and Spanish when President Biden and Harris were elected in 2020."  Scott, *VP Harris, supra,* ¶ 89.

304.    "[Vice President] Harris is asking the groups to promote voting on three national days of action: Juneteenth, the anniversary of the Voting Rights Act (Aug.

69

6) and National Voter Registration Day (Sept. 24 this year)." Scott, *VP Harris*, *supra*, ¶ 89.

305. When Secretary Watson contacted the White House "about the plans submitted by each agency" to implement the EO, an official informed him that "those plans are not public, and they never intended for them to be public." Watson, *Opinion Column*, *supra*, ¶ 239.

### ***Ongoing Litigation and APA Implications***

306. Unsurprisingly, federal agencies have not been forthcoming with demands for answers.

307. This stonewalling has led to litigation under the Freedom of Information Act (FOIA). *See, e.g.*, *Found. Gov't Accountability v. Dep't of Just.*, No. 2:22-cv-252-JLB-KCD (M.D. Fla.). Yet the Biden-Harris Administration continues to obfuscate the details of its EO implementation from the voting public, which seems bizarre if, as advertised, it is simply a nonpartisan program assisting eligible citizens registering to vote.

308. Mere interpretive rules do not generate 3.5 million new voters. *See supra* ¶ 95. Agency actions with such an impact on the rights of millions of Americans are by their nature substantive rules *at minimum*, and more likely is a result that can obtain only by Congress's passing legislation—not any sort of agency action—and even then, with an eye to carefully examining such legislation to ensure that each provision of such a statute is consistent with the Constitution, given States' primacy in the field of elections.

70

309.   This Court should infer from this stonewalling that the actions implementing the EO are measures crassly adopted for base political motives.  The Biden-Harris Administration failed to pass the legislation that would cement the political power of its partisan allies and ideologues, so it refused to open up these agency actions to notice and comment, still refuses to disclose records concerning the developing and implementing of this policy, and refuses to answer questions from the state officials who would be the indispensable partners to implementing this policy.

310.   The intent and effect of Executive Order 14019 is to register voters who will favor the Democratic Party, helping Vice President Harris and members of the political party led by President Biden and Vice President Harris win future elections, beginning with 2024.

311.   None of these agencies published in the Federal Register their proposed voter registration programs and policies to implement the EO.

312.   As a necessary result of that nonpublication, none of these agencies gave APA-compliant notice to the public regarding these programs and policies to implement the EO.

313.   As an additional consequence of that nonpublication, none of these agencies provided the public with an opportunity to submit comments regarding these programs and policies to implement the EO, as required by the APA.

314.   These agencies therefore could not consider and respond to public comments regarding these programs and policies to implement the EO, as required by the APA.

315.    Agencies can also publish in the Federal Register an intent to establish negotiated rulemaking committees to receive public comment.  *See generally, e.g.*, Negotiated Rulemaking Committee, 86 Fed. Reg. 28,299 (publishing the dates and time of public virtual hearings on the Biden-Harris Administration's proposed student debt transfer program).

316.    No agency published such an intent in the Federal Register.

### *Agency Actions Implementing EO in the Northern District of Texas*

317.    In addition to the facts recounted above that are specific to the Northern District of Texas, there are numerous other unlawful agency actions implementing the EO in the Northern District of Texas, many of which are more specifically occurring within the Amarillo Division.

318.    Texas Tech University has a campus in Amarillo, Texas.  Given the actions ED is taking to implement the EO, such as the unlawful use of FWS funds and resources, *see supra* ¶¶ 176–86, these unlawful actions are, on information and belief, likely occurring at that location.

319.    Other colleges and universities in the Amarillo Division include Amarillo College, Clarendon College, Franks Phillips College, and the Amarillo Campus of Wayland Baptist University.  ED's unlawful actions implementing the EO are, on information and belief, likely taking place at these locations as well.

320.    USDA maintains an area office in Amarillo, Texas.  Nearby in Panhandle, Texas, USDA also maintains operations for U.S. Consolidated Farm Services Agency and also Natural Resources Conservation Service.  Given the specific

USDA actions explained above and President Biden's order to maximize voter registration and participation, *see supra* ¶¶ 151–57, these activities are, on information and belief, likely taking place at this facility.

321.   DOD maintains a Military Entrance Processing Station (MEPS) in Amarillo, Texas.  As explained above, Plaintiffs do not contest the legality of voter-assistance services for uniformed servicemembers of the Armed Forces as those activities were conducted prior to the EO.  However, given the specific DOD actions explained above and President Biden's order to maximize voter registration and participation, *see supra* ¶¶ 161–64, some of the activities that, on information and belief, are likely taking place at this Amarillo facility violate the APA for the reasoned explained in the Counts below.

