**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| AMERICA FIRST POLICY INSTITUTE, *et al.*, | § | |
| | § | |
| | § | |
| *Plaintiffs,* | § | |
| v. | § | Civil Action No.: 2:24-cv-00152-Z |
| | § | |
| JOSEPH R. BIDEN, JR., in his official capacity | § | |
| as President of the United States, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ........................................................................................................... 1

ARGUMENT ................................................................................................................ 7

    I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. .................................. 7

        A.    Agencies implementing the EO exceed statutory authority............................ 10

            1.    Congress must clearly authorize agency actions implicating federalism concerns and the major questions doctrine. ...................... 10

            2.    These agency actions exceed statutory authority under the clear-statement rule, as confirmed by history. ..................................... 12

        B.    Agency actions implementing the EO were not preceded by required notice and comment. ..................................................................................... 16

        C.    Agency actions implementing the EO are arbitrary and capricious. .............. 25

            1.    Agency actions implementing the EO have impermissible partisan objectives...................................................................................... 26

            2.    GOTV activities are inherently partisan. ............................................... 31

            3.    Consequently, the proffered reason for these actions is mere pretext. ................................................................................................... 33

            4.    Ignoring risks of noncitizen voting and discouraging voters make the challenged agency actions arbitrary and capricious. ........... 35

        D.    The challenged agency actions are inconsistent with NVRA and violate other statutes. ..................................................................................... 36

            1.    Inconsistency with NVRA § 2 and violations of other federal laws. .................................................................................................... 36

            2.    The challenged actions in non-designating States violate NVRA § 7. ............................................................................................ 39

        E.    The challenged actions also violate the Anti-Deficiency Act because Congress has not appropriated funds for them. ............................................. 40

        F.    President Biden acted *ultra vires* in issuing Executive Order 14019. ........... 42

    II.    REMAINING INJUNCTION FACTORS ARE SATISFIED. ....................................... 43

    III.    A TEMPORARY RESTRAINING ORDER AND NATIONWIDE RELIEF ARE WARRANTED HERE. .............................................................................................................. 47

CONCLUSION............................................................................................................ 50

CERTIFICATE OF SERVICE ..................................................................................... 52

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abbott v. Perez*,
  585 U.S. 579 (2018).................................................................................. 46

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
  594 U.S. 758 (2021).................................................................................. 11

*Am. First Legal Found. v. USDA*,
  No. 23-5173 (D.C. Cir. argued Sept. 5, 2024)...................................... 48

*Am. Sch. of Magnetic Healing v. McAnnulty*,
  187 U.S. 108 (1902).................................................................................. 43

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983).................................................................................. 11

*Arizona v. Inter Tribal Council of Ariz.*,
  570 U.S. 1 (2013)...................................................................................... 21

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015).................................................................................. 43

*Ashcroft v. Biden*,
  No. 4:24-cv-01062-SEP (E.D. Mo. filed July 31, 2024) ........................ 6

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
  715 F.2d 897 (5th Cir. 1983) .................................................................. 16

*Bellito v. Snipes*,
  935 F.3d 1192 (11th Cir. 2019) .............................................................. 27

*Biden v. Missouri*,
  595 U.S. 87 (2022).................................................................................... 15

*Biden v. Nebraska*,
  600 U.S. 477 (2023)..................................................................... 11, 14, 15

*Brnovich v. Democratic Nat'l Comm.*,
  594 U.S. 647 (2021).................................................................................. 26

*BST Holdings, LLC v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) .................................................................. 46

*Burgess v. Fed. Deposit Ins.*,
  871 F.3d 297 (5th Cir. 2017) .................................................................. 45

*Bush v. Gore*,
  531 U.S. 98 (2000)............................................................................. 11, 37

*Canal Auth. of State of Fla. v. Callaway*,
  489 F.2d 567 (5th Cir. 1974) .................................................................. 48

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024).................................................................................. 40

*Chamber of Com. v. Reich,*
   74 F.3d 1322 (D.C. Cir. 1996) ........................................................................ 42, 43

*Chiafalo v. Washington,*
   591 U.S. 578 (2020) ........................................................................................ 10

*Citizens United v. FEC,*
   558 U.S. 310 (2010) ........................................................................................ 11

*City of Arlington v. FCC,*
   569 U.S. 290 (2013) ........................................................................................ 16

*Cook v. Gralike,*
   531 U.S. 510 (2001) ........................................................................................ 10

*Crawford v. Marion Cnty. Election Bd.,*
   472 F.3d 949 (7th Cir. 2007) .......................................................................... 45

*Crawford v. Marion Cnty. Election Bd.,*
   553 U.S. 181 (2008) .................................................................................. 37, 46

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC,*
   710 F.3d 579 (5th Cir. 2013) .......................................................................... 45

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.,*
   45 F.4th 846 (5th Cir. 2022) .......................................................................... 50

*Dep't of Comm. v. New York,*
   588 U.S. 752 (2019) .................................................................................. *passim*

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.,*
   591 U.S. 1 (2020) .............................................................................................. 8

*Dep't of Lab. v. Kast Metals Corp.,*
   744 F.3d 1145 (5th Cir. 1984) ........................................................................ 17

*Duncan v. Poythress,*
   657 F.2d 691 (5th Cir. Unit B Sept. 1981) ..................................................... 10

*Earth Island Inst. v. Hogarth,*
   494 F.3d 757 (9th Cir. 2007) .......................................................................... 26

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
   485 U.S. 568 (1988) ........................................................................................ 38

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016) .................................................................................. 25, 31

*Farace v. Indep. Fire Ins. Co.,*
   699 F.2d 204 (5th Cir. 1983) .......................................................................... 49

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ........................................................................................ 34

*FCC v. Prometheus Radio Project,*
   592 U.S. 414 (2021) ........................................................................................ 25

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ........................................................................................................ 11

*Fed. Sav. & Loan Ins. Corp. v. Dixon*,
  835 F.2d 554 (5th Cir. 1987) ........................................................................................... 48

*Fishermen's Finest, Inc. v. Locke*,
  593 F.3d 886 (9th Cir. 2010) ........................................................................................... 26

*Fort James Corp. v. Thiel Eugene Ratliff*,
  No. 3:99-CV-0148-D, 1999 WL 97932 (N.D. Tex. Feb. 12, 1999) ................................ 49

*Funk v. Stryker Corp.*,
  631 F.3d 777 (5th Cir. 2011) ........................................................................................... 48

*GE Cap. Com. Inc. v. Wright & Wright Inc.*,
  No. 3:09-CV-572-L, 2009 WL 1148235 (N.D. Tex. Apr. 28, 2009) ............................... 49

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ........................................................................................................ 10

*Hawaii v. Trump*,
  878 F.3d 662 (9th Cir. 2017) ..................................................................................... 42, 43

*Int'l Chem. Workers Union v. Columbian Chem. Co.*,
  331 F.3d 491 (5th Cir. 2003) ........................................................................................... 49

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) ........................................................................................................ 38

*Jones v. Tex. Dep't of Crim. Just.*,
  880 F.3d 756 (5th Cir. 2018) ............................................................................................. 7

*King v. Burwell*,
  576 U.S. 473 (2015) ........................................................................................................ 30

*Leedom v. Kyne*,
  358 U.S. 184 (1958) ........................................................................................................ 43

*Level the Playing Field v. FEC*,
  961 F.3d 462 (D.C. Cir. 2020) ......................................................................................... 26

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) ................................................................................................. 7, 10

*Louisiana v. Dep't of Energy*,
  90 F.4th 461 (5th Cir. 2024) ...................................................................................... 36, 45

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ........................................................................................................ 46

*Maryland v. King*,
  567 U.S. 1301 (2012) ...................................................................................................... 46

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ........................................................................................................ 44

iv

*Missouri ex rel. Bailey v. Biden*,
    No. 4:24-cv-01063-RWS (E.D. Mo. filed Aug. 1, 2024) ...................................... 6

*Mock v. Garland*,
    75 F.4th 563 (5th Cir. 2023) ...................................................................... 47

*Montana v. Biden*,
    No. 6:24-cv-01141-DDC-GEB (D. Kan. filed Aug. 13, 2024) ............................ 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) ........................................................................ 25, 31, 35, 36

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*,
    894 F.3d 95 (2d Cir. 2018) ........................................................................ 16

*Nelson v. Warner*,
    12 F.4th 376 (4th Cir. 2021) ...................................................................... 45

*NFIB v. OSHA*,
    595 U.S. 109 (2022) ........................................................................... 11, 15

*Norman Bridge Drug Co. v. Banner*,
    529 F.2d 822 (5th Cir. 1976) ................................................................. 7, 48

*Norwood v. Harrison*,
    413 U.S. 455 (1973) ................................................................................. 42

*Nuziard v. Minority Bus. Dev. Agency*,
    No. 4:23-CV-00278-P, 2024 WL 965299 (N.D. Tex. Mar. 5, 2024) ...................... 50

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ............................................................................... 35, 46

*Republican Nat'l Comm. v. Whitmer*,
    No. 1:24-cv-00720-PLM-SJB (W.D. Mich. filed July 15, 2024) ......................... 7

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ................................................................... 46

*Sackett v. EPA*,
    598 U.S. 651 (2023) ........................................................................... 10, 14

*Sambrano v. United Airlines, Inc.*,
    No. 21-11159, 2022 WL 486610 (5th Cir. Feb. 17, 2022) ................................ 46

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) .................................................................................. 34

*SEC v. Cherif*,
    933 F.2d 403 (7th Cir. 1991) ..................................................................... 49

*SEC v. Collector's Coffee, Inc.*,
    697 F. Supp. 3d 138 (S.D.N.Y. 2023) ......................................................... 49

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001) ....................................................................... 10, 38, 39

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) .................................................................................. 39

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) .................................................................................. 45

*Tex. Democratic Party v. Benisker*,
   459 F.3d 582 (5th Cir. 2006) .................................................................. 45

*Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.*,
   201 F.3d 551 (5th Cir. 2000) .................................................................. 16

*Texas v. Biden*,
   10 F.4th 538 (5th Cir. 2021) .................................................................. 25

*Texas v. Biden*,
   554 F. Supp. 3d 818 (N.D. Tex. 2021) ................................................ 50

*Texas v. EEOC*,
   933 F.3d 433 (5th Cir. 2019) ............................................................ 8, 16

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) .................................................................. 46

*Texas v. Nuclear Regul. Comm'n*,
   78 F.4th 827 (5th Cir. 2023) .................................................................. 12

*Texas v. U.S. Dep't of Homeland Sec.*,
   __ F. Supp. 3d __, No. 6:23-cv-00007, 2024 WL 1021068
   (S.D. Tex. Mar. 8, 2024) ........................................................................ 22

*Texas v. United States*,
   40 F.4th 205 (5th Cir. 2022) .................................................................. 47

*Texas v. United States*,
   50 F.4th 498 (5th Cir. 2022) .................................................................. 47

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ...................................................... *passim*

*The Found. Gov't Accountability v. U.S. Dep't of Just.*,
   No. 2:22-cv-00252-JLB-KCD (M.D. Fla.) ........................................ 48

*Trump v. Hawaii*,
   585 U.S. 667 (2018) .................................................................................. 42

*Turtle Island Foods, S.P.C. v. Strain*,
   65 F.4th 211 (5th Cir. 2023) .................................................................. 38

*U.S. Chamber of Com. v. U.S. Dep't of Lab.*,
   885 F.3d 360 (5th Cir. 2018) .................................................................. 36

*United States v. Fallen*,
   498 F.2d 172 (8th Cir. 1974) .................................................................. 49

*United States v. Johnson*,
   632 F.3d 912 (5th Cir. 2011) .................................................................. 25

*United States v. Quezada*,
 754 F.2d 1190 (5th Cir. 1985) ................................................................. 48

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*,
 985 F.3d 472 (5th Cir. 2021) ................................................................. 25

*Util. Air Regul. Grp. v. EPA*,
 573 U.S. 302 (2014).................................................................................. 11

*Wages & White Lion Invs., LLC v. FDA*,
 16 F.4th 1130 (5th Cir. 2021) ................................................................. 46

*Ward v. Thompson*,
 No. 22-16473, 2022 WL 14955000 (9th Cir. Oct. 22, 2022) .................. 49

*West Virginia v. EPA*,
 597 U.S. 697 (2022)................................................................... 10, 11, 15

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
 586 U.S. 9 (2019)...................................................................................... 8

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008)...................................................................................... 46

**Constitutional Provisions**

U.S. CONST. art. I ................................................................................................ 11

**Statutes**

5 U.S.C. § 551.................................................................................................... 8

5 U.S.C. § 553.................................................................................................... 24

5 U.S.C. § 704.................................................................................................... 8

5 U.S.C. § 706.................................................................................... *passim*

8 U.S.C. § 1373.................................................................................................. 47

20 U.S.C. § 1087-51 ......................................................................................... 36

20 U.S.C. § 1087-53 ................................................................................... 36, 41

31 U.S.C. § 1341................................................................................................ 40

31 U.S.C. § 1342................................................................................................ 40

31 U.S.C. § 1517................................................................................................ 40

52 U.S.C. § 20501 ....................................................................................... 35, 37

52 U.S.C. § 20506 ......................................................................................... 9, 39

52 U.S.C. § 20507 ............................................................................................. 44

52 U.S.C. § 20509 ............................................................................................. 44

52 U.S.C. § 21083 ............................................................................................. 23

Administrative Procedure Act, 5 U.S.C. § 551 *et seq*..................................... 7

Help America Vote Act, Pub. L. No. 107-252, 116 Stat. 1666 (2002)
(codified at 52 U.S.C. § 20901 *et seq.*)...................................................................... 23

National Voter Registration Act, 52 U.S.C. §§ 20501–20511..................................................... 9

**Regulations**

11 C.F.R. § 100.133 ........................................................................................................... 40

34 C.F.R. § 675.22 ........................................................................................................ 36, 41

*Comprehensive Election Security Ensuring Legal Voters and Accurate Counting*,
Exec. Order 35 (Va. Aug. 7, 2024) ...................................................................... 22

Executive Order 14019, *Promoting Access to Voting*,
86 Fed. Reg. 13,623 (Mar. 7, 2021)...................................................................... *passim*

Systematic Alien Verification for Entitlements Program System of Records,
76 Fed. Reg. 58,525 (Sept. 21, 2011) ...................................................................... 47

**Treatise**

11A Charles A. Wright & Arther R. Miller,
Fed. Prac. & Proc. § 2951 (3d ed. 2024 update) ...................................................................... 47