322.   HUD employs a Home Program Coordinator in Amarillo, Texas.  Given the specific HUD actions explained above and President Biden's order to maximize voter registration and participation, *see supra* ¶¶ 216–18, HUD's unlawful activities are, on information and belief, likely taking place throughout the Northern District of Texas, including the Amarillo Division.

323.   DOI maintains a Rural Development office in Amarillo, Texas.  Also in Amarillo, the DOI's Bureau of Land Management maintains two facilities.  Given the specific DOI actions explained above and President Biden's order to maximize voter registration and participation, *see supra* ¶¶ 223–32, these activities are, on information and belief, likely taking place at this facility.

324.    DHS maintains a Port Office in Amarillo, Texas, at a location that includes operations for U.S. Customs and Border Protection.  Given the specific DHS actions explained above and President Biden's order to maximize voter registration and participation, *see supra* ¶¶ 144, 210–13, these activities are, on information and belief, likely taking place at this facility.

325.    DOJ maintains a correctional facility in Post, Texas, which is in the Northern District of Texas.  It is the Giles W. Dalby Correctional Facility, run by the Bureau of Prisons (BOP)—a component of DOJ.  Given the specific DOJ actions explained above and President Biden's order to maximize voter registration and participation, *see supra* ¶¶ 234–56, these activities are, on information and belief, likely taking place at this facility.

326.    DOJ also maintains the Federal Correctional Institution in Seagoville, Texas, in the Dallas-Fort Worth area, the Federal Medical Center in Fort Worth, the Federal Medical Center in Carswell, and the Federal Bureau of Prisons South Central Regional Office in Dallas.  DOJ's unlawful actions implementing the EO, *see supra* ¶¶ 234–56, are, on information and belief, likely taking place at these locations.

327.    There is the USCIS Dallas Field Office in Irving, Texas, which is in the Northern District of Texas.  Given that USCIS specifies that the voter registration actions it is taking to implement the EO—and which Plaintiffs challenge—is taking place in all eighty-eight Field Offices nationwide, *see supra* ¶ 213, those activities are, on information and belief, likely taking place in this district.

328.   The plans of other federal agencies are unknown, but they presumably exist for every federal agency.  This is because President Biden ordered, "Within 200 days of [March 7, 2021], the head of *each* agency shall submit to the Assistant to the President for Domestic Policy a strategic plan outlining the ways identified under this review that the agency can promote voter registration and voter participation." EO § 3(b) (emphasis added).

329.   Congress issued subpoenas that should have revealed these details.  *See supra* ¶ 13.  However, Congress's June 26, 2024, subpoena deadline passed without the Department recipients complying with the subpoenas.  M.D. Kittle, *No One Knows How Much 'Bidenbucks' Is Costing Taxpayers, Not Even Congress*, THE FEDERALIST (July 1, 2024), https://tinyurl.com/3uerrnk9; *see also* M.D. Kittle, *EXCLUSIVE: House Committee Gives Cabinet Secretaries 5 Days To Release 'Bidenbucks' Docs*, THE FEDERALIST (July 30, 2024), https://tinyurl.com/5ackver3.

330.   Absent such information, Plaintiffs presume that Defendants are withholding this information because it would further substantiate the illegality of their ongoing actions and planned imminent actions.

331.   Regardless of the details for each agency, these agency actions are unlawful as set forth by the Secretaries of State for fifteen States (Alabama, Arkansas, Florida, Georgia, Idaho, Indiana, Louisiana, Mississippi, Montana, Nebraska, Ohio, South Dakota, Tennessee, West Virginia, and Wyoming):  "As the supreme law of the land, the Constitution clearly says the state legislatures *shall* (emphasis added) prescribe the way elections are run, and that if any adjustments

need to be made, such adjustments are the province of Congress, not the Executive branch." Letter of Ala. Sec'y State John Merrill *et al.* to President Joe Biden (Aug. 3, 2022), https://www.democracydocket.com/wp-content/uploads/2022/08/Secretary-of-State-letter.pdf.

332.    As the Secretaries of State rightly conclude, "Therefore, Executive Order 14019 was issued without Constitutional authority or Congressional approval." *Id.*

333.    Recent developments make this litigation an urgent matter. For one, Defendants have defied Congress's subpoenas demanding details on how the Biden-Harris Administration plans to implement the EO in a manner consistent with law, *see supra* ¶ 13, allowing the June 26, 2024, deadline on those subpoenas to pass without submitting documents that comply with the subpoenas.