**Other Authorities**

Samuel J. Abrams,
*One of the Most Liberal Groups in America*, InsideHigherEd.com
(Nov. 7, 2018) ...................................................................... 28

American Heritage Dictionary (3d ed. 1996) ...................................................................... 9

*The American Presidency Project: Statistics*,
UC Santa Barbara (Mar. 3, 2021)...................................................................... 14

*The Americans with Disabilities Act and Other Federal Laws Protecting
the Rights of Voters with Disabilities*, Dep't of Just. (Apr. 18, 2024).................................... 19

Phillip J. Ardoin et al.,
*The Partisan Battle Over College Student Voting: An Analysis of Student
Voting Behavior in Federal, State, and Local Elections*,
96 Soc. Sci. Q. 1178 (2015) ...................................................................... 27

Emily Badger,
*Liberals are More Likely to Use Public Transit than Conservatives*,
Wash. Post (June 30, 2014) ...................................................................... 31

*Biden-Harris Administration Finalizes Policies to Increase Access
to Health Coverage for DACA Recipients*,
U.S. Dep't of Health & Hum. Servs. (May 3, 2024) ...................................................................... 21

Black's Law Dictionary (9th ed. 2009) ...................................................................... 9

Evie Blad,
*Help Students Register to Vote, Education Department Urges Schools*,
EducationWeek (Feb. 27, 2024)...................................................................... 12

*Changing Partisan Coalitions in a Politically Divided Nation*,
    PEW RSCH. CTR. (Apr. 9, 2024) ...................................................................... 28, 30

Josh Christenson,
    *How Non-Citizens Are Getting Voter Registration Forms Across the US—and*
    *How Republicans Are Trying to Stop It*, N.Y. POST (June 14, 2024) ..................................... 21

*CZI Announces David Plouffe to Lead Policy and Advocacy Work*,
    Chan Zuckerberg Initiative (Jan. 20, 2017) .......................................................... 2, 32

Demos,
    *Federal Agency Voter Registration Estimates of Annual Impact* (Feb. 2023) ........................ 14

*Demos*, INFLUENCE WATCH ............................................................................... 27

Editorial,
    *Zuckerbucks Shouldn't Pay for Elections*, WALL ST. J. (Jan. 3, 2022)........................... 2, 32, 33

Fed. Election Comm'n,
    No. 2-0000TBD/SPATBD, Federal Elections 2020: Election Results for
    the U.S. President, the U.S. Senate and the U.S. House of
    Representatives (Oct. 2022).............................................................................. 3

For the People Act, H.R. 1, 117th Cong. (2021) ........................................................ 15

Freedom to Vote Act, H.R. 11, S. 1, 118th Cong. (2023) ............................................... 15

Freedom to Vote Act, S. 2747, 117th Cong. (2021)..................................................... 15

Shane Goldmacher & Reid J. Epstein,
    *Kamala Harris Hires Top Obama Advisers, Building Out Campaign*,
    N.Y. TIMES (Aug. 2, 2024) .......................................................................... 5, 33

Christal Hayes,
    *Virginia Election Tie: Coin Tosses, Picking Names in a Hat?*
    *Yep, That's How Some Races are Decided*, USA TODAY (Dec. 21, 2017) ........................... 22

*Head Start Services*,
    Dep't of Health & Hum. Servs. (June 30, 2023) ...................................................... 30

House Judiciary Committee GOP,
    *Mark Zuckerberg just admitted three things*, FACEBOOK (Aug. 26, 2024) ............................. 6

Joshua Kalla & David E. Broockman,
    *The Minimal Persuasive Effects of Campaign Contact in General Elections:*
    *Evidence from 49 Field Experiments*, 112 AM. POL. SCI. REV. 148 (2017) ........................... 31

M.D. Kittle,
    *'Bidenbucks' Plan Uses Native American School Children in Voter*
    *Registration Scheme*, THE FEDERALIST (July 31, 2024) .............................................. 14

M.D. Kittle,
    *EXCLUSIVE: House Committee Gives Cabinet Secretaries 5 Days To Release*
    *'Bidenbucks' Docs*, THE FEDERALIST (July 30, 2024)................................................. 5

M.D. Kittle,
*No One Knows How Much 'Bidenbucks' Is Costing Taxpayers,*
*Not Even Congress*, THE FEDERALIST (July 1, 2024) .............................................. 4

Letter from James Comer, Chairman,
H. Comm. on Oversight & Accountability et al., to Shalanda Young,
Dir., Off. Mgmt. & Budget (May 13, 2024) ........................................ 15

Letter from Sen. Joni K. Ernst, Ranking Member,
Comm. on Small Bus. & Entrepreneurship, to Isabel Casillas Guzman,
Admin., U.S. Small Bus. Admin. (Apr. 19, 2024)........................................ 29

Letter from Virginia Foxx, Bryan Steil, Mary Miller & Laurel Lee, U.S. Reps.,
to Miguel Cardona, Sec'y, U.S. Dep't of Educ. (Mar. 12, 2024)............................... 4

Letters from Comm. on H. Admin., to Agency Heads (May 15, 2024) ........................ 4

Barbara J. Lucas,
*Unabashed Radicals: The Mission of Demos, Elizabeth Warren's Favorite*
*Left-wing Group*, CAPITAL RSCH. CTR. (July 3, 2014) ............................... 27

Fred Lucas,
*Exclusive: How Biden Pushes Inmate Voting with Help From Interest Groups*,
DAILY SIGNAL (Jan. 30, 2024) ........................................ 19

Charlie Mahtesian & Madi Alexander,
*"This is a Really Big Deal": How College Towns Are Decimating the GOP*,
POLITICO (July 21, 2023) ........................................ 27

Dylan Matthews,
*A massive new study reviews the evidence on whether campaigning works.*
*The answer's bleak.*, VOX (Sept. 28, 2017) ........................................ 31

Anna Maria Mayda et al.,
*Immigration to the U.S.: A Problem for the Republicans or the Democrats?*
(Nat'l Bureau of Econ. Rsch., Working Paper No. 21941, 2016) ........................... 30

Rich Morin,
*The Politics and Demographics of Food Stamp Recipients*,
PEW RSCH. CTR. (July 12, 2013)........................................ 30

Kamden Mulder,
*Hearing: Federal Business Agency Spends 'Bidenbucks' to Win*
*Michigan for Democrats*, THE FEDERALIST (June 4, 2024).................................. 29

Tina Namian, U.S. Dep't of Agric.,
*Promoting Access to Voting through the Child Nutrition Programs*,
Pol'y & Program Dev. Div. (Mar. 23, 2022)........................................ 13

David Plouffe,
*A Citizen's Guide to Beating Donald Trump* (2020) ........................................ 2, 32

*David Plouffe*, OBAMA PRES. CTR. ........................................ 32

Press Release 24-23, Small Bus. Admin.,
   SBA Administrator Guzman Announces Agency's First-Ever Voter Registration
   Agreement with Michigan Department of State (Mar. 19, 2024)............................ 28

Press Release, Off. of Tex. Governor,
   Governor Abbott Announces Over 1 Million Ineligible Voters Removed
   From Voter Rolls (Aug. 26, 2024).......................................................................... 22

Nicole Russell,
   *Republicans Were Right: Zuckerberg Admits Biden Administration Censored
   Your Facebook Feed*, USA TODAY (Aug. 28, 2024) ................................................ 6

SAFEGUARD AMERICAN VOTER ELIGIBILITY ACT,
   H.R. REP. NO. 118-552 (2024).......................................................................... 23, 24

ANTONIN SCALIA & BRYAN A. GARNER,
   READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) ............................ 38

Tom Scheck et al.,
   *How Private Money From Facebook's CEO Saved The 2020 Election*,
   NAT'L PUB. RADIO (Dec. 8, 2020) .......................................................................... 33

Michael Scherer,
   *Mark Zuckerberg and Priscilla Chan Donate $100 Million More to
   Election Administrators, Despite Conservative Pushback*,
   WASH. POST (Oct. 13, 2020) ................................................................................... 32

Gregory S. Schneider,
   *A Single Vote Leads to a Rare Tie for Control of the Virginia Legislature*,
   WASH. POST (Dec. 19, 2017) ................................................................................... 22

Eugene Scott,
   *VP Harris to announce Biden team's plans to boost voting access*,
   AXIOS (Feb. 27, 2024) ....................................................................................*passim*

Hans von Spakovsky,
   *Biden Executive Order 14019: Unlawful Interference in State Election
   Administration*, THE HERITAGE FOUND. (Aug. 23, 2024)......................................... 5

Subpoena Cover Letters from Comm. on H. Admin.,
   to Agency Sec'ys (June 12, 2024) ............................................................................ 4

*Tbl. 2: Resident Population for the 50 States, the District of Columbia,
   and Puerto Rico: 2020 Census*, U.S. CENSUS BUREAU (Apr. 1, 2020) .................... 50

Ashley Tjhung,
   *Expanding Voter Registration: Reflections on the Voting Access
   Executive Order*, DEMOS: BLOG (Mar. 7, 2024) ................................................. 3, 26

Christopher Uggen & Jeff Manza,
   *Democratic Contraction? Political Consequences of Felon Disenfranchisement
   in the United States*, 67 AM. SOCIOLOGICAL REV. 777 (2002) .............................. 30

U.S. Dep't of Agric.,
  *SNAP Eligibility for Non-Citizens*, Food & Nutrition Serv. (Aug. 1, 2024) ........................... 13

U.S. Election Assistance Commission Funding Advisory Opinion FAO-08-005 ...................... 40

U.S. Marshals Serv., U.S. Dep't of Just.,
  *United States Marshals Service FY 2022 Annual Report* (Apr. 2023) .................................... 19

Jackson Walker,
  *Kamala Harris Says Government Will Pay College Students to Register Voters*,
  THE NAT'L DESK (Feb. 28, 2024) ........................................................................................... 41

Michael Watson,
  *Opinion Column: "A Republic, if you can keep it."*,
  MISS. SEC'Y OF STATE PRESS RELEASES & COLUMNS (Apr. 10, 2024) .................................... 19

NOAH WEBSTER,
  AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ............................................ 40

Ben Weingarten,
  *Exclusive: House Oversight Chair Threatens Subpoenas If White House
  Doesn't Cough Up 'Bidenbucks' Plans*, THE FEDERALIST (Aug. 26, 2024) .............................. 6

## PRELIMINARY STATEMENT

Plaintiffs challenge President Joseph Biden's Executive Order 14019, *Promoting Access to Voting*, 86 Fed. Reg. 13,623 (Mar. 7, 2021) (the EO).  For the reasons set forth below, the Court should enjoin Defendants from implementing the EO, which was issued to achieve electoral victories for the Democratic Party.  Invoking the National Voter Registration Act, the EO requires every federal agency to implement programs to register voters and turn out those votes, under White House supervision.  The EO thus commandeers every federal agency—regardless of the agency's statutory purpose—to use taxpayer money to create voter-registration programs and get-out-the-vote (GOTV) initiatives.  As demonstrated below, this is a blatant and unlawful effort to use federal machinery and taxpayer money to help elect Democratic candidates, including Vice President Kamala Harris.  Together, the EO and its implementing agency actions violate federal law, including multiple violations of the Administrative Procedure Act (APA).  The Constitution grants States primacy in elections, with Congress playing a vital—but carefully circumscribed—secondary role.  Through the Tenth Amendment, *all* other aspects of elections remain entrusted to the States as coequal sovereigns.  There is no federal role to engage in state voter registration or GOTV efforts—especially to benefit one political party.  Moreover, the limited role for the Federal Government in elections is vested in Congress *alone*, not the President acting unilaterally without congressional authorization or funding.  These agencies' actions violate the APA.

## BACKGROUND

Four years ago, the Biden-Harris ticket was the beneficiary of privately funded election-influence efforts that poured $400 million into predominantly Democratic areas to drive voter registration and GOTV efforts.  Once in the White House, the Biden-Harris Administration decided to expand their 2020 model by an order of magnitude with taxpayer dollars and federal

agencies.  The extent of this strategy remained largely hidden from view until Congress began investigating Executive Order 14019 this year.  The Biden-Harris Administration has resisted efforts to uncover the agency actions implementing the EO: now asserting presidential communications privilege for FOIA requests and defying congressional subpoenas.  Injunctive relief is necessary to prevent their unlawful actions from impacting future elections.

In 2020, Mark Zuckerberg infused $350 million into the presidential election from his Chan Zuckerberg Initiative (CZI) to the Center for Tech and Civic Life (CTCL).  *See* Editorial, *Zuckerbucks Shouldn't Pay for Elections*, WALL ST. J. (Jan. 3, 2022) (*Zuckerbucks*), https://tinyurl.com/WSJ-Zuckerburg-CTCL.  This funding played a major role in the election, giving Democrats an advantage over Republicans, especially in key swing States in the presidential election. It implemented the strategic voter registration and GOTV plan that David Plouffe, the campaign manager for President Barack Obama's victorious 2008 campaign, described in his book, *A Citizen's Guide to Beating Donald Trump* (2020).  *See generally CZI Announces David Plouffe to Lead Policy and Advocacy Work*, Chan Zuckerberg Initiative (Jan. 20, 2017), https://tinyurl.com/yc7d28ux.  In October 2019, Plouffe switched to a part-time strategy role.

The partisan nature of these efforts has been downplayed, but as sixteen Attorneys General concluded regarding the "Zuckbucks" program: "laudable activities like encouraging voter turnout and registering voters have to happen somewhere, and that somewhere decides elections."  ECF No. 11-5.  CTCL's "10 biggest grants per capita all went to counties that Biden won, 6 of which are part of the greater Atlanta metropolitan area.  Not surprisingly, these 10 counties gave Biden 60 percent (1.49 million votes) of his statewide total in Georgia, and nearly 378,000 votes over 2016 Democrat turnout.  Trump, however, only received 691,000 votes in these counties in 2020, an increase of just 92,000 votes over his 2016 performance.  Funding disparities apparently

achieved similar results in other battleground states.  So CTCL's non-partisan designation seems like a lie because it concentrated in areas that helped Democrats most."  *Id.* (footnotes omitted). These votes were enough to tip the scales in several key States: 10,457 (AZ); 11,779 (GA); 20,682 (WI); 33,596 (NV); 80,555 (PA).  Fed. Election Comm'n, No. 2-0000TBD/SPATBD, Federal Elections 2020: Election Results for the U.S. President, the U.S. Senate and the U.S. House of Representatives, at 7 (Oct. 2022), https://tinyurl.com/FEC-2020results.