334.    For another recent development, on July 8, 2024, the White House announced that President Biden would veto the Safeguard American Voter Eligibility Act (SAVE) Act, H.R. 8281 if Congress passed legislation. Off. Mgmt. & Budget, *Statement of Administration Policy: H.R. 8281—Safeguard American Voter Eligibility Act* (July 8, 2014), https://www.whitehouse.gov/wp-content/uploads/2024/07/SAP-HR8281.pdf. The SAVE Act simply requires States to require proof of U.S. citizenship when registering applicants to vote in federal elections, and to remove noncitizens from their voter rolls. *See* H.R. 8281, 118th Cong. § 2 (2024).

335.    Polls show an overwhelming supermajority of Americans believe that only American citizens should be able to participate in federal elections. John Binder,

*Exclusive Poll: 6-in-7 Voters Say Only Americans Should Vote in U.S. Elections*
Breitbart (Feb. 15, 2024), https://tinyurl.com/4bbcw747 (86% of voters say only
American citizens should be allowed to vote in federal elections); Honest Elections
Project, *Honest Elections Project Polling Shows Strong Support for Election Integrity
Measures* (July 31, 2023), https://honestelections.org/honest-elections-project-polling-
shows-strong-support-for-election-integrity-measures/ (linked polling memo shows
"89% think that American elections should only be for American citizens, including
82% of Democrats, 80% of Black voters, and 78% of Hispanic voters"); Rasmussen
Reports, *Are Democrats Using Illegal Immigration to Build a 'Permanent Majority'?*
(Apr. 9, 2024), https://tinyurl.com/b4cwtr96 (78% of Likely U.S. voters believe it is
important to prevent illegal immigrants from voting in American elections, including
62% who consider it Very Important.").

336.   President Biden's threat to veto the SAVE Act therefore heightens
Plaintiffs' concerns that the EO will facilitate noncitizens—both illegal aliens and
noncitizens in the United States legally—participating in federal elections, in
violation of federal law. *See* 18 U.S.C. § 611 (prohibiting aliens from voting in federal
elections for federal officers); *see* Dan Hart, *Up to 2.7 Million Noncitizens Could Vote
Illegally in November, Study Warns*, DAILY SIGNAL (May 23, 2024),
https://tinyurl.com/m5ac558n ("A new study has revealed that roughly 10% to 27% of
noncitizens living in the U.S. are illicitly registered to vote, which could result in up
to 2.7 million illegal votes being cast in the November elections.  Experts say the

significant amount of potential illegal votes could be enough to alter election results.").

337.    In light of these recent developments, coupled with the fact that early voting begins on September 16, 2024, *see* 25 PA. STAT. §3146.2a(a) (absentee ballots may be received 50 days before election)—which is only 67 days from the filing of this Complaint, urgent injunctive relief is necessary to prevent compounding violations of law.

## CLAIMS FOR RELIEF

### COUNT I
### *Ultra Vires* Presidential Action

338.    Plaintiffs restate the foregoing paragraphs as if fully set forth herein.

339.    Executive orders issued by a President can be challenged as *ultra vires* when there is no statute authorizing the President's action, and where the executive order does not rest on the President's inherent constitutional powers.  *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667 (2018); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996).

340.    There was no legal authority for President Biden to issue the EO.  No provision of the Constitution grants him such power.  Neither does the NVRA or any other federal statute grant him such power.

341.    Plaintiffs have no adequate remedy at law.

342.    Accordingly, this Court should hold the EO unlawful as *ultra vires*.

## COUNT II
## Administrative Procedure Act, 5 U.S.C. § 706(2)(D)
### Lack of Notice and Comment

343.    Plaintiffs restate the foregoing paragraphs as if fully set forth herein.

344.    The actions described above implementing the EO are final agency actions under the Administrative Procedure Act (APA), and thus subject to judicial review under 5 U.S.C. § 704.  Final agency actions are those that "mark the consummation of the agency's decisionmaking process" and "one by which rights or obligations have been determined, or from which legal consequences will flow." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (internal quotation marks omitted).

345.    The APA requires public notice via publication in the Federal Register for agency actions that do not meet certain narrow statutory exemptions.  5 U.S.C. § 553(b).

346.    Even if an agency action would otherwise be lawful, it is unlawful under the APA if the agency fails to comply with the procedural requirements of notice and comment for those actions that are not statutorily exempt.