Even before the Biden-Harris Administration took office, leftwing groups planned to vastly increase the scale of this private election-influence effort by embedding it in the administrative state.  One such group, Demos, published in December 2020 its strategy proposal for coordinated executive actions regarding elections.  Once President Biden and Vice President Harris were in the White House, their Administration began meeting with these groups on voter registration issues, notably without *any* groups aligned with conservative causes or Republicans, as one would expect from a truly neutral voter registration program.  ECF No. 11-2.

Executive Order 14019 became the product of these closed-door meetings.  Demos claimed credit for the EO and noted that "agency-based registration" could "add *millions* of eligible persons to the voting rolls."  ECF No. 11-4.  Demos also noted that the agencies implementing the EO were on track to deliver Democrat votes per the 2021 strategy, highlighting that it would target "people of color, people with low incomes, students and young people, and Native communities." *See* Ashley Tjhung, *Expanding Voter Registration: Reflections on the Voting Access Executive Order*, DEMOS: BLOG (Mar. 7, 2024), https://tinyurl.com/Demos-EO-Voter-Registration.  Through federal agencies and taxpayer dollars, these groups and the Biden-Harris administration aimed to reproduce the program that had been so successful for them in 2020.  Because these meetings took

place behind closed doors and congressional scrutiny did not bring these matters to the public's attention in a significant way until this year, this strategy flew largely under the radar.

In late February 2024, it became clear that the EO was not a neutral program. Axios interviewed Vice President Harris and her staff, and then reported their explanation as revealing the Biden-Administration's voting policy; the EO's purpose is "to try to boost turnout among key voting blocs this November," giving Democrats—including Vice President Harris herself—a partisan advantage. Eugene Scott, *VP Harris to announce Biden team's plans to boost voting access*, AXIOS (Feb. 27, 2024), https://tinyurl.com/nu77tch6. Private groups began seeking information on the EO through FOIA requests.

Given the Biden-Harris Administration's evasiveness over a purportedly pedestrian program, Congress began to investigate. On March 12, 2024, the House Administration Committee and Committee on Education and the Workforce asked the Department of Education about its GOTV efforts using federal work-study funds. Letter from Virginia Foxx, Bryan Steil, Mary Miller & Laurel Lee, U.S. Reps., to Miguel Cardona, Sec'y, U.S. Dep't of Educ. (Mar. 12, 2024), available at https://tinyurl.com/ywrsxfcx. On May 15, the House Administration Committee broadened its investigation to 15 agencies across the Biden-Harris Administration. Letters from Comm. on H. Admin., to Agency Heads (May 15, 2024), available at https://tinyurl.com/536pzs82. Nothing responsive was produced. The Committee formalized its requests with subpoenas on June 12, due two weeks later. Subpoena Cover Letters from Comm. on H. Admin., to Agency Sec'ys (June 12, 2024), *available at* https://tinyurl.com/wd6vwwhs. The Biden-Harris administration let the House's June 26 deadline pass without responsive production. M.D. Kittle, *No One Knows How Much 'Bidenbucks' Is Costing Taxpayers, Not Even Congress*, THE FEDERALIST (July 1, 2024), https://tinyurl.com/3uerrnk9. Plaintiffs here had become aware

of the EO and were monitoring the subpoenas to determine if there was a lawful explanation for agencies' actions, many of which had only recently become public.

Two weeks later, Plaintiffs filed suit. As Plaintiffs began their investigation, the Chair for the House Administration Committee warned the Biden-Harris Administration on July 29, 2024, that their meagre responses to the congressional subpoenas were non-responsive and demanded the subpoenaed documents within days. M.D. Kittle, *EXCLUSIVE: House Committee Gives Cabinet Secretaries 5 Days To Release 'Bidenbucks' Docs*, THE FEDERALIST (July 30, 2024), https://tinyurl.com/5ackver3. Plaintiffs amended their complaint two days after the Chair's warning and added additional Plaintiffs across 13 States to represent the widespread threat of the Biden-Harris administration's unconstitutional and illegal actions.

The scope of the EO's effects continued to increase during throughout August, as the States of Texas and Virginia each identified thousands of noncitizens on their voting roles, *see infra* Part I.B.3, and the Heritage Foundation issued a report on the EO, connecting the many efforts to obtain the agency strategic plans that the Biden-Harris Administration has been concealing. *See* Hans von Spakovsky, *Biden Executive Order 14019: Unlawful Interference in State Election Administration*, THE HERITAGE FOUND. (Aug. 23, 2024), https://tinyurl.com/5ctb5bmc. Of particular concern is the Administration's assertion of executive privilege regarding a FOIA request to the agencies to obtain the strategic plans and their litigating that assertion, as it indicates that Defendants will not voluntarily disclose these documents prior to the 2024 election.

In August, the same day that Vice President Harris secured enough delegates for the Democratic Party nomination, it was reported that Plouffe was joining her campaign as a senior advisor. Shane Goldmacher & Reid J. Epstein, *Kamala Harris Hires Top Obama Advisers, Building Out Campaign*, N.Y. TIMES (Aug. 2, 2024), https://tinyurl.com/ywmputxb. Then, on

August 26, the House Committee on Oversight and Accountability informed the Biden-Harris Administration that continued refusals to produce subpoenaed documents would lead the Committee to "consider additional measures, including the use of compulsory process, to gain compliance and obtain this critical material." Ben Weingarten, *Exclusive: House Oversight Chair Threatens Subpoenas If White House Doesn't Cough Up 'Bidenbucks' Plans*, THE FEDERALIST (Aug. 26, 2024), https://tinyurl.com/dsn8zp8v.

That same day, Zuckerberg admitted that in 2020, the FBI warned Zuckerberg about alleged disinformation that could harm the Biden-Harris nomination. Nicole Russell, *Republicans Were Right: Zuckerberg Admits Biden Administration Censored Your Facebook Feed*, USA TODAY (Aug. 28, 2024), https://tinyurl.com/5yfmfbk5. Zuckerberg suppressed the *New York Post*'s reporting on Hunter Biden's laptop and corruption allegations involving then-Democratic presidential nominee Biden. Zuckerberg admitted that the reporting was *not* disinformation. House Judiciary Committee GOP, *Mark Zuckerberg just admitted three things*, FACEBOOK (Aug. 26, 2024), https://tinyurl.com/yckdwyc2. Zuckerberg also admits the actions of his company during the 2020 election may have impacted the election results, claiming that they were supposedly nonpartisan but noting that "some people believe this work benefited one party over the other." *Id.* "Zuckbucks" may have ended, but the much larger "Bidenbucks" is now underway, and on the verge of its final phase. This unlawful program must be enjoined.[1]

---

[1] Subsequent to the filing of Plaintiffs' lawsuit, at least eleven other States filed suit against the EO through their Attorney General, Secretary of State, or both, with each raising one or more counts that are identical or similar to counts raised by Plaintiffs and briefed in this Memorandum: *Montana v. Biden*, No. 6:24-cv-01141-DDC-GEB (D. Kan. filed Aug. 13, 2024) (including Montana, Kansas, Iowa, South Dakota, Mississippi, Nebraska, North Dakota, Oklahoma, and South Carolina); *Ashcroft v. Biden*, No. 4:24-cv-01062-SEP (E.D. Mo. filed July 31, 2024) (Missouri and Arkansas); *Missouri ex rel. Bailey v. Biden*, No. 4:24-cv-01063-RWS (E.D. Mo. filed Aug. 1, 2024) (Missouri). Yet another lawsuit does not include a State, but was brought by the Republican National Committee and President Trump's campaign, raising related claims

**ARGUMENT**

A preliminary injunction is appropriate here because Plaintiffs have established a "substantial likelihood of success on the merits," there is a "substantial threat of irreparable injury if the injunction is not issued," while "the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and a "grant of an injunction will not disserve the public interest." *Jones v. Tex. Dep't of Crim. Just.*, 880 F.3d 756, 759 (5th Cir. 2018).

Moreover, a temporary restraining order is appropriate here to preserve the status quo while the Court considers a motion for a preliminary injunction, applying the same four factors. *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 829 (5th Cir. 1976). While the EO has been in place for some time, it is only as of July 26, 2024, that Defendants defied lawful subpoenas wherein Defendants were required to disclose their precise actions and justify their legality, and only as of September 4 that Defendants reaffirmed in court that they are asserting executive privilege. Given that early voting will soon commence (in Pennsylvania on September 16, followed by Virginia and Minnesota on September 20), a temporary restraining order is briefly necessary to prevent additional harm as this Court decides upon a preliminary injunction.

**I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.**

Federal agency actions implementing Executive Order 14019, *Promoting Access to Voting*, 86 Fed. Reg. 13,623 (Mar. 7, 2021), violate the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*. "Congress in 1946 enacted the APA as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024). "The APA sets forth the

---

arising from the EO. *Republican Nat'l Comm. v. Whitmer*, No. 1:24-cv-00720-PLM-SJB (W.D. Mich. filed July 15, 2024). These cases demonstrate that there are widespread concerns regarding the legality of the EO and the need for injunctive relief.

procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 16 (2020).

The APA authorizes judicial review of "final agency action." 5 U.S.C. § 704. Final agency action includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). Courts take a "flexible" and "pragmatic approach" when assessing finality. *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019).

Many of the EO's implementing actions described in the First Amended Complaint are final agency actions under the APA, involving new programs and funding voter registration and GOTV initiatives, as well as directives to state and local partners. *E.g.*, 1st Am. Compl. ¶¶ 155, 174, 177, 178, 190, 199, 206, 213, 218, 232, 239, 245, 274, 286, 291 (ECF No. 11). The APA "embodies a basic presumption of judicial review," *Dep't of Comm. v. New York*, 588 U.S. 752, 766 (2019) (internal quotation marks omitted), subject to narrowly construed exemptions not relevant here, *see Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2019), and consequently is "potentially the most versatile tool available to an enterprising" party to challenge federal agency actions. *Texas v. United States*, 809 F.3d 134, 161 (5th Cir. 2015), *aff'd by an equally divided Court*, 579 U.S. 547, 548 (2016) (mem.).

The EO commands every federal agency "to provide access to voter registration services and vote-by-mail ballot applications" when "directly engag[ing] with the public." EO § 3(a)(iii). This includes "distributing voter registration and vote-by-mail ballot application forms," *id.* § 3(a)(iii)(A), assisting applicants in filling out those forms, *id.* § 3(a)(iii)(B), and "soliciting and facilitating approved, nonpartisan third-party organizations" to assist, *id.* § 3(a)(iii)(C). It directed each agency to submit a "strategic plan" to the White House, *id.* § 3(b), for the Office of Management and Budget to coordinate efforts, *id.* § 3(c), and to give federal employees time off

so federal employees can participate in early voting, *id.* § 6.  It also singles out incarcerated felons and Native Americans for special focus in these registration and GOTV efforts.  *See id.* §§ 9, 10.

The only statutory authority the EO claims is the National Voter Registration Act, 52 U.S.C. §§ 20501–20511 (NVRA).[2]  The NVRA, however, authorizes neither the President's EO nor the actions being taken by federal agencies to implement it.  The NVRA requires *States*—not the federal government—to "designate agencies for the registration of voters in elections for Federal office."  *Id.* § 20506(a)(1).  The NVRA directs the federal government to *cooperate* with States in this effort, but does not authorize the federal government to go it alone.  *See id.* § 20506(b) ("All departments, agencies, and other entities of the executive branch of the Federal Government shall, to the greatest extent practicable, cooperate with the States in carrying out subsection (a) ….").  To "cooperate" means "[t]o work or act together toward a common end or purpose." *Cooperate*, AMERICAN HERITAGE DICTIONARY 414 (3d ed. 1996).  As explained below, the agency actions  implementing the EO are unilateral federal actions; the federal agencies are not working in partnership with States.   Indeed,  the  very  concept  of  "cooperative  federalism"  is  the "[d]istribution of power between the federal government and the states whereby each recognizes the powers of the other while jointly engaging in certain governmental functions."  *Federalism*, BLACK'S LAW DICTIONARY 687 (9th ed. 2009).

For the reasons that follow, the agency actions implementing the EO violate the APA for at least five reasons: they (1) exceed the authority granted by the NVRA, (2) lack notice and comment, (3) are arbitrary and capricious, (4) are not in accordance with the NVRA, and (5) lack congressional funding.

---

[2] The EO also makes an isolated reference to the Voting Rights Act of 1965, but does not invoke that statute as authorizing the agency actions at issue here, *see* EO § 1, and Plaintiffs' challenges here would succeed against such an invocation in any event, for the same reasons set forth below.

### A.      Agencies implementing the EO exceed statutory authority.

The APA prohibits agency actions from exceeding the limits of the authority that Congress conveyed by statute.  *West Virginia v. EPA*, 597 U.S. 697, 723 (2022).  Courts must ensure that agencies stay within the boundaries established by law.  *Loper Bright*, 144 S. Ct. at 2263.  "Agencies have only those powers given to them by Congress and enabling legislation is generally not an open book to which the agency may add pages and change the plot line."  *West Virginia*, 597 U.S. at 723 (cleaned up).  However, the NVRA lacks language typical of congressional authorization for partisan voter registration drives or GOTV programs.  *See Loper Bright*, 144 S. Ct. at 2263 (discussing delegation language).  And given the federalism implications and major political questions arising from  these agency actions, the NVRA's broad language about encouraging voting and increasing registration fall short of the clarity required for targeted, intentional actions to give the party in power an electoral advantage.  And the NVRA contains *no language* granting authority to federal agencies.

### 1.      Congress must clearly authorize agency actions implicating federalism concerns and the major questions doctrine.

Before agencies can encroach upon federalism, Congress must use "exceedingly clear language if it wishes to significantly alter the balance between federal and state power."  *Sackett v. EPA*, 598 U.S. 651, 679 (2023); *accord Gregory v. Ashcroft*, 501 U.S. 452, 459–60 (1991); *see also Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–74 (2001).  There is a federalism issue here because elections are an area in which States have primacy.  *See Cook v. Gralike*, 531 U.S. 510, 523 (2001); *Duncan v. Poythress*, 657 F.2d 691, 702 (5th Cir. Unit B Sept. 1981); *cf. also Chiafalo v. Washington*, 591 U.S. 578, 588–89 (2020).