347.    If an agency action is a substantive rule, "the exemption from giving public notice is inapplicable, and the full panoply of notice-and-comment requirements must be adhered to scrupulously.  The APA's notice and comment exemptions must be narrowly construed." *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015), *aff'd by an equally divided Court*, 579 U.S. 547, 548 (2016) (mem.).

348.    Agency actions are substantive rules if they "affect individual rights and obligations." *Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.*, 201 F.3d 551, 556 (5th Cir. 2000).

349.    Proponents of the EO estimate that these agency actions will register 3.5 million additional voters, *see supra* ¶ 95, which thereby directly affects the individual rights of those 3.5 million persons.

350.    Registering 3.5 million voters, coupled with GOTV efforts to encourage those voters to participate in an upcoming election, also has a substantial impact on the outcome of those elections, thereby indirectly affecting the rights of many millions of other voters.

351.    The agency actions described above therefore "modif[y] substantive rights and interests," *Texas*, 809 F.3d at 176.

352.    These agency actions are therefore substantive rules.

353.    None of the exemptions from public notice applies here.  *See* 5 U.S.C. §§ 553(b)(A)–(B).

354.    Therefore, under the APA, the agency actions implementing the EO, resulting in such significant public impact, are substantive rules.

355.    Defendants failed to give the public notice of these agency actions before the agencies took them.  Indeed, none of the agency actions set forth above were published in the Federal Register.

356.    After notice, the agency must give the opportunity for public comment. *Id.* § 553(c).

357.    After allowing time for public comment, the agency must publish the final rule in the Federal Register, with an effective date of at least 30 days thereafter unless certain statutory exemptions apply.  *See id.* §§ 553(d)(1)–(3).

358.    There was no such delay in the effective date for these agency actions. And Defendants provided no opportunity for comment.

359.    Even if a final agency action would otherwise be lawful, that same action is unlawful if the agency did not follow the APA's mandatory notice-and-comment procedures in reaching the final result.

360.    Plaintiffs have no adequate remedy at law.

361.    These actions therefore violate the APA because they were taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

362.    Accordingly, this Court must hold them unlawful and set them aside.

**COUNT III**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious—Lack of Reasoned Decision**
**Arbitrary and Capricious—Pretext**

363.    Plaintiffs restate the foregoing paragraphs as if fully set forth herein.

364.    A district court must "hold unlawful and set aside agency action" that is "arbitrary" and "capricious."  5 U.S.C. § 706(2)(A).  An agency action is arbitrary and capricious if it does not "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choices made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).  The APA

"requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

365.   A court must "not defer to the agency's conclusory or unsupported suppositions." *Texas v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021) (citing *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010)).   The court must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State Farm*, 463 U.S. at 43. Such an error is one where the agency "entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Id.*

366.   An agency action taken to obtain partisan advantage in an election does not pursue a permissible objective. *Level the Playing Field v. FEC*, 961 F.3d 462, 464 (D.C. Cir. 2020); *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 768 (9th Cir. 2007).

367.   Vice President Harris admitted that this is the actual objective of the EO and implementing agency actions. *See supra* ¶ 89.

368.   The agency actions implementing the EO therefore are not the product of reasoned decisionmaking.

369.   As a separate but related issue, courts are empowered to find unlawful agency actions purportedly justified on a rationale that is pretextual, when courts identify evidence supporting an inference of pretext. *See Texas*, 809 F.3d at 173–75. Such pretext is arbitrary and capricious. *See id.*

370.   As Vice President Harris admitted, President Biden's and other Defendants' true purpose in the EO and the agency actions implementing it is to secure his party's victory in the presidential election in 2024, and also achieve broad-based victories for the Democratic Party. *See supra* ¶ 89.

371.   The purposes announced in the EO and in its implementing agency actions are therefore mere pretexts.

372.   Even if a final agency action would otherwise be lawful, that same action is unlawful as arbitrary and capricious if the agency did not engage in a properly reasoned process in reaching the final result.

373.   Plaintiffs have no adequate remedy at law.

374.   For both of these reasons, the agency actions implementing the EO therefore violate the APA because they are "arbitrary" and "capricious."  5 U.S.C. § 706(2)(A).  Accordingly, this Court should hold them unlawful and set them aside.

## COUNT IV
### Administrative Procedure Act, 5 U.S.C. § 706(2)(C)
### Exceeding Statutory Jurisdiction, Authority, or Limits

375.   Plaintiffs restate the foregoing paragraphs as if fully set forth herein.

376.   The APA requires that an agency action cannot exceed the limits of the authority that Congress conveyed to that agency by statute. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022).