Each States enacts a code of election laws that is "comprehensive" and "governs the registration and qualifications of voters" as well as "the voting process itself."  *Anderson v.*

*Celebrezze*, 460 U.S. 780, 788 (1983).  The Elections Clause specifies that Congress can supersede the States regarding the time, place, and manner of elections.  U.S. CONST. art. I, § 4, cl. 1.  But where the Constitution empowers the Federal Government to override the States in this area, it specifies that such exertions of authority must come from Congress, not the Executive.

The major questions doctrine likewise requires a clear statement.  The doctrine holds that, in determining "whether Congress in fact meant to confer the power [an] agency has asserted," the "political significance of that assertion[] provide[s] a reason to hesitate before concluding that Congress meant to confer such authority."  *West Virginia*, 597 U.S. at 721 (internal quotation marks omitted).  Congress must "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance."  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (internal quotation marks omitted).  Although the major questions doctrine often comes to bear regarding economic matters, *see, e.g.*, *West Virginia*, 597 U.S. at 730, it also pertains to "political[ly] significan[t]" questions, *see id.* at 721.  The doctrine has applied to politically sensitive matters for a quarter century at least.  *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–61 (2000) ("tobacco has its own unique political history"); *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam) (vaccine mandate was "significant encroachment").

The right to vote is of such foundational importance that it is a fundamental right under the Constitution.  *Bush v. Gore*, 531 U.S. 98, 105 (2000) (per curiam).  Citizens' right to speak and listen in that process is a prerequisite to an enlightened electorate, which directs the course of the Nation and shapes our destiny.  *See Citizens United v. FEC*, 558 U.S. 310, 339–40 (2010).  Major questions include tobacco, *Brown & Williamson*, 529 U.S. at 160, evictions, *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021), power generation, *West Virginia*, 597 U.S. at 729, student loans, *Biden v. Nebraska*, 600 U.S. 477, 502 (2023), and nuclear waste, *Texas*

*v. Nuclear Regul. Comm'n*, 78 F.4th 827, 844 (5th Cir. 2023), *reh'g denied,* 95 F.4th 935 (5th Cir. 2024), *cert. petitions docketed*, No. 23-1300 (June 12, 2024) *and sub nom. Interim Storage Partners, LLC v. Texas,* No. 23-1312 (June 14, 2024).  Registering and turning out voters favoring the party in power in numbers that can determine presidential and congressional elections belongs in that category.

> **2.    These agency actions exceed statutory authority under the clear-statement rule, as confirmed by history.**

The EO's implementing agency actions fail under both clear-statement rules.

a.    Start with the U.S. Department of Education (ED), which prepared a toolkit entitled "Promotion of Voter Participation for Students" that focuses on both postsecondary and secondary institutions.  ECF No. 11-10.  It includes "resources and strategies for increasing civic engagement" at all schooling levels, covering "more than 67 million students—and their families." ECF No. 11-8.  ED's efforts are to "encourage students to participate in elections," meaning GOTV efforts.  Evie Blad, *Help Students Register to Vote, Education Department Urges Schools*, EDUCATIONWEEK (Feb. 27, 2024),  https://tinyurl.com/ym5ej92u.

ED also targeted areas surrounding campus.  ED issued a "Dear Colleague Letter to remind institutions of higher education of the Federal requirements regarding voting that are tied to participation in Federal student aid programs … [that] made clear that Federal Work Study (FWS) funds could be used to compensate a student who is employed directly by a postsecondary institution for employment involving voter registration activities that take place on or off-campus." ECF No. 11-10 at 4.

But the NVRA does not clearly authorize voter registration programs or GOTV utilizing students and staff, conducted at schools or around college campuses and communities, or through educational programs like FWS.  These federal actions are imposed upon institutions that are either

private actors or the instrumentality of a State, and Congress did not authorize these actions with a clear statement.  (In fact, such programs violate additional legal restrictions, as explained below.)

b.      Other agency actions likewise are beyond NVRA's authority.  One such agency is the U.S. Department of Agriculture (USDA).  USDA is engaged in voter registration outreach through its child nutrition programs, including the Supplemental Nutrition Assistance Program (SNAP) and Women, Infants, and Children (WIC).  Tina Namian, U.S. Dep't of Agric., *Promoting Access to Voting through the Child Nutrition Programs*, Pol'y & Program Dev. Div. (Mar. 23, 2022), https://tinyurl.com/USDA-Promoting-Voting-Access.  USDA has issued letters to state agencies administering SNAP and WIC programs, instructing them to carry out voter-registration activities with federal funds.  *See* ECF No. 11-13.  Of particular interest, many noncitizens are eligible to receive SNAP benefits.  U.S. Dep't of Agric., *SNAP Eligibility for Non-Citizens*, Food & Nutrition Serv. (Aug. 1, 2024), https://www.fns.usda.gov/snap/recipient/eligibility/non-citizen.

There are other examples.  Vice President Harris and her staff made clear that the U.S. Department of Health and Human Services (HHS) "will email voter registration information to every person—more than 20 million last year—who signs up for health insurance through the Affordable Care Act."  Scott, *supra*.  At the U.S. Department of Homeland Security(DHS), the U.S. Citizenship and Immigration Services (USCIS) issued "policy guidance to its 88 field offices to standardize and lift up best practices for voter registration services, including providing a clear roadmap for how to successfully partner with state and local election administration officials and nonpartisan organizations to provide voter registration applications to all new Americans.  In Fiscal Year 2022, USCIS administered the Oath of Allegiance for 967,400 new Americans, across more than 20,000 naturalization ceremonies."  ECF No. 11-9.  And at the Department of the Interior (DOI), Bureau of Indian Education (BIE) staff are encouraging students at "K-12 schools

to carry voter registration cards home to their parents."  M.D. Kittle, *'Bidenbucks' Plan Uses Native American School Children in Voter Registration Scheme*, THE FEDERALIST (July 31, 2024), https://tinyurl.com/bdm43vhk.  BIE "oversees 183 schools on more than 60 Indian reservations in 23 states." *Id.*  In sum, many agency actions at issue here will specifically register and turn out voters who support Vice President Harris and other Democrats.  *See* 1st Am. Compl. ¶¶ 65, 91–95, 119–23, 169–70, 198–200, 206–08, 218–19, 255–59 (ECF No. 11).

c.      The EO does all this while usurping the prerogatives of States.  In *Sackett*, the Court held that "waters of the United States" could not reach as far as the EPA claimed, because States' "responsibilities and rights" would not "remain primary" if federal agencies could reach so deeply into this area of traditional state authority.  598 U.S. at 674.  So too here, the NVRA does not contain a clear statement regarding targeted voter registration or GOTV, so proper concern for States' traditional role in elections does not permit Defendants' broad reading here.

The major questions doctrine, too, prohibits these actions.  The 2020 presidential election was decided by fewer than 50,000 votes across three States.  *The American Presidency Project: Statistics*, UC SANTA BARBARA (Mar. 3, 2021), https://perma.cc/JHU8-ZD4L (entries for Georgia, Arizona, and Wisconsin).  White House allies estimate the EO could add 3.5 million voters.  Demos, *Federal Agency Voter Registration Estimates of Annual Impact* 1 (Feb. 2023), https://tinyurl.com/Demos-FAVREOAI-Archive.  And they are likely to vote for Vice President Harris and other Democratic candidates.  *See infra* Part I.A.3.  That is every bit as major of a political question as the items already designated as such by the Supreme Court.

The NVRA does not clearly authorize agency actions implementing the EO.  Neither does any other statute.  In *Nebraska*, the statute's language authorized "waivers and modifications," 600 U.S. at 499, but the Court held that the student debt transfer was beyond the "size or scope" of

previous programs, *id.* at 502.  Likewise, the NVRA's language has never authorized anything with the all-of-government size and scope of these actions.

History is also relevant when analyzing agency actions under the APA.  Elections are governed by laws enacted by state legislatures, with limited federal carveouts for congressional legislation authorized by specific constitutional provisions.  For APA challenges, "longstanding practice … in implementing the relevant statutory authorities" is evidence of the limits of statutory authority. *Biden v. Missouri*, 595 U.S. 87, 94 (2022) (per curiam).  Courts look for prior assertions of similar authority.  Given the absence of previously actions of the "history and breadth of the authority" now claimed under the NVRA for federal registration or GOTV—especially targeted to benefit the party in power—this Court has "reason to hesitate before concluding that Congress" included such authority in the NVRA. *West Virginia*, 597 U.S. at 721.

Indeed, the Biden-Harris Administration tried to pass legislation in this area, which would have been an even greater imposition on the States.  (For the People Act, H.R. 1, 117th Cong. (2021); Freedom to Vote Act, S. 2747, 117th Cong. (2021); Freedom to Vote Act, H.R. 11, S. 1, 118th Cong. (2023)).  But those legislative efforts failed, leaving the Administration only with the powers it already had under current law.  Those failures suggest that the existing statutory regime did not confer authority for these agency actions. *Cf. NFIB*, 595 U.S. at 119.

d.    And indeed, Congress has disputed the Administration's claim that federal agencies have statutory authority to engage in actions implementing the EO.  As noted above, several committee have demanded answers and documentation from the Biden-Harris Administration, insisting that the Administration does not have legal authority to implement this EO. *See, e.g.*, Letter from James Comer, Chairman, H. Comm. on Oversight & Accountability et al., to Shalanda Young, Dir., Off. Mgmt. & Budget (May 13, 2024), *available at* https://tinyurl.com/2supet.

In sum, in order to conclude that the agency actions challenged here are authorized by statute, respect for federalism requires a clear statement from Congress, and the major questions doctrine would independently require such a statement as well.  Even though historical practice cannot remedy this deficiency, the lack of historical pedigree confirms the illegality of these actions.  And Congress disputes that it has authorized these actions by statute.  Defendants have "gone beyond what Congress has permitted [them] to do."  *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013).  The agency actions implementing the EO therefore violate the APA because they are "in excess of statutory jurisdiction, authority, or limitations."   5 U.S.C. § 706(2)(C). Accordingly, this Court should hold them unlawful and set them aside.

**B.     Agency actions implementing the EO were not preceded by required notice and comment.**

An otherwise-lawful agency action violates the APA if it is a substantive rule regarding which the agency fails to comply with the procedural requirements of notice and comment.  They are "basic to our system of administrative law," facilitating "robust debate of competing and frequently complicated policy considerations having far-reaching implications and, in so doing, foster reasoned decisionmaking."  *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 115 (2d Cir. 2018).  Violating notice-and-comment requirements deprives Plaintiffs of a procedural right.  *Texas*, 933 F.3d at 447.

1.     Agency actions are substantive rules if they "affect individual rights and obligations."  *Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.*, 201 F.3d 551, 556 (5th Cir. 2000).  Substantive rules are agency actions that "grant rights, impose obligations, or produce other significant effects on private interests.  They also narrowly constrict the discretion of agency officials by largely determining the issue addressed."  *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir. 1983).  The Fifth Circuit applies this substantial impact test to

16

identify substantive rules, determining whether an agency action "is of the type Congress thought appropriate for public participation," and holding that the enforcement discretion memo at the heart of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) was a substantive rule. *Texas*, 809 F.3d at 176. And for agency actions that modify substantive rights and interests, the exemptions from notice and comment for interpretive rules and agency actions concerning agency organization, procedure, and practice do not apply. *Id.*; *see also Dep't of Lab. v. Kast Metals Corp.*, 744 F.3d 1145, 1153 (5th Cir. 1984).

Registering 3.5 million voters has a substantial effect on the rights of those persons, changing their status from nonvoters to voters, including potentially noncitizens who are not eligible to vote. Mere interpretive rules do not generate millions of new voters. Agency actions with such an impact on the rights of millions are by their nature substantive rules *at minimum*, and more likely such a result can obtain only by Congress passing legislation—not by any sort of agency action. Registering even a fraction of that number has a substantial impact on the outcome of those elections, especially when coupled with GOTV efforts to push those voters to participate in an upcoming election, thereby indirectly affecting the rights of the entire electorate.

Each of the agency actions discussed below in this part "undoubtedly meets" the substantial impact test, *Texas*, 809 F.3d at 176, by significantly altering the electorate by registering millions of individuals—inevitably including noncitizens and others who are ineligible to vote—and commandeering the machinery of government to get those new registrants to cast ballots. Many of them "encod[e] a substantive value judgment" and are separately substantive rules on that basis. *Id.* at 177. Therefore, the implementing agency actions are substantive rules.

2.     Many agency actions implementing the EO are substantive rules under this test. ED's "Dear Colleague" letter directing universities to use FWS funds for voter registration

programs on and off-campus certainly qualifies. *See* ECF No. 11-10. DHS's efforts to register close to 1 million immigrants per year to vote is yet another. So too the U.S. Department of Housing and Urban Development (HUD) directing over 3,000 public housing authorities, "managing approximately 1.2 million public housing units—through a letter to Executive Directors that provides useful information to PHAs about permissible ways to inform residents of non-partisan voter registration information and services." ECF No. 11-8. "The Department of Labor will continue to require Job Corps centers to implement procedures for enrollees to vote, and where local law and leases permit, encourage Job Corps centers to serve as polling precincts." *Id.* And it "will also provide guidance that grantees can use federal workforce development funding, where consistent with program authority, to conduct nonpartisan voter registration efforts with participants." *Id.*

The Department of Justice (DOJ) is taking significant steps to implement the EO, and is even going to great lengths to make it as easy as possible for convicted criminals to vote, "produc[ing] an accessible, plain-language guide for 50 states and the District of Columbia, which also describes each state's voting rules for individuals with criminal convictions. The guide walks readers through a series of questions to help them understand how each state's laws work and gives information about how to reach officials in a particular state to register to vote and to ask questions." ECF No. 11-12. DOJ "will also provide information about voting to individuals in federal custody, facilitate voting by those who remain eligible to do so while in federal custody, and educate individuals before reentry about voting rules and voting rights in their states." ECF No. 11-8.