377.   Any federal action regarding elections must be authorized by Congress in a statute.

378.   States have primacy in conducting elections, so federal actions involving elections inherently carry federalism implications.  *See Cook v. Gralike*, 531 U.S. 510, 523 (2001).

379.   For agency actions with federalism implications, Congress must speak with a clear voice authorizing those actions.  *Gregory v. Ashcroft*, 501 U.S. 452, 459–60 (1991).

380.   Under the major questions doctrine, the same clear-statement rule applies to agency actions of vast political significance.  *West Virginia*, 597 U.S. at 730.

381.   The NVRA does not clearly authorize the EO or the agency actions implementing the EO.

382.   No other statute enacted by Congress clearly authorizes the agency actions taken to implement the EO.

383.   Plaintiffs have no adequate remedy at law.

384.   The agency actions implementing the EO therefore violate the APA because they are "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).  Accordingly, this Court should hold them unlawful and set them aside.

**COUNT V**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Not in Accordance with Law—NVRA Purposes**
**Not in Accordance with Law—NVRA Lack of Designation**

385.   Plaintiffs restate the foregoing paragraphs as if fully set forth herein.

386.   Defendants' actions violate the NVRA.

387.   In the NVRA, Congress found that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections."  52 U.S.C. § 20501(a)(3).

388.   NVRA includes among its purposes "to protect the integrity of the electoral process."  *Id.* § 20501(b)(3).

389.   NVRA includes among its purposes "to ensure that accurate and current voter registration rolls are maintained."  *Id.* § 20501(b)(4).

390.   The agency actions taken to implement the EO discriminate against voting-age citizens who do not interact with federal agencies seeking benefits.

391.   The agency actions taken to implement the EO are unfair to voting-age citizens who do not interact with federal agencies seeking benefits.

392.   By increasing the opportunities for ineligible persons to register to vote, these agency actions are inconsistent with the purpose of ensuring that States maintain accurate and current voter registration rolls.

393.   Moreover, under NVRA § 7, States initiate a designation process by designating specific federal offices within the State as locations for voter registration, and the federal government responds by accepting or rejecting that designation.  52 U.S.C. § 20506.

394.   Thus, no federal offices in a State are designated as voter registration offices unless the State first affirmatively acts by offering to designate a federal office.

395.   While some States have designated certain federal offices as voter registration sites, others have not.

396.    States that have not designated federal offices under NVRA § 7 appear to include Texas and Ohio, but Plaintiffs are having difficulty confirming that fact because the Biden-Harris Administration has not been transparent regarding the implementation of the EO.

397.    The agency actions taken to implement the EO do not exempt federal employees in federal offices located in non-designating States from the EO's command to register voters.

398.    Federal agencies with offices in those States wherein federal employees or contractors are registering voters are thereby violating NVRA § 7.

399.    Plaintiffs have no adequate remedy at law.

400.    The agency actions taken to implement the EO therefore violate the APA because they are "not in accordance with law."  5 U.S.C. § 706(2)(A).  Accordingly, this Court should hold them unlawful and set them aside.

## COUNT VI
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Not in Accordance with Law—Hatch Act

401.    Plaintiffs restate the foregoing paragraphs as if fully set forth herein.

402.    The Hatch Act, Pub. L. No. 89-554, 80 Stat. 525 (1939), as amended, restricts political activities by federal employees.  "The law's purposes are to ensure that federal programs are administered in a nonpartisan fashion…."  Congress' policy in the Hatch Act includes "that employees should be encouraged to exercise fully, freely, and without fear … their right to … refrain from participating in the political processes of the Nation."  5 U.S.C. § 7321.  A federal employee may not "use his official

authority or influence for the purpose of interfering with or affecting the result of an election." *Id.* § 7323(a)(1). Moreover, federal employees cannot engage in political activity while on duty, in an agency building, wearing government uniforms, or using any government vehicle. *Id.* § 7324(a).

403. As noted above, *see supra* ¶¶ 125–28, GOTV activities unavoidably increase net turnout of whatever party has majority support in the area where the activities occur. Consequently, GOTV activities in geographical areas favoring Democrats will benefit Vice President Harris and the Democratic Party.

404. Therefore, GOTV activities cannot be conducted in a nonpartisan fashion—and those concentrated in Democratic-favoring communities are certainly partisan—and thus violate the Hatch Act.

405. However, some agency actions at issue here require federal employees to perform acts that are inconsistent with the Hatch Act.