The Biden-Harris DOJ is especially interested in the votes of incarcerated federal felons, "promoting access to voting for those who remain eligible to vote while in federal custody,

including by putting in place procedures to facilitate voter registration and voting."  ECF No. 11-9.  DOJ "will also provide information about voting to individuals in federal custody, facilitate voting by those who remain eligible to do so while in federal custody, and educate individuals before reentry about voting rules and voting rights in their states."  ECF No. 11-8.  The U.S. Marshals Service (USMS) has initiated a process to ensure those in its custody are offered the chance to register to vote.  U.S. Marshals Serv., U.S. Dep't of Just., *United States Marshals Service FY 2022 Annual Report* 48 (Apr. 2023), https://tinyurl.com/Marshals-FY2022-Report. Mississippi Secretary of State Michael Watson claims that USMS is "currently modifying 936 intergovernmental agreements and jail contracts."  Michael Watson, *Opinion Column: "A Republic, if you can keep it.",* Miss. Sec'y of State Press Releases & Columns (Apr. 10, 2024), https://tinyurl.com/4x9j3nv4.  The Federal Bureau of Prisons (BOP) "has partnered with and regularly consults on voting issues with the League of Women Voters, the American Civil Liberties Union, the Campaign Legal Center, and the Washington Lawyers' Committee."  Fred Lucas, *Exclusive: How Biden Pushes Inmate Voting with Help From Interest Groups*, Daily Signal (Jan. 30, 2024), https://tinyurl.com/2p9swt8c.  DOJ is filing statements of interest in ongoing litigation that federal laws "require the right to absentee ballot return assistance."  *The Americans with Disabilities Act and Other Federal Laws Protecting the Rights of Voters with Disabilities*, Dep't of Just. (Apr. 18, 2024), https://tinyurl.com/37nhj73m.

Several agencies are partnering with local governments and even private citizens to implement voter registration and GOTV.  The Department of Transportation (DOT) "will communicate guidance to transit systems—including more than 1,150 rural public transit systems and more than 1,000 urban public transit systems—to consider providing free and reduced fare service on election days and consider placing voter registration materials in high-transit stations."

ECF No. 11-8.  It "will also work with state and local entities seeking to mitigate traffic and construction impacts on routes to the polls, particularly in underserved communities." *Id.*  For its part, DOI "will disseminate information on registering and voting, including through on-site events, at schools operated by the Bureau of Indian Education and Tribal Colleges and Universities, serving about 30,000 students," *id.*, as well as "display Vote.org signage in national park entrances and visitor centers across the country," Scott, *supra*.  And as noted in Part I.A.1, BIE is even giving registration and GOTV materials to children to share with their parents.  These programmatic actions qualify as substantive rules.

The Biden-Harris Administration is also taking significant actions with those who receive government benefits.  The Department of Veterans Affairs (VA) "will provide materials and assistance in registering and voting for tens of thousands of inpatients and residents, including VA Medical Center inpatients and residents of VA nursing homes and treatment centers for homeless veterans."  ECF No. 11-1.  VA "will also facilitate assistance in registering and voting for homebound veterans and their caregivers through VA's home-based and telehealth teams."  ECF No. 11-8.  Speaking of veterans, the Department of the Treasury "will include information about registration and voter participation in its direct deposit campaigns for Americans who receive Social Security, Veterans Affairs, and other federal benefit payments."  *Id.*  Treasury made concerted efforts "to promote voter registration access to the low-income clients of its voluntary tax preparation clinics, and shar[ed] information about voter registration with millions of Americans through the taxpaying process."  ECF No. 11-11 at 8.  Treasury also worked with third-party tax volunteers to offer voter registration services, and sent "direct mail pieces delivered to approximately 900,000 Americans who receive Social Security Benefits, Railroad Pension

benefits, and federal retirement benefits."  ECF No. 11-9.  Those are major agency actions, easily satisfying the substantial impact test.

HHS's effort to contact 20 million persons urging them to register to vote, *see* Scott, *supra*, is the final example, on that also segues into the issue of noncitizen voting.  Through HHS, the Administration has expanded access to health insurance exchanges under the Affordable Care Act (ACA) to an estimated 100,000 noncitizens who are beneficiaries of the Deferred Action for Childhood Arrivals (DACA) amnesty program for illegal aliens.  *Biden-Harris Administration Finalizes Policies to Increase Access to Health Coverage for DACA Recipients*, U.S. Dep't of Health & Hum. Servs. (May 3, 2024), https://tinyurl.com/HHS-DACA-Recipients.  These actions likewise have a substantial impact.

3.       The impact of the implementing actions is even more substantial when coupled with the risk of noncitizen voting.  The potential impact is significant enough that these agency actions' opening the door wide for that illegal activity are substantive rules on that basis alone, as this factor can change outcome of close elections.  Since President Biden and Vice President Harris took office, "at least 11 million illegal aliens have entered the United States."  ECF No. 11-7.  Media outlets report that forty-nine States provide voter registration forms to migrants without requiring proof of citizenship.  Josh Christenson, *How Non-Citizens Are Getting Voter Registration Forms Across the US—and How Republicans Are Trying to Stop It*, N.Y. Post (June 14, 2024), https://tinyurl.com/334s6da7.  And even the one State that does—Arizona—cannot enforce that requirement when applicants use the federal form to register.  *Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1, 12 (2013).

States are finding many noncitizens—both illegal aliens and aliens in this country legally—on the voter rolls.  In the past month, Governor Glenn Youngkin removed 6,300 noncitizens from

the voter rolls in Virgina. *Comprehensive Election Security Ensuring Legal Voters and Accurate Counting*, Exec. Order 35 (Va. Aug. 7, 2024), https://tinyurl.com/msfa7x4r.[3]  Then in the past couple weeks, Governor Greg Abbott removed 6,500 noncitizens from the voter rolls in Texas, as part of an astounding total of over one million ineligible names on the rolls of the Lone Star State. Press Release, Off. of Tex. Governor, Governor Abbott Announces Over 1 Million Ineligible Voters Removed From Voter Rolls (Aug. 26, 2024), https://tinyurl.com/e33rxa2f.  This highlights an alarming risk that these agency actions could substantially affecting legal rights in an unlawful manner.

DHS admits that under the Biden-Harris Administration's policies, illegal aliens in this Nation from certain countries can be granted parole status, and Attorney General Garland is granting parole status to many of them.  *Texas v. U.S. Dep't of Homeland Sec.*, __ F. Supp. 3d __, No. 6:23-cv-00007, 2024 WL 1021068, at *3–4 (S.D. Tex. Mar. 8, 2024), *recons. denied,* 2024 WL 2888758 (S.D. Tex. May 28, 2024), *appeal docketed*, No. 24-40160 (5th Cir. Mar. 12, 2024). Receiving parole status allows those noncitizens to obtain a Social Security Number (SSN) and driver's license.  ECF No. 11-7; *see also Texas*, 2024 WL 1021068, at *9–10.  However, the Help

---

[3] To highlight how significant 6,300 noncitizens are, the Court should be made aware that in the November 2017 election for control of Virginia's legislature, the result in one district was a literal tie, in a 100-seat House of Delegates that was split 50-50.  The race was literally decided by picking a name out of a cannister in a bowl, and the resulting victory of Delegate Shelly Simonds gave the Democrats control of one chamber in the Virginia General Assembly, costing Republicans control of the legislature.  *See* Christal Hayes, *Virginia Election Tie: Coin Tosses, Picking Names in a Hat? Yep, That's How Some Races are Decided*, USA TODAY (Dec. 21, 2017), https://tinyurl.com/VA-Election-CoinToss.  And with Republicans holding a bare 21-19 majority in the Senate and the Democratic Lieutenant Governor able to break 20-20 ties in Democrats' favor, the entire Virginia legislature was on the verge of unified control by a single vote, deciding the race 11,608 to 11,607.  *See* Gregory S. Schneider, *A Single Vote Leads to a Rare Tie for Control of the Virginia Legislature*, WASH. POST (Dec. 19, 2017), https://tinyurl.com/VA-Election-Tie.  If even one noncitizen voted in the legislative race in question, it could have dictated which party controlled the Virginia General Assembly.

22

America Vote Act, Pub. L. No. 107-252, 116 Stat. 1666 (2002) (codified at 52 U.S.C. § 20901 *et seq.*) (HAVA), provides that either an SSN or a driver's license is sufficient identification to register to vote. 52 U.S.C. § 21083. This means that illegal aliens have all the documentation needed to register to vote, and agency actions implementing the EO mentioned above increase the risk exposure of illegal aliens both registering and casting ballots.

In Congress, the Committee on House Administration has been investigating the EO and its implementation since at least March 2024, and Chairman Bryan Steil recently issued a report that highlights significant problems and concerns arising from these agency actions. The Steil Report found that in the wake of the EO, this problem is no longer confined to driver's licenses, citing noncitizens' eligibility for federal programs such as SNAP, Temporary Assistance for Needy Families, and Medicaid, to name only a few. SAFEGUARD AMERICAN VOTER ELIGIBILITY ACT, H.R. REP. NO. 118-552, at 11 (2024), *available at* https://tinyurl.com/5n7rzsdu. The Steil Report found that the risks from these practices have been exacerbated by automatic voter registration in Pennsylvania and other States. *Id.* at 10. And in addition to the numbers of noncitizens removed from voter rolls in Texas and Virginia, the Steil Report found that for example, 10,000 noncitizens were on the voter rolls in Pennsylvania and more than 1,600 noncitizens in Georgia had attempted to register to vote, to name a couple States in which Plaintiffs here are domiciled. *Id.*

The Steil Report found that illegal alien voting does indeed occur. In the 1996 federal midterm election for the California 46th District, there was clear evidence that 624 aliens voted illegally, and circumstantial evidence that another 196 aliens had done so. One Plaintiff here is a public official in that State. And in 2011, 117 aliens voted illegally in Fairfax County, Virginia, the Republican Party of which is a Plaintiff here. *Id.* at 11. Noncitizen voting also occurred in

Arizona, Illinois, and Pennsylvania. *Id.* Two of those three States likewise have Plaintiffs here. Such illegal activity is more likely than ever given the all-of-government mobilization of the EO.

All this confirms that the actions implementing the EO substantially affect legal rights, providing further proof that these agency actions are substantive rules for APA purposes.

4.     The APA requires these agency actions to undergo notice and comment before implementation, because none of the exemptions from public notice applies here. *See* 5 U.S.C. §§ 553(b)(A)–(B). Rules are exempt from notice and comment if they are interpretive rules, general statements of policy, or a rule of agency organization, procedure, or practice. *Texas*, 809 F.3d at 171 (quoting 5 U.S.C. §§ 553(b)(A)). But just as DHS's enforcement memo at the heart of the DAPA program was not exempt, *id.* at 177–78, so too none of those exemptions apply here.

The APA requires public notice via publication in the Federal Register for rules that do not meet those narrow statutory exemptions. 5 U.S.C. § 553(b). After notice, the agency must give the opportunity for public comment. *Id.* § 553(c). If an agency action is a substantive rule, "the exemption from giving public notice is inapplicable, and the full panoply of notice-and-comment requirements must be adhered to scrupulously." *Texas*, 809 F.3d at 171. In sum, courts do not elevate form over substance when assessing whether agency actions are substantive rules or exempted from comment. The agency actions discussed here require notice and comment, but none of these agencies published in the Federal Register their proposed voter registration programs and policies to implement the EO, depriving the public of adequate notice and an opportunity to comment on the proposed actions.

After notice and allowing time for public comment, the agency must publish the final rule in the Federal Register, with an effective date at least 30 days thereafter unless there is good cause to act immediately. *See* 5 U.S.C. §§ 553(d)(1)–(3). Defendants offer no reason for this lack of

24

delay, as the APA requires.  *See United States v. Johnson*, 632 F.3d 912, 927–30 & n.82 (5th Cir. 2011) (finding "necessity or emergency").  Doubtless this is because they do not acknowledge that these are substantive rules under the APA, but that does not waive Section 553(d)'s requirements.

These agency actions thus violate the APA because they were taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  This Court should set them aside.

### C.   Agency actions implementing the EO are arbitrary and capricious.

Even if these agency actions were authorized by the NVRA and complied with notice and comment, this Court should "'hold unlawful and set aside' agency actions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting 5 U.S.C. § 706(2)(A)) .

An agency action is arbitrary and capricious if it does not "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choices made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43 (1983) (internal quotation marks omitted).  The APA "requires that agency action be reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  A court must "not defer to the agency's conclusory or unsupported suppositions," *Texas v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021), and instead determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *State Farm*, 463 U.S. at 43.  The APA is satisfied only "when the agency's explanation is clear enough that its path may reasonably be discerned."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (internal quotation marks omitted).  This arbitrary-and-capricious violation therefore ties back in this case to the lack of notice and comment.  "Agencies are free to change their existing policies so long as they provide a reasoned explanation for the change."  *Id.*

1. **Agency actions implementing the EO have impermissible partisan objectives.**

a.       An agency action taken to obtain partisan advantage in an election does not pursue a permissible objective.  *Level the Playing Field v. FEC*, 961 F.3d 462, 464 (D.C. Cir. 2020); *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 768 (9th Cir. 2007).  Even a "pure political compromise" is arbitrary and capricious because it is not based on objective reasoning such as scientific data. *Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 898 (9th Cir. 2010).

Axios reports that, according to Vice President Harris's description of it, the true purpose of the EO is "to try to boost turnout among key voting blocs this November," essentially admitting that the EO and its implementing agency actions are to give Democrats—including Vice President Harris—a partisan advantage in the 2024 election.  Scott, *supra*.  While Defendants will doubtless say their plans are intended to assist racial minorities per the NVRA, their collaborators' admissions show this to be a pretext.  On March 7, 2024, Demos indicated that the agencies implementing the EO were on track to deliver Democrat votes per the 2021 strategy, highlighting that it would target "people of color, people with low incomes, students and young people, and Native communities."  Tjhung, *supra*.  That list mentions several categories in addition to race.