406. Such activities ordered by decisionmaking personnel with the knowledge that Democrats will benefit electorally are therefore taken with the purpose of obtain partisan advantage in elections, and thus violates the Hatch Act.

407. Many of these GOTV activities are performed by federal employees on duty, or are performed in a government building, or while wearing a government uniform, or using a government vehicle, all of which further violate the Hatch Act.

408. To the extent that administrative agencies accept volunteer services from private organizations that have a partisan purpose in their voter registration

efforts, those service acts violate the Hatch Act, and therefore the agency's program or policy of accepting those volunteer services facilitates violations of the Hatch Act.

409.   Likewise, the extent that administrative agencies accept volunteer services from private organizations that have a partisan purpose in their GOTV efforts, those service acts violate the Hatch Act, and therefore the agency's program or policy of accepting those volunteer services facilitates violations of the Hatch Act.

410.   Given the EO's all-of-government approach, on information and belief, that all of these categories of Hatch Act violations are occurring in implementing the EO.

411.   Plaintiffs have no adequate remedy at law.

412.   The agency actions implementing the EO therefore violate the APA because they are "not in accordance with law."  5 U.S.C. § 706(2)(A).  Accordingly, this Court should hold them unlawful and set them aside.

**COUNT VII**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Not in Accordance with Law—Anti-Deficiency Act**

413.   Plaintiffs restate the foregoing paragraphs as if fully set forth herein.

414.   The Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 923 (1982) (codified at 31 U.S.C. § 1341) (ADA), prohibits money from being expended from the Treasury in excess of the amount appropriated by Congress through legislation for that item.

415.   The ADA is the statutory codification of the Constitution's prohibition regarding unauthorized federal spending, as found in the Appropriations Clause, U.S. CONST. art. I, § 9, cl. 7.

416.   At least twenty-seven States have banned private dollars (a.k.a. Zuckbucks) from being used to fund elections.  *See supra* ¶ 135.

417.   Congress has not appropriated money for federal voter registration programs or GOTV programs.

418.   Many of these agency GOTV activities implementing the EO are performed by federal employees during work hours.

419.   Other such GOTV activities are performed by federal contractors who are receiving taxpayer money.

420.   Therefore, federal dollars spent by federal agencies to implement the EO are not authorized by Congress in duly enacted spending legislation.

421.   It violates the ADA for federal agencies to spend money from the treasury—including on employees and contractors—on anything for which Congress has not appropriated funds.

422.   Plaintiffs have no adequate remedy at law.

423.   The agency actions implementing the EO therefore violate the APA because they are "not in accordance with law."  5 U.S.C. § 706(2)(A).  Accordingly, this Court should hold them unlawful and set them aside.

## COUNT VIII
### Administrative Procedure Act, 5 U.S.C. § 706(2)(B)
### Contrary to Constitutional Right—Fundamental Right to Vote

424.   Plaintiffs restate the foregoing paragraphs as if fully set forth herein.

425.   Congress has found that "the right of citizens of the United States to vote is a fundamental right."  52 U.S.C. § 20501(a)(1).

426.   That provision refers  to a right in the Constitution of the United States that Congress thereby acknowledged in the NVRA.  *See Harper v. Va. State. Bd. of Elections*, 383 U.S. 663, 667 (1966).

427.   In addition to the right to register and cast a ballot, the right to vote is the right to a fully effectual vote, one that is not diluted or canceled by another person's illegal election activity.  *Bush v. Gore*, 531 U.S. 98, 105 (2000) (per curiam).

428.   That is why it is a purpose of NVRA "to ensure that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501(b)(4).

429.   The agency actions implementing the EO facilitate the registration of noncitizens—including illegal aliens—and citizens who are ineligible to vote.

430.   The agency actions implementing the EO through GOTV programs will also result in some of those unlawful registrants casting ballots.

431.   Those ballots will dilute the lawful votes cast by lawful voters, violating the constitutional rights of those lawful voters.

432.   Those unlawful ballots could alter the outcome of close elections, compounding the violation of lawful voters' constitutional rights.

433.   Plaintiffs have no adequate remedy at law.

434.   The agency actions implementing the EO therefore violate the APA because they are "contrary to constitutional right," 5 U.S.C. § 706(2)(B).  Accordingly, this Court should hold them unlawful and set them aside.

**COUNT IX**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**
**Contrary to Constitutional Right—Elections and Electors Clauses**
**Contrary to Constitutional Right—Tenth Amendment**

435.   Plaintiffs restate the foregoing paragraphs as if fully set forth herein.

436.   The Elections Clause and Electors Clause of the Constitution recognize the primacy of state legislatures in the federal electoral process, with a limited federal role.  *See supra* ¶¶ 6–7, 54–57.