The "Democratic plan"—Axios's description when conferring with sources for the article—is in part to counteract recent Supreme Court decisions that uphold the rule of law, but which President Biden and Vice President Harris consider unfavorable to Democrats.  *See id.*  And in fact, the agenda for one meeting with Biden-Harris Administration staff included the item "Brnovich fixes," as in *Brnovich v. DNC*, 594 U.S. 647 (2021).  ECF No. 11-2 at App. 117. *Brnovich* was a major defeat for the Democratic Party's preferred election policies, policies they preferred because they provided partisan electoral advantages.  *See id.* at App. 5.  As the Heritage Foundation noted, "Every participant whose party affiliation or political donation history could be

identified by the Oversight Project was identified as a Democrat except for one Green Party member," and their talking points focused on traditional Democratic constituencies, with no evidence of efforts to "increase voter access and education in likely Republican constituencies." ECF No. 11-2 at 2.  Taken together, this makes sense of many EO implementing actions.[4]

       b.      ED once again provides a prime example, conducting on-campus and off-campus voter registration drives and also engaging in GOTV, because College towns heavily favor Vice President Harris and the Democratic Party.  The Biden-Harris Administration acknowledges that they are targeting college students, admitting ED "will use StudentAid.gov to help connect borrowers to voter registration services by linking to vote.gov."  ECF No. 11-9.  Both college students and student loan borrowers are more likely to vote Democrat.  Phillip J. Ardoin et al., *The Partisan Battle Over College Student Voting: An Analysis of Student Voting Behavior in Federal, State, and Local Elections*, 96 Soc. Sci. Q. 1178, 1178 (2015).  In fact, college students tend to vote for Democrat to such an extent that one battleground State college town's "overwhelmingly Democratic nature of the student vote" is described as "a Republican-killing Death Star" that "truly mak[es] it impossible for Republicans to win a statewide race."  Charlie Mahtesian & Madi Alexander, *"This is a Really Big Deal": How College Towns Are Decimating the GOP*, Politico (July 21, 2023), https://tinyurl.com/Politico-College-Towns.  And these efforts are supervised and approved by university administrators, where those who favor liberals outnumber those who favor

---

[4] One such organization in these meetings is Demos, a liberal organization that pushes for election policies that favor the Democratic Party.  For example, Demos litigates against election-integrity measures like cleaning up voter rolls under NVRA § 8.  *See, e.g.*, *Bellito v. Snipes*, 935 F.3d 1192 (11th Cir. 2019).  Former President Barack Obama is a founding board member of Demos.  Barbara J. Lucas, *Unabashed Radicals: The Mission of Demos, Elizabeth Warren's Favorite Left-wing Group*, Capital Rsch. Ctr. (July 3, 2014), https://tinyurl.com/CRC-Demos-Mission-Summary.  Demos receives money tied to megadonor George Soros, well known for supporting leftwing causes.  *See Demos*, Influence Watch, https://www.influencewatch.org/non-profit/demos/ (last visited June 10, 2024).

conservatives by a twelve-to-one ratio.  Samuel J. Abrams, *One of the Most Liberal Groups in America*, INSIDEHIGHERED.COM (Nov. 7, 2018), https://tinyurl.com/4utz8zsv.  And ED declares that colleges have an "existing obligation" to pursue registration and GOTV opportunities, ECF No. 11-8, encouraging them "to identify further opportunities to assist eligible students with voter registration," *id.*, and directing those college administrators "to support voter registration activities" whether they occur "on or off-campus," ECF No. 11-10 at 4.  Thus, the groups singled out for special attention by the ED letter vote mostly for Democrats, providing a partisan advantage to the Democrat Party and its candidates (including Vice President Harris).  *Cf. Changing Partisan Coalitions in a Politically Divided Nation* 13–23, PEW RSCH. CTR. (Apr. 9, 2024), https://tinyurl.com/Pew-Changing-Coalitions.

   c. Another example of agency actions implementing the EO not being the product of reasoned decisionmaking are those of the Small Business Administration (SBA).  On March 19, 2024, SBA Administrator Isabel Casillas Guzman entered into a Memorandum of Understanding (MOU) with Michigan Secretary of State Jocelyn Benson to implement the EO.  Press Release 24-23, Small Bus. Admin., SBA Administrator Guzman Announces Agency's First-Ever Voter Registration Agreement with Michigan Department of State (Mar. 19, 2024), https://tinyurl.com/4dbptaws.  Under this MOU, Benson was to create a URL to which SBA will drive its members to register to vote, *id.*, and can capture information that could be used for GOTV efforts. From January through April 2024, twenty-two out of twenty-five SBA outreach events in Michigan took place in counties with the highest population of Democratic National Committee (DNC) target demographics.  *See* ECF No. 11-14 at 4.  Similarly, eleven of fifteen Michigan counties that showed the largest voter registration increases over the last year have ranked highest in population among young voters and Black voters, which are top Democratic Party targets.  *See*

*id.* at 4–5.  This is a mismatch from the concentration of businesses and employees that SBA is tasked by statute with servicing, *see id.* at 3, but it does correspond to Democratic Party voter targets, *see id.* at 4–5, resulting in significant registration gains for Vice President Harris and other Democrats in Michigan, *id.* at 2, providing a partisan electoral advantage that could be multiplied by GOTV.

Congressional hearings reinforce that SBA's efforts here are to help Democrats in elections.  Senator Joni Ernst on the Senate Small Business Committee has demanded answers from Guzman, writing that Guzman's "senior advisor indicates you and your team are participating in politically motivated travel with taxpayer dollars … and that your official travel is purposefully targeted to 'indirectly campaign for Joe Biden.'"[5]  Letter from Sen. Joni K. Ernst, Ranking Member, Comm. on Small Bus. & Entrepreneurship, to Isabel Casillas Guzman, Admin., U.S. Small Bus. Admin. at 1 (Apr. 19, 2024), https://tinyurl.com/46kukpzm.  The letter continued, "Your alleged travel is particularly questionable in light of the SBA's recent announcement that it finalized the agency's first-ever voter registration agreement with Michigan Department of State.  The SBA's mission is to aid the interests of small businesses, not to swing votes."  *Id.* (footnote omitted).  Congressman Pete Stauber asked during a Small Business Administration hearing why the SBA was targeting Michigan when "[r]oughly 91% of Michigan voters are registered to vote" and the SBA could have "enter[ed] into an MOU with states that have lower voter registration than Michigan."  Kamden Mulder, *Hearing: Federal Business Agency Spends 'Bidenbucks' to Win Michigan for Democrats*, THE FEDERALIST (June 4, 2024), https://tinyurl.com/Hearing-SBA.

---

[5] This Court should now regard the Senator's concern as the SBA official indirectly campaigning for Vice President Harris.

d.      Other agency actions described above appear to target for registration and GOTV individuals likely to vote for Democrats like Vice President Harris.  SNAP recipients are lower-income and tend to vote for Democrats.  Rich Morin, *The Politics and Demographics of Food Stamp Recipients*, PEW RSCH. CTR. (July 12, 2013), https://tinyurl.com/Pew-FS-Partisanship. Insurance offered through the Affordable Care Act (ACA) includes insurance exchanges designed for lower-income individuals.  *See King v. Burwell*, 576 U.S. 473, 482 (2015).  Statistically, such voters favor Democrats.  *Changing Partisan Coalitions*, *supra*, at 41.  Head Start is also a welfare program administered by HHS for low-income families.  *Head Start Services*, Dep't of Health & Hum. Servs. (June 30, 2023), https://www.acf.hhs.gov/ohs/about/head-start.    The ACLU advocated targeting Head Start participants for voter registration efforts.  ECF No. 11-2 at 3 & App. 5.  The ACLU also advocated targeting Social Security beneficiaries for voter *registration* efforts because "[t]hey are lower-income and have disabilities."  *Id.*  The EO targets imprisoned felons.  EO § 9.  Convicted criminals are more likely to vote Democrat.  *See* Christopher Uggen & Jeff Manza, *Democratic Contraction? Political Consequences of Felon Disenfranchisement in the United States*, 67 AM. SOCIOLOGICAL REV. 777, 787 tbl.1 (2002) (polling disenfranchised felons).  Demos addressed pushing registration through federal immigration services, HUD, and IHS.  ECF No. 11-2 at App. 5–6.  As noted in Part I.A.2.b, USCIS recently administered the citizenship oath to almost 1 million immigrants in one year alone.  First-generation naturalized immigrants are more likely to vote Democrat.  Anna Maria Mayda et al., *Immigration to the U.S.: A Problem for the Republicans or the Democrats?*, at 5 (Nat'l Bureau of Econ. Rsch., Working Paper No. 21941, 2016).  Persons who use public transportation are more likely to vote Democrat. Emily Badger, *Liberals are More Likely to Use Public Transit than Conservatives*, WASH. POST

30

(June 30, 2014), https://tinyurl.com/WP-Transport-Poll-Summary.   Overall, the agency actions target individuals likely to vote Democrat.

e.      Once again, history matters.  A "long history" supporting an agency action is one factor in assessing whether it is "reasonable and reasonably explained."  *New York*, 588 U.S. at 776.  Conversely, the lack of any history is a factor that calls for an explanation for the change in course.  "Agencies are free to change their existing policies"—but only "as long as they provide a reasoned explanation for the change."  *Encino Motorcars*, 579 U.S. at 221.   Indeed, the "presumption from which judicial review should start" is one "*against* changes in current policy" unless those changes were justified by the agency's record.  *State Farm*, 463 U.S. at 42.

Here, there is an unbroken history of federal agencies *not* interpreting the NVRA as authorizing a nationwide campaign to register voters and then turn out those voters during an election.  Defendants cannot overcome the presumption against changing that practice.

### 2.      GOTV activities are inherently partisan.

GOTV efforts are thus inherently political on a practical level, ineluctably favoring one party over another rather than generically increase voter participation in a neutral manner.  Studies show that "outreach activity by political campaigns, including door to door canvassing, phone banking, direct mail, and even advertising, has basically no effect on voters' choice of candidate in general elections."  Dylan Matthews, *A massive new study reviews the evidence on whether campaigning works. The answer's bleak.*, Vox (Sept. 28, 2017), https://tinyurl.com/4nn9z28f (citing Joshua Kalla & David E. Broockman, *The Minimal Persuasive Effects of Campaign Contact in General Elections: Evidence from 49 Field Experiments*, 112 Am. Pol. Sci. Rev. 148 (2017)).  Quite to the contrary, the Kalla and Broockman study concludes that GOTV programs boost turnout by "voters whose minds are already made up."  *Id.*

In other words, if GOTV resources are devoted to a county where Democrats significantly outnumber Republicans, then the GOTV activities will generate proportionately more Democrat votes than Republican votes, and thus increase Democrats' advantage statewide (or districtwide for elections that are not statewide in scope), because only equal resources in equally Republican-majority counties would offset the partisan advantage to restore parity across the relevant electorate.  And the Biden-Harris Administration did not devote such targeted resources in such a manner in Republican-majority areas.

Take as one example the GOTV efforts from one nonprofit organization, the Center for Technology and Civic Life (CTCL).  That organization is funded by Mark Zuckerberg, the founder of Facebook.  *Zuckerbucks, supra*.  A key strategist in Zuckerberg's universe is David Plouffe.  Plouffe was the campaign manager of President Barack Obama's successful 2008 election campaign.  *David Plouffe*, OBAMA PRES. CTR., https://www.obama.org/about/leadership/david-plouffe/ (last visited Sept. 8, 2024).  Plouffe has explained how to target voter registration and GOTV efforts to give the Democratic Party an advantage over the Republican Party, especially in key swing States in the presidential election.  *See generally, e.g.*, David Plouffe, A CITIZEN'S GUIDE TO BEATING DONALD TRUMP (2020).  From 2017–19, Plouffe was head of policy and advocacy for the organization named for Zuckerberg and his wife, the Chan Zuckerberg Initiative (CZI).  Chan Zuckerberg Initiative, *supra*.  In 2019, he stepped down to a part-time role as a strategist.  Kurt Wagner, *David Plouffe Moves to Part-Time Role at Zuckerberg Philanthropy*, BLOOMBERG (Oct. 10, 2019), https://tinyurl.com/3w9w2tkv.  In 2020, CZI cumulatively donated around $350 million to CTCL, which was spent on election administration.  Michael Scherer, *Mark Zuckerberg and Priscilla Chan Donate $100 Million More to Election Administrators, Despite Conservative Pushback*, WASH. POST (Oct. 13, 2020), https://tinyurl.com/3yrn9wn6; Tom Scheck

et al., *How Private Money From Facebook's CEO Saved The 2020 Election*, NAT'L PUB. RADIO (Dec. 8, 2020), https://tinyurl.com/yc2s83wt; *Zuckerbucks*, *supra*. And coming full circle, Plouffe is now a senior adviser to Vice President Harris's 2024 campaign for President, Goldmacher & Epstein, *supra*, able to reap the benefits of the EO agency actions.

As the Attorneys General for sixteen States (West Virginia, Indiana, Arkansas, Georgia, Idaho, Iowa, Kansas, Mississippi, Montana, Nebraska, North Dakota, South Dakota, South Carolina, Oklahoma, Texas, and Utah) explained as an example in a letter objecting to the EO:

> In Georgia, CTCL gave grants to election offices in counties that went to President Biden and counties that went to President Trump, favoring no one. But CTCL's 10 biggest grants per capita all went to counties that Biden won, 6 of which are part of the greater Atlanta metropolitan area. Not surprisingly, these 10 counties gave Biden 60 percent (1.49 million votes) of his statewide total in Georgia, and nearly 378,000 votes over 2016 Democrat turnout. Trump, however, only received 691,000 votes in these counties in 2020, an increase of just 92,000 votes over his 2016 performance. Funding disparities seem to have achieved similar results in other battleground states. So CTCL's non-partisan designation seems like a lie because it concentrated in areas that helped Democrats most.

ECF No. 11-5 (cleaned up). GOTV programs consume tremendous resources, with one cost estimate at $60 per vote resulting from the efforts. *Id.* Therefore, federal agency GOTV actions are an enormous—and potentially decisive—benefit to Vice President Harris and her party.

### 3.   Consequently, the proffered reason for these actions is mere pretext.

The APA's "reasoned explanation requirement" also exists to "ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *New York*, 588 U.S. at 785. Consequently, courts find agency actions arbitrary and capricious when they are purportedly justified by a rationale that is pretextual, as courts identify evidence supporting an inference of pretext. *See Texas*, 809 F.3d at 173–75 (finding DACA and DAPA memos' discretionary language pretextual). This Court can make such an evidentiary assessment at this stage based on declarations or testimony. *Id.* at 175.

For the reasons just discussed, identifying Defendants' partisan political goal gets to the heart of the matter here; that is what is truly motivating these agency actions. The APA requires that "an agency must disclose the basis of its action." *New York*, 588 U.S. at 780 (internal quotation marks omitted). More than that, "the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). And an agency cannot "depart from a prior policy sub silentio or simply disregard rules still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, the prior policy recognized the NVRA gives federal agencies no role in targeted voter registration and GOTV.

*New York* concluded regarding the Commerce Secretary's explanation for reinstating a question on citizenship in the census that "the evidence tells a story that does not match the explanation the Secretary gave for his decision." *New York*, 588 U.S. at 756. While an action with "both stated and unstated reasons" can be upheld, the action is unlawful if it "is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.* at 785. A court "cannot ignore the disconnect between the decision made and the explanation given." *Id.* Such is the case here, from Vice President Harris's explanation to the White House listening session records. *See* 1st Am. Compl. ¶¶ 89, 112–23 (ECF No. 11) (collecting sources).