437.   Even that federal role, however, is determined by Congress through legislation.  *See id.*  Federal agencies have no inherent authority to take actions that influence elections without authorization by Congress.

438.   The Tenth Amendment reserves to all Plaintiffs the right to be free of election regulations that are not authorized by federal or state statutes.  *Cf. Bond v. United States*, 564 U.S. 211, 222 (2011).

439.   Therefore, U.S. citizens have a constitutional right under the Elections and Electors Clauses to participate in elections according to the manner prescribed by state and federal legislatures, without modification by federal agency actions that do not flow from Acts of Congress.

440.   Moreover, candidates for elected office have a right under the Elections and Electors Clauses and the Tenth Amendment to run for office in elections according to the manner prescribed by state and federal legislatures, without modification by federal agency actions that do not properly flow from Acts of Congress.

441.    Similarly, political parties have a right under the Elections and Electors Clause to promote, campaign for, nominate, and elect officeholders according to the manner prescribed by state and federal legislatures, without modification by federal agency actions that do not properly flow from Acts of Congress.

442.    Election administrators have the right under the Elections and Electors Clauses and the Tenth Amendment to conduct registration-related or election-related activities according to the manner prescribed by state and federal legislatures, without modification by federal agency actions that do not properly flow from Acts of Congress.

443.    The agency actions implementing the EO modify States' conduct of elections, and they do so without federal statutory authority.

444.    The agency actions therefore violate Plaintiffs' rights under the Elections and Electors Clauses, and they violate the Tenth Amendment.

445.    Plaintiffs have no adequate remedy at law.

446.    The agency actions implementing the EO therefore violate the APA because they are "contrary to constitutional right." 5 U.S.C. § 706(2)(B). Accordingly, this Court should hold them unlawful and set them aside.

## COUNT X
### Administrative Procedure Act, 5 U.S.C. § 706(2)(B)
### Contrary to Constitutional Right—Unconstitutional Delegation

447.    Plaintiffs restate the foregoing paragraphs as if fully set forth herein.

448.    Congress cannot delegate its legislative authority. *See Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).

449.    Therefore, Congress must set forth an intelligible principle to constrain and direct agency action, so as not to delegate actual legislative power. *Gundy v. United States*, 588 U.S. 128, 145–46 (2019).

450.    To the extent that the NVRA is read broadly enough to authorize the EO or the agency actions implementing it, that purported authorization does not include a sufficiently intelligible principle, and thus would violate the nondelegation doctrine.

451.    Plaintiffs have a constitutional right to be governed by laws enacted by Congress, not laws declared by fiat by the Executive pursuant to a delegation of legislative power to the Executive.

452.    Plaintiffs have no adequate remedy at law.

453.    The agency actions implementing the EO therefore violate the APA because they are "contrary to constitutional right." 5 U.S.C. § 706(2)(B). Accordingly, this Court should hold them unlawful and set them aside.

## COUNT XI
### Administrative Procedure Act, 5 U.S.C. § 706(2)(B)
### Contrary to Constitutional Right—First Amendment

454.    Plaintiffs restate the foregoing paragraphs as if fully set forth herein.

455.    The Federal Government may engage in its own speech, and generally may convey the message it wishes to convey. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015).

456.    However, there are constitutional limits on government speech. *See id.* at 208.

457. Generally, the government may not compel speech. *Id.*

458. The government also generally may not engage in viewpoint discrimination. *Shurtleff v. City of Bos.*, 596 U.S. 243, 247–48 (2022).

459. The Biden-Harris Administration cannot engage in taxpayer-funded government speech that so directly funds and disseminates advancing the electoral prospects of Vice President Harris and the Democratic Party at the expense of opposing candidates and parties through compelling speech to advance a particular viewpoint that goes beyond legitimate uses of government speech. *See NRA v. Vullo*, 602 U.S. 175, 190–92 (2024).

460. The EO and agency actions implementing it compel precisely such partisan, viewpoint-based discrimination, and thereby violate the First Amendment rights of Plaintiffs.