The purposes announced in the EO and in its implementing agency actions are therefore mere pretexts. For both that reason and their true partisan goals, the agency actions implementing the EO violate the APA because they are "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A). Accordingly, this Court should hold them unlawful and set them aside.

**4.     Ignoring risks of noncitizen voting and discouraging voters make the challenged agency actions arbitrary and capricious.**

Agency actions are also arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. The agencies failed to consider at least two important implications of their actions implementing the EO.

Pushing voter registration and GOTV through programs that the Biden-Harris Administration opened to noncitizens—including both legal and illegal aliens—therefore increases the risk of noncitizen voting. As noted in Part I.B.2, 100,000 noncitizens are now eligible for subsidized healthcare on the Obamacare exchanges. Many noncitizens are also eligible to receive SNAP benefits. *See supra* Part I.A.2.b.

Given (1) the massive numbers of illegal aliens entering this country, (2) that combinations of SSNs and driver's licenses can be used to register to vote, (3) that illegal aliens are able to obtain those items through the policies described above, (4) how noncitizens who are legally in this Nation are also able to obtain those items as a matter of course, and (5) the significant numbers of noncitizens removed from the rolls in various States, it is abundantly clear that the Biden-Harris Administration did consider this factor when implementing the EO. These agency actions make it significantly easier for noncitizens to register to vote and cast ballots.

As a separate point, voters "who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). But the NVRA's findings include that "discriminatory and unfair" procedures harm voters, 52 U.S.C. § 20501(a), and that one NVRA purpose is protecting election integrity, *id.* § 20501(b)(3). That renders these agency actions inconsistent with the NVRA, as they discriminate against voters less inclined to vote for Democrats and also undermine election integrity. "Illogic and internal

35

inconsistency are characteristic of arbitrary and unreasonable agency action." *U.S. Chamber of Com. v. U.S. Dep't of Lab.*, 885 F.3d 360, 382 (5th Cir. 2018).  And an agency action is arbitrary and capricious if it "fail[s] to consider an important aspect of the problem."  *State Farm*, 463 U.S. at 43; *Louisiana v. Dep't of Energy*, 90 F.4th 461, 469 (5th Cir. 2024) (failing to "account for relevant factors").

That these agency efforts lack safeguards to prevent voting by illegal aliens and other ineligible individuals ultimately works against the NVRA's findings and purpose, and thus the policy's purported justification.  They are inconsistent with the program's stated goals and fail to consider an important aspect of this situation, instead pursuing partisan goals.

### D.    The challenged agency actions are inconsistent with NVRA and violate other statutes.

Some of the agency actions here go beyond exceeding lawful authority to actually violate federal law.  Still others are inconsistent with the NVRA.  Both are separate APA violations.

### 1.    Inconsistency with NVRA § 2 and violations of other federal laws.

a.    One example of a statutory violation comes from ED.  As already noted, ED sent a "Dear Colleague" letter to universities directing them to use FWS funds "to support voter registration activities," whether they occur "on or off-campus."  ECF No. 11-10 at 4.  But FWS programs must "benefit the Nation."  20 U.S.C. § 1087-51.   Federal law mandates that the students' work be "in the public interest."  *Id.* § 1087-53.  However, under current regulations, "[w]ork is not in the public interest if … [i]t involves any partisan or *nonpartisan* political activity . . ."  34 C.F.R. § 675.22(b)(5) (emphasis added).

Voter registration and GOTV efforts are political activities, even if purportedly nonpartisan.  And federal statutes and regulations could not be more clear that FWS funds cannot

be used on political activities even if they are nonpartisan. ED's actions are therefore not in accordance with law. To the contrary, they flagrantly violate the law.

b.       The EO and its agency actions here also frustrate the NVRA. They derogate the NVRA's stated goals of election integrity, accuracy, and nondiscrimination. *See* 52 U.S.C. §§ 20501(a)(3), (b)(3), (b)(4). The NVRA's purposes include "protect[ing] the integrity of the electoral process" and "ensur[ing] that accurate and current voter registration rolls are maintained." *Id.* §§ 20501(b)(3), (b)(4). Indeed, some of the agency actions are "manifestly contrary" to these purposes. *Texas*, 809 F.3d at 186. For example, consider agencies' targeted mass-registration efforts. These efforts have very likely facilitated the registration of noncitizens and ineligible citizens, which could result in some unlawfully cast ballots. Given that the EO aims to increase voter turnout without adding safeguards, implementing agency actions thwart the goals of integrity and accuracy. After all, an "election system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identify of voters." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (internal quotation marks omitted).

Turn to protecting the "fundamental right" of "citizens of the United States to vote." 52 U.S.C. § 20501(a)(1). This right includes the right to a fully effectual vote, one that is not diluted or canceled by another person's illegal election activity. *Bush*, 531 U.S. at 105. It also includes protection from the "damaging effect" of "discriminatory and unfair registration laws and procedures." 52 U.S.C. § 20501(a)(3). Not only do the agency actions discriminate against Republicans, they also risk diluting lawful votes with illegal ballots. That renders those actions both "contrary to constitutional right" and also "otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(B), (2)(A).

37

One clear example is HHS sending materials for voter registration and GOTV to Obamacare exchange participants, when as noted above that list includes 100,000 DACA recipients. They are not citizens; therefore it is illegal for them to vote. That action undermines election integrity and confidence in vote tallies. Another example is the focus from the article on Vice President Harris and her staff regarding implementing the EO, where Axios reported that the EO focuses on turning out key Democrat voting blocs. Favoring Democratic voters is a form of government discrimination against voters who support other parties, contrary to the NVRA's purpose of ensuring nondiscrimination in voter registration.

        c.      Finally, to the extent that the NVRA can be read as authorizing racial preferences for minority voters, this Court should reject such a reading under the canon of constitutional doubt. Under this canon, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (citation omitted); *accord Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018) ("[W]hen statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems."); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 247–51 (2012).

        This Court need not conclude that a broader interpretation would necessarily be unconstitutional, only that it would raise serious doubts. *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 220 (5th Cir. 2023) (quoting *Jennings*, 583 U.S. at 286). Consequently, "[w]here an administrative interpretation of a statute invokes the outer limits of Congress' power," this Court requires "a clear indication that Congress intended that result." *Solid Waste*, 531 U.S. at 172. This

Court should assume "that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority." *Id.* at 172–73.

Government programs cannot affirmatively prefer one racial group over another unless the preference satisfies strict scrutiny. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 215, 218–23 (2023). While identifying any current race-specific barriers and mitigating their effects might be permissible under the Constitution—provided that those actions comply with all the substantive and procedural requirements of the APA— affirmatively preferring certain racial groups would raise constitutional doubts.

### 2.   The challenged actions in non-designating States violate NVRA § 7.

Separately, the EO empowers agencies to become voter registration agencies without state designations, despite the NVRA's explicit contrary language.   52 U.S.C. §§ 20506(a)(1), (a)(3)(B)(ii), 20506(b). The NVRA permits federal agencies to act as voter registration agencies in only one way: state designations. Voter registration efforts hosted in both "Federal and non-governmental offices" still require state approval. *Id.* § 20506(a)(3)(B)(ii). Such federal-state offices must be "designate[d]" by "[e]ach State." *Id.* § 20506(a). All voting registration agencies require a state designation. *Id.* That requirement reflects the NVRA's command that federal entities must, "to the greatest extent practicable, cooperate with the States." *Id.* § 20506(b).

Pursuant to the EO, agencies appear to have claimed state voter registration agency status without state designation, consent, approval, or authorization. For example, it appears such agencies might have been established in Ohio. *See* 1st Am. Compl. ¶ 396. But the Ohio Secretary of State has not designated federal offices under NVRA § 7. CITE. If agencies in those States have registered voters, they have done so in violation of the NVRA. Their actions must therefore be set aside as "not in accordance with the law." 5 U.S.C. § 706(2)(A).

39

**E.     The challenged actions also violate the Anti-Deficiency Act because Congress has not appropriated funds for them.**

The Anti-Deficiency Act commands federal employees to comply with the Appropriations Clause, U.S. CONST. art. I, § 9, cl. 7.  31 U.S.C. § 1341; *see also id.* §§ 1342, 1517.  Appropriations assign funds to "a particular use… in exclusion of all others."  *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 427 (2024) (quoting 1 NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)).  Put more simply, federal employees can expend "a source of public funds" for only "designated purposes."  *Id.*

Congress has not appropriated money for a whole-of-government voter registration drive— either nonpartisan or partisan—or GOTV.  Even if these agency actions authorized by the generic NVRA language about encouraging voting and increasing registration—that is to say, actions that benefit the Nation and electorate as a whole, not just Vice President Harris and other Democrats— and did not require notice and comment, and satisfy arbitrary-and-capricious review—they would still require congressional funding.  The Election Assistance Commission has issued an advisory opinion stating that election officials are prohibited from using federal funds to engage in voter registration.  "[V]oter registration activities do not qualify for funding ….  Neither Section 101 nor 251 funds may be used to conduct voter registration drives or get out the vote efforts; including advertising for the event, setting up booths, and paying salaries of employees who register new voters."  U.S. Election Assistance Commission Funding Advisory Opinion FAO-08-005, https://tinyurl.com/EAC-FAO-HAVA-funds.

But that is what the EO orders, and it is what agencies are providing (and plan to provide).  It also makes no difference whether agency personnel take the action directly versus contracting with private organizations.  Federal campaign finance laws apply to private parties' voter-registration activities as well.  11 C.F.R. § 100.133.

40

One prime example of an Anti-Deficiency Act violation here is FWS dollars being used for on and off-campus voter registration drives.  ECF No. 11-10; *see also supra* Part I.A.2.  First, federal law requires student work in college FWS programs to be "in the public interest."  20 U.S.C. § 1087-53.  However, such work is "not in the public interest" if it "involves *any* partisan *or nonpartisan* political activity."  34 C.F.R. § 675.22(b)(5) (emphases added).  Recall that these efforts on college campuses are referred to as "a Republican-killing Death Star."  Part I.C.1.b, *supra*.  These FWS programs are designed to register and mobilize voters likely to vote Democrat.  But even if the EO actions were nonpartisan, they are by definition political.  This makes FWS actions here both contrary to that legal prohibition and an unauthorized use of taxpayer dollars.

And Vice President Harris confirmed that this would be *paid* political work.  ED's letter to colleges "made clear that Federal Work Study (FWS) funds could be used to compensate a student who is employed directly by a postsecondary institution for employment involving voter registration activities that take place on or off-campus."  ECF No. 11-10.  And Vice President Harris also announced the Administration's plan to "engage our young leaders" on college campuses and "activate them" by paying students to register their peers through the Federal Work-Study program.  Jackson Walker, *Kamala Harris Says Government Will Pay College Students to Register Voters*, THE NAT'L DESK (Feb. 28, 2024), https://tinyurl.com/yh3nurve.  So it is beyond dispute that federal taxpayer dollars are going to these efforts.

As a second example, the Biden-Harris Administration "will allow federal employees to take off work on Election Day" or give them time off to do so prior to Election Day.  Scott, *supra*; *accord* EO § 6.  But unless they are required to use vacation time or other paid time off, this amounts to taxpayer-funded election activity.

41

Other examples abound, as already discussed.   HHS "will email voter registration information to every person—more than 20 million last year—who signs up for health insurance through the Affordable Care Act." Scott, *supra*.  Treasury is spending funds to send 900,000 direct mail pieces.  ECF No. 11-9.  USDA is stocking up supplies and materials in every field office.  *Id.*  BIE is taking time in school to provide materials to students to take home, encouraging their parents to register and vote.  *See supra* Part I.A.2.  The DOT is issuing "guidance" to more than 2,150 public transit to provide free or reduced fare service on Election Day.  ECF No. 11-8.  To the extent those transit systems receive federal funds and are expected to be responsive to "guidance" to continue receiving such funding, that too is spending funds that Congress has not appropriated, because Government cannot do through a third party something that it cannot do directly.  *See Norwood v. Harrison*, 413 U.S. 455, 465 (1973).

As a result of these and other examples, agencies have used public funds, appropriated by Congress for other uses, in both registration efforts and GOTV efforts.  Those actions are "not in accordance with law" and must be set aside.  5 U.S.C. § 706(2)(A).

### F.    President Biden acted *ultra vires* in issuing Executive Order 14019.

President Biden's EO itself is illegal because it is *ultra vires*.  Although this Court might provide complete relief under the APA, the Court could also hold in the alternative that EO 14019 itself is unlawful because it is beyond the President's authority to issue.

Executive orders issued by a President can be challenged as *ultra vires* when there is no statute authorizing the President's action, and where the executive order does not rest on the President's inherent constitutional powers.  *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667 (2018); *Chamber of Com. v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996).

Plaintiffs have a cause of action to challenge Executive Orders that are *ultra vires* even without a final agency action.  *Hawaii v. Trump*, 878 F.3d 662, 682 & n.8 (9th Cir. 2017).  The

Supreme Court has held unlawful presidential actions that are beyond a President's statutory authority and not among his inherent constitutional powers. *Reich*, 74 F.3d at 1327–28 (citing, *inter alia*, *Leedom v. Kyne*, 358 U.S. 184, 188–89 (1958); *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 108, 110 (1902)). For example, in *Leedom* the Supreme Court permitted a challenge to an executive order that was implemented by the Labor Secretary, despite the lack of subsequent final agency action from the Department of Labor. *See Leedom*, 358 U.S. at 188–89. As recently as the past decade, the Supreme Court characterized *McAnnulty* as standing for the proposition that federal courts can enjoin "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Examining *McAnnulty* in that light, the Ninth Circuit concluded that "[w]hen, as here, Plaintiffs challenge the President's statutory authority to issue the Proclamation, we are provided with an additional avenue by which to review these claims." *Hawaii*, 878 F.3d at 683.

There was no legal authority for President Biden to issue the EO. No provision of the Constitution grants him such power, and indeed he does not even claim one. Neither does the NVRA for all the reasons explained in Part I.A.1, or any other statute. With no authorizing law, this Court should accordingly hold the EO is *ultra vires*, and enjoin all federal agencies from implementing it.