461. Plaintiffs have no adequate remedy at law.

462. The agency actions implementing the EO therefore violate the APA because they are "contrary to constitutional right." 5 U.S.C. § 706(2)(B). Accordingly, this Court should hold them unlawful and set them aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court:

a. Declare that President Biden lacked constitutional and statutory authority to issue Executive Order 14019, and therefore that the Executive Order is unlawful because it is *ultra vires* (Count I);

b.      Preliminarily and permanently enjoin each agency action implementing Executive Order 14019 as unlawful, or vacate each such agency action as unlawful (Counts II–XI);

c.      Declare that the agency actions implementing Executive Order 14019 violate 5 U.S.C. § 706(2)(D) because of those agency actions' lack of public notice and comment (Count II);

d.      Declare that the agency actions implementing Executive Order 14019 violate 5 U.S.C. § 706(2)(A) because the agency actions are intended for an impermissible purpose, and thus are not reasonable, nor the product of reasoned decisionmaking, and therefore are arbitrary and capricious (Count III);

e.      Declare that the agency actions implementing Executive Order 14019 violate 5 U.S.C. § 706(2)(A) because the agency actions are pretextual, and therefore are arbitrary and capricious (Count III);

f.      Declare that the agency actions implementing Executive Order 14019 violate 5 U.S.C. § 706(2)(C) because the agency actions exceed statutory jurisdiction, authority, and limits under the NVRA (Count IV);

g.      Declare that the agency actions implementing Executive Order 14019 violate 5 U.S.C. § 706(2)(A) because the agency actions violate the NVRA's purposes and policy and thus are not in accordance with law (Count V);

h.      Declare that the agency actions implementing Executive Order 14019 violate 5 U.S.C. § 706(2)(A) because many States did not designate federal offices as

voter registration agencies under NVRA § 7, and thus those federal offices' actions are not in accordance with law (Count V);

i. Declare that the agency actions implementing Executive Order 14019 violate 5 U.S.C. § 706(2)(A) because the agency actions result in federal employee actions that violate the Hatch Act, and thus are not in accordance with law (Count VI);

j. Declare that the agency actions implementing Executive Order 14019 violate 5 U.S.C. § 706(2)(A) because the agencies are spending federal funds that were not appropriated by Congress, thereby violating the Anti-Deficiency Act, and thus are not in accordance with law (Count VII);

k. Declare that the agency actions implementing Executive Order 14019 violate 5 U.S.C. § 706(2)(B) because the agency actions violate the fundamental right to a fully effectual vote, and thus is contrary to constitutional right (Count VIII);

l. Declare that the agency actions implementing Executive Order 14019 violate 5 U.S.C. § 706(2)(B) because the agency actions violate Plaintiffs' constitutional rights under the Elections Clause, Electors Clause, and Tenth Amendment, and therefore are contrary to constitutional right (Count IX);

m. Declare that the agency actions implementing Executive Order 14019 violate 5 U.S.C. § 706(2)(B) because, if the NVRA can be read broadly enough to authorize the EO or those implementing agency actions, then it violates the nondelegation doctrine, and therefore is contrary to constitutional right (Count X);

n.      Declare that the agency actions implementing Executive Order 14019 violate 5 U.S.C. § 706(2)(B) because the agency actions result in compelled speech and viewpoint discrimination, and therefore are contrary to constitutional right (Count XI);

o.      Enjoin Defendants Department of Homeland Security and Social Security Administration to provide to Plaintiff election administrators meaningful access to the Systematic Alien Verification for Entitlements ("SAVE") and the Social Security Number Verification Service so that those Plaintiffs can better verify the citizenship of voters on the rolls, pursuant to those administrators' duties under the NVRA;

p.      Award Plaintiffs the costs of this suit and reasonable attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and other applicable laws; and

q.      Grant any other relief that the Court deems just, proper, and equitable.

July 31, 2024                               Respectfully submitted,

                                           */s/ Kenneth A. Klukowski*
                                           H. CHRISTOPHER BARTOLOMUCCI*
                                           D.C. Bar No. 453423
                                           KENNETH A. KLUKOWSKI
                                           D.C. Bar No. 1046093
                                           JUSTIN A. MILLER
                                           Tex. Bar No. 24116768
                                           SCHAERR | JAFFE LLP
                                           1717 K Street NW, Suite 900
                                           Washington, DC 20006
                                           Telephone: (202) 787-1060
                                           Facsimile: (202) 776-0136
                                           kklukowski@schaerr-jaffe.com

                                           *Admitted *pro hac vice*

                                           *Attorneys for Plaintiffs*

                                           JESSICA HART STEINMANN
                                           Tex. Bar No. 24067647
                                           MICHAEL D. BERRY
                                           Tex. Bar No. 24085835
                                           AMERICA FIRST POLICY INSTITUTE
                                           1635 Rogers Road
                                           Fort Worth, TX 76107
                                           Telephone: (571) 348-1802

                                           *Attorneys for America First Policy
                                           Institute*