## II.   REMAINING INJUNCTION FACTORS ARE SATISFIED.

Plaintiffs are suffering irreparable harm due to these agency actions, and the balance of equities and public interest likewise favor a preliminary injunction. Thus, all three remaining injunctive factors warrant a preliminary injunction.

A. Plaintiffs here are suffering injuries-in-fact traceable to the EO and the agency actions implementing it. Plaintiffs LaRose, Jacobsen, Genetski, and Pinnow are election administrators whose administrative overhead is increased by Defendants' actions, including a drain of resources

43

attributable to noncitizen registrations, unlawful felon registrations, and registrations of individuals who are complying with registration requests because it was foisted upon them, but did not affirmatively seek to register.  Such registrations are inferior in quality, with increased error rates and other flaws making them more time-consuming to process.  Blackwell Dec. ¶¶ 11–12 (App. 3); Jacobsen Dec. ¶¶ 5–9 (App. 13–14); Genetski Dec. ¶¶ 15–17 (App. 18); *see also* Katz Dec. ¶¶ 10–13 (App. 32).  Still more, when those registrations are being facilitated by personnel who are not trained by state and local election authorities, there are increased errors and quality-control problems on that end as well.  Blackwell Dec. ¶ 15 (App. 3); Von Spakovsky Dec. ¶ 10 (App. 9).  After registrations are processed, federal law also requires "the appropriate State election official to send notice to each applicant of the disposition of the application."  52 U.S.C. § 20507(a)(2).  These are Article III injuries.  *See New York*, 588 U.S. at 766–67; Plaintiffs LaRose and Jacobsen are also each the "chief State election official" under the NVRA whose duty it is to coordinate State responsibilities under federal election law, 52 U.S.C. § 20509, and who represent the interests of their States with regards to elections.  Jacobsen Dec. ¶¶ 1–2 (App. 13); *see also* Katz Dec. ¶¶ 6–7 (App. 31–32).  The agency actions discussed here that increase the risk of noncitizen voting also harm States' interests in election integrity and maintaining voter confidence.  Blackwell Dec. ¶¶ 27–28 (App. 5); Von Spakovsky Dec. ¶¶ 19–21 (App. 10); Jacobsen Dec. ¶ 10 (App. 14); *see also* Gorka Dec. ¶¶ 10–12 (App. 27).  States are entitled "to special solicitude in [the Supreme Court's] standing analysis."  *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).  By invading the province of how each State chooses to conduct its elections, both the EO and its agency actions encroach upon the interests of their States.  *See Texas*, 809 F.3d at 151.  Plaintiffs Jackson, Van Duyne, Crane, Loudermilk, Meuser, Tiffany, Bishop, Krause, and Essayli are injured because these agency actions benefit their Democratic opponents, giving their political

competition an advantage in their upcoming 2024 elections, and also those actions make it necessary to commit additional resources to counteract the undesired effects of those unlawful actions. *Nelson v. Warner*, 12 F.4th 376, 385 (4th Cir. 2021); *see also Louisiana*, 90 F.4th at 467–68; Blackwell Dec. ¶¶ 27–28 (App. 5); Von Spakovsky Dec. ¶¶ 15–17, 22–27 (App. 9–11); Krause Dec. ¶¶ 11–14 (App. 23). Plaintiffs Georgia Republican Party, Michigan Republican Party, Utah Republican Party, and Fairfax County Republican Committee are harmed for the same reason. *Tex. Democratic Party v. Benisker*, 459 F.3d 582, 586–87 (5th Cir. 2006); *accord Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008); Genetski Dec. ¶¶ 20–21 (App. 19); Gorka Dec. ¶¶ 13–15 (App. 27–28). Plaintiff Genetski, for example, has received voter registrations from on-campus voter registration drives at a Michigan university, Genetski Dec. ¶¶ 11–12 (App. 18), which for the reasons explained in Part I.C.1 & 2 provide a partisan advantage to Democratic candidates. With early voting set to begin on September 16 and the resulting activity from Defendants' forthcoming unlawful GOTV efforts, Plaintiffs also imminently face future injuries once balloting is underway. Future injuries suffice to confer standing if "there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). This rule specifically applies to APA challenges to federal agency actions. *See, e.g.*, *New York*, 588 U.S. at 766–67.

B. Plaintiffs suffer "irreparable harm" here because "there is no adequate remedy at law," *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013) (internal quotation marks omitted), meaning that it "cannot be undone through monetary remedies," *Burgess v. Fed. Deposit Ins.,* 871 F.3d 297, 304 (5th Cir. 2017). "Complying with an agency order later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs" because "federal agencies generally enjoy sovereign immunity" from monetary

damages. *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (cleaned up). Accordingly, when unlawful government action has Plaintiffs as its object, "there is ordinarily little question that the action or inaction has caused [them] injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). It "is not so much the magnitude but the irreparability" of the injury that satisfies this factor. *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016).

Moreover, Federal agency actions that interfere with a State's enforcing its statutes inflict irreparable harm. *See, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). And violating constitutional rights causes irreparable harm, *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 & n.21 (5th Cir. 2021). That is true with the separation of powers, the Elections and Electors Clauses, and the Tenth Amendment here. This principle also extends to violations of statutory rights that are adjacent to constitutional rights. *See Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *8 (5th Cir. Feb. 17, 2022). Here, the APA and NVRA secure such rights at the statutory level.

C.   The remaining factors (balance of equities and public interest) "merge when the Government is the opposing party." *Texas*, 809 F.3d at 187. Courts "balance the competing claims of injury" if the injunction is granted versus denied. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). States have interests "in counting only the votes of eligible voters" and "orderly administration and recordkeeping" in voter registration and conducting elections. *Crawford*, 553 U.S. at 196. And election integrity is a compelling interest. *Purcell*, 549 U.S. at 4. By contrast, the Federal Government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Moreover, federal agencies have "no interest in the perpetuation of unlawful agency action." *Texas v. United States*, 40 F.4th

46

205, 229 (5th Cir. 2022) (internal quotation marks omitted).  Indeed, it is always in the public interest to end "a program that was created in violation of law and whose existence violates the law." *Texas v. United States*, 50 F.4th 498, 530 (5th Cir. 2022) (internal quotation marks omitted).

This Court should both enjoin Defendants from implementing the EO and issue a mandatory injunction granting all States and election administrators access to the SAVE database maintained by DHS.  The SAVE program obligates DHS "to respond to inquiries 'by a federal, state, or local government agency seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law.'" Systematic Alien Verification for Entitlements Program System of Records, 76 Fed. Reg. 58,525, 58,528 (Sept. 21, 2011) (quoting 8 U.S.C. § 1373(c)).  DHS should accordingly allow Plaintiffs here that are state or local agencies to "use SAVE for any legal purpose," specifically here, "voter registration." *Id.* at 58,527.

**III.    A TEMPORARY RESTRAINING ORDER AND NATIONWIDE RELIEF ARE WARRANTED HERE.**

A.      The threat of irreparable harm rapidly compounding is sufficiently imminent that this Court should  expedite briefing and issue a temporary restraining as soon as practicable to preserve the status quo while the Court to decides upon a preliminary injunction.  *See Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023); 11A CHARLES A. WRIGHT & ARTHER R. MILLER, FED. PRAC. & PROC. § 2951 & n.48 (3d ed. 2024 update).  Congress subpoenaed documents on EO implementation from agencies, seeking specific details.  Before filing suit, Plaintiffs monitored this investigation to determine if the Administration is violating the APA.  Those agencies did not comply with the June 26, 2024, subpoena deadline.  Plaintiffs filed suit two weeks later.  Those agencies still have not provided responsive documents, notwithstanding that the House Oversight Committee is now demanding them as well.  And on August 26, Plaintiffs became aware Defendants are asserting the presidential communications privilege against disclosing the most

important documents needed to confirm Defendants' unlawful intentions and goals, which Defendants reaffirmed before the D.C. Circuit on September 5, making it certain that these documents will not be disclosed before September 16. *See Am. First Legal Found. v. USDA*, No. 23-5173 (D.C. Cir. argued Sept. 5, 2024) (*AFL*). Early voting begins on September 16, and in the absence of documents to the contrary, the risk that unlawful GOTV efforts will irreversibly compound Plaintiffs' injuries justifies interim relief to preserve the status quo regarding GOTV and partially restore the status quo on registration efforts. *See Norman Bridge*, 529 F.2d at 829; *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

B.      Unsurprisingly, federal agencies have not been forthcoming with demands for answers. This stonewalling has led to Freedom of Information Act (FOIA) litigation in addition to *AFL*. *See, e.g.*, *Found. Gov't Accountability v. U.S. Dep't of Just.*, No. 2:22-cv-00252-JLB-KCD (M.D. Fla.). Yet the Biden-Harris Administration continues to go to desperate lengths to conceal the details of its EO implementation from the voting public, which seems bizarre if, as advertised, it is simply a nonpartisan program assisting eligible citizens registering to vote. They should instead be trumpeting those details, if they were as high-minded as they claim.

In large part due to the Biden-Harris Administration's stonewalling on the EO's implementation and defying congressional subpoenas, Plaintiffs cannot fully prove prior to commencing discovery that a nationwide injunction is necessary to avert further irreparable injury. The Court should therefore proceed on three premises.  First, official government publications regarding its policies and actions are admissible as evidence. *See Funk v. Stryker Corp.,* 631 F.3d 777, 783 (5th Cir. 2011); *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987); *United States v. Quezada*, 754 F.2d 1190, 1194 (5th Cir. 1985).  Second, courts apply a presumption of regularity and good faith, that when the government says it is

performing an act, the Court will take the government at its word, absent sufficient evidence to the contrary. *United States v. Fallen*, 498 F.2d 172, 174 (8th Cir. 1974).

And third, this Court should draw a negative inference from Defendants' withholding of evidence—namely, that such evidence would show that the agency actions implementing the EO are inflicting on Plaintiffs irreparable harms that warrant an injunction. "[W]hen a subpoena is ignored" by a party to civil litigation, the opposing "party can draw an adverse inference." *Int'l Chem. Workers Union v. Columbian Chem. Co.*, 331 F.3d 491, 497 (5th Cir. 2003). Courts also "routinely draw adverse inferences in connection with preliminary injunction proceedings." *SEC v. Collector's Coffee, Inc.*, 697 F. Supp. 3d 138, 154 (S.D.N.Y. 2023) (internal quotation marks omitted); *see, e.g.*, *SEC v. Cherif*, 933 F.2d 403, 417 (7th Cir. 1991). A party's "refusal to testify may be used against him" at the preliminary-injunction stage, "and the court may assume that his testimony would have been adverse to his interests." *Fort James Corp. v. Thiel Eugene Ratliff*, No. 3:99-CV-0148-D, 1999 WL 97932, at *2 (N.D. Tex. Feb. 12, 1999); *accord GE Cap. Com. Inc. v. Wright & Wright Inc.*, No. 3:09-CV-572-L, 2009 WL 1148235, at *3 (N.D. Tex. Apr. 28, 2009). Such an adverse inference may be drawn from a party's refusal to testify or provide information, even when that refusal did not occur in the course of the litigation in which the opposing party asks that an adverse inference be drawn. *See Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 209–10 (5th Cir. 1983) (adverse inference could be drawn against litigant based on his "failure to cooperate with the fire marshal's investigation"). In fact, one circuit specifically held, in a case where a party sought an injunction pending appeal, that it was "appropriate to draw adverse inferences" in that civil proceeding because when a congressional "Committee sought to question her about [certain] activities, she invoked the Fifth Amendment and refused to answer." *Ward v. Thompson*, No. 22-16473, 2022 WL 14955000, at *2 (9th Cir. Oct. 22, 2022).

49

Plaintiffs come from thirteen States, representing forty-five percent of the Nation's population. *See Tbl. 2: Resident Population for the 50 States, the District of Columbia, and Puerto Rico: 2020 Census*, U.S. CENSUS BUREAU (Apr. 1, 2020), https://tinyurl.com/Census-2020-Table-2. Defendants have facilities scattered throughout the Nation, and Plaintiffs cannot ascertain at this point whether the actions of a federal employee in one State contributes to a Plaintiff's injury in another State. Therefore, this Court should conclude that it is sufficiently likely that Defendants' published facts are occurring in at least some of the jurisdictions from which Plaintiffs hail, resulting in harm to at least one Plaintiff. And therefore, a nationwide injunction is appropriate.

This relief should also be nationwide at this preliminary stage because of the scope of final relief. The Federal Government is nationwide in scope. This equitable relief should apply nationally until evidence reveals that narrower relief is adequate in any event. *See Texas*, 809 F.3d at 188; *Texas v. Biden*, 554 F. Supp. 3d 818, 857 (N.D. Tex. 2021), *rev'd and remanded on other grounds*, 597 U.S. 785 (2022); *Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-CV-00278-P, 2024 WL 965299, at *49 (N.D. Tex. Mar. 5, 2024). But for APA violations, "[t]he default rule is that vacatur in the appropriate remedy." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022). The final disposition of this case should vacate all of Defendants' unlawful actions, which will be nationwide in scope. The preliminary relief should mirror that scope.

## CONCLUSION

For the foregoing reasons, this Court should issue a preliminary injunction enjoining implementation of Executive Order 14019. Furthermore, given that early voting begins Monday, September 16, Plaintiffs also ask for this Court to issue a temporary restraining order by that date or as soon as practicable thereafter to preserve the status quo until this Court decides upon a preliminary injunction.

50

September 10, 2024

Respectfully submitted,

*/s/ Kenneth A. Klukowski*
H. CHRISTOPHER BARTOLOMUCCI*
D.C. Bar No. 453423
KENNETH A. KLUKOWSKI
D.C. Bar No. 1046093
JUSTIN A. MILLER
Tex. Bar No. 24116768
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136
kklukowski@schaerr-jaffe.com

JESSICA HART STEINMANN
Tex. Bar No. 24067647
MICHAEL D. BERRY
Tex. Bar No. 24085835
AMERICA FIRST POLICY INSTITUTE
1635 Rogers Road
Fort Worth, TX 76107
Telephone: (571) 348-1802

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

On September 10, 2024, the foregoing document was filed with the Clerk of Court for the United States District Court, Northern District of Texas using the Court's CM/ECF system.  I hereby certify that I have served the document on all counsel of record by manner authorized by Federal Rule of Civil Procedure 5(b)(2) (ECF system).

> _/s/ Kenneth A. Klukowski_
> Kenneth A. Klukowski
> _Counsel for Plaintiffs_