## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| AMERICA FIRST POLICY INSTITUTE, *et al.*, <br><br>      *Plaintiffs*, <br><br>   v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States *et al.*, <br><br>      *Defendants*. | Case No. 2:24-cv-00152-Z |

## DEFENDANTS' COMBINED MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendants oppose Plaintiffs' motion for a temporary restraining order and preliminary injunction, ECF No. 15, and simultaneously move to dismiss Plaintiffs' Amended Complaint for lack of subject matter jurisdiction and, in the alternative, for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(1), 12(b)(6). In support, Defendants rely on the accompanying brief.

Dated:  September 14, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

*/s/ Alexander V. Sverdlov*
ALEXANDER V. SVERDLOV
  (NY Bar No. 4918793)
JACOB S. SILER
GARRETT F. MANNCHEN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20530
Tel: (202) 305-2532
Fax: (202) 616-8470
E-mail: alexander.v.sverdlov@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

---

AMERICA FIRST POLICY
INSTITUTE, *et al.*,

     *Plaintiffs,*

     v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States
*et al.*,

     *Defendants.*

Case No. 2:24-cv-00152-Z

---

**DEFENDANTS' COMBINED BRIEF IN SUPPORT OF THEIR MOTION
TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

ALEXANDER V. SVERDLOV
  (NY Bar No. 4918793)
JACOB S. SILER
GARRETT F. MANNCHEN
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20530
Tel: (202) 305-2532
Fax: (202) 616-8470
E-mail: alexander.v.sverdlov@usdoj.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

I.      The Executive Order and Its Ongoing Implementation .......................................... 3

II.     Related Litigation ................................................................................. 5

III.    This Case ........................................................................................ 7

LEGAL STANDARD ........................................................................................... 7

ARGUMENT .................................................................................................. 8

I.      Plaintiffs Are Unlikely to Succeed and the Court Should Dismiss the Complaint
        Because the Court lacks Article III Jurisdiction ...................................................... 8

        A.      *Plaintiffs' Claims of Injury Run Contrary to the Text of the Executive Order and Its
                Implementation* ........................................................................... 9

        B.      *Plaintiffs' Fears of Injury Rest on Sheer Speculation About the Independent
                Actions of Third Parties and Therefore Fail to Show Traceability* ......................... 13

        C.      *Plaintiffs' Other Miscellaneous Allegations Do Not Establish Standing* ................. 19

II.     Plaintiffs Are Unlikely to Succeed and the Court Should Dismiss the Complaint
        Because Plaintiffs Lack Standing Under the APA ................................................. 21

        A.      *The APA Does Not Provide a Cause of Action to Challenge a Government-Wide
                Effort to Implement with an Executive Order* ............................................ 22

        B.      *The Agencies' Implementing Activities are Not Final Agency Action* ................... 24

III.    Plaintiffs' APA Challenges are Unlikely to Succeed on the Merits and Should be
        Dismissed ........................................................................................ 28

        A.      *Plaintiffs Fail to Establish that Agency Activities Are Inconsistent with the
                NVRA or any Other Source of Law* ...................................................... 28

        B.      *Providing Voting Registration Information is Not Arbitrary or Capricious* ............. 31

        C.      *Providing Letters and Information Does Not Require Notice and Comment* ........... 33

IV.     Plaintiffs are Unlikely to Succeed on Their *Ultra Vires* Claim, Which Should be
        Dismissed ........................................................................................ 35

V.      Plaintiffs Fail on the Other Preliminary Injunction Factors ................................... 37

VI.     Any Injunctive Relief Should be Appropriately Tailored, and Plaintiffs Have Failed
        to Justify the Vague and Sweeping Relief that They Demand ............................... 43

CONCLUSION .......................................................................................................... 49

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*AARP v. U.S. Equal Emp. Opportunity Comm'n*,
    226 F. Supp. 3d 7 (D.D.C. 2016) ............................................................... 40

*Am. First Legal Found. v. U.S. Dep't of Agric.*,
    Case No. CV 22-3029, 2023 WL 4581313 (D.D.C. July 18, 2023) ..........................*passim*

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
    995 F.2d 1106 (D.C. Cir. 1993) ................................................................ 33

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) .................................................................. 44

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
    570 U.S. 1 (2013) ............................................................................ 29

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) .................................................................. 14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................... 8

*Ass'n of Cmty. Orgs. For Reform Now v. Miller*,
    129 F.3d 833 (6th Cir. 1997) .................................................................. 42

*Benisek v. Lamone*,
    585 U.S. 155 (2018) .......................................................................... 38

*Bennett v. Spear*,
    520 U.S. 154 (1997) .......................................................................... 24

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*,
    295 F.3d 28 (D.C. Cir. 2002) ................................................................. 35

*Bognet v. Sec'y Commonwealth of Pennsylvania*,
    980 F.3d 336 (3d Cir. 2020) ......................................................... 13, 15, 20

*Boire v. Pilot Freight Carriers, Inc.*,
    515 F.2d 1185 (5th Cir. 1975) ................................................................ 40

*Bost v. Ill. State Bd. of Elections*,
    684 F. Supp. 3d 720 (N.D. Ill. 2023) ......................................................... 20

*Bowyer v. Ducey*,
    506 F. Supp. 3d 699 (D. Ariz. 2020) .......................................................... 20

*Bruni v. Hughs*,
    468 F. Supp. 3d 817 (S.D. Tex. 2020) ........................................................ 18

*BST Holdings, LLC v. OSHA*,
    17 F.4th 604 (5th Cir. 2021) ...................................................................... 38

*Burgess v. FDIC*,
    871 F.3d 297 (5th Cir. 2017) ...................................................................... 37

*CAE Integrated, LLC v. Moov Techs., Inc.*,
    44 F.4th 257 (5th Cir. 2022) ........................................................................ 8

*California v. Env't Prot. Agency*,
    72 F.4th 308 (D.C. Cir. 2023) ............................................................... 36, 37

*Camp v. Pitts*,
    411 U.S. 138 (1973) .................................................................................... 44

*Catholic Health Initiatives v. Sebelius*,
    617 F.3d 490 (D.C. Cir. 2010) .................................................................... 34

*Chen Zhou Chai v. Carroll*,
    48 F.3d 1331 (4th Cir. 1995) ...................................................................... 37

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985) ........................................................................ 40

*City of New York v. United States Dep't of Def.*,
    913 F.3d 423 (4th Cir. 2019) ................................................................. 22, 23

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .............................................................................*passim*

*Club v. Costle*,
    657 F.2d 298 (D.C. Cir. 1981) .................................................................... 37

*Corman v. Torres*,
    287 F. Supp. 3d 558 (M.D. Pa. 2018) ........................................................ 14

*Crane v. Johnson*,
    783 F.3d 244 (5th Cir. 2015) ...................................................................... 20

*Crane v. Napolitano*,
    920 F. Supp. 2d 724 (N.D. Tex. 2013) ........................................................... 20

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
    452 F.3d 798 (D.C. Cir. 2006) ..................................................................... 27

*Ctr. for Biological Diversity v. EPA*,
    937 F.3d 533 (5th Cir. 2019) ....................................................................... 19

*Dep't of Homeland Sec. v. New York*,
    140 S. Ct. 599 (2020) .................................................................................. 43

*Dep't of Com. v. New York*,
    139 S. Ct. 2551 (2019) ................................................................................ 15

*Dep't of Com. v. New York*,
    139 S. Ct. 2551 (2019) ................................................................................ 32

*Donald J. Trump for President, Inc. v. Boockvar*,
    493 F. Supp. 3d 331 (W.D. Pa. 2020) .......................................................... 18

*Donald J. Trump for President, Inc. v. Cegavske*,
    488 F. Supp. 3d 993 (D. Nev. 2020) ................................................. 13, 18, 20

*Donald J. Trump for President, Inc. v. Way*,
    2020 WL 6204477 (D.N.J. Oct. 22, 2020) ................................................... 26

*Feehan v. Wis. Elections Comm'n*,
    506 F. Supp. 3d 596 (E.D. Wis. 2020) ......................................................... 20

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ....................................................................... 9, 14, 21

*Found. for Gov't Accountability v. U.S. Dep't of Just.*,
    688 F. Supp. 3d 1151 (M.D. Fla. 2023) ...................................................... 6, 43

*Gen. Motors Corp. v. Ruckelshaus*,
    742 F.2d 1561 (D.C. Cir. 1984) .................................................................... 33

*Gill v. Whitford*,
    585 U.S. 48 (2018) .............................................................................. 43, 44

*Holistic Candlers & Consumers Association v. FDA*,
    664 F.3d 940 (D.C. Cir. 2012) ..................................................................... 27

*In re Kosmos Energy Ltd. Sec. Litig.*,
    955 F. Supp. 2d 658 (N.D. Tex. 2013) ........................................................ 16

*Indep. Equip. Dealers Ass'n v. E.P.A.*,
    372 F.3d 420 (D.C. Cir. 2004) ................................................................... 28

*Ineos USA v. Fed. Energy Reg. Comm.*,
    940 F.3d 1326 (D.C. Cir. 2019) .................................................................. 14

*Justin Indus., Inc. v. Choctaw Securities, L.P.*,
    920 F.2d 262 (5th Cir. 1990) ...................................................................... 47

*Keefer v. Biden*,
    Case No. 1:24-CV-00147, 2024 WL 1285538 (M.D. Pa. Mar. 26, 2024) ................. *passim*

*Labrador v. Poe ex rel. Poe*,
    144 S. Ct. 921 (2024) ................................................................................. 43

*Lance v. Coffman*,
    549 U.S. 437 (2007) ............................................................................. 13, 21

*Louisiana State v. United States Army Corps of Engineers*,
    834 F.3d 574 (5th Cir. 2016) ...................................................................... 26

*Louisiana v. Becerra*,
    20 F.4th 260 (5th Cir. 2021) ...................................................................... 43

*Louisiana v. Biden*,
    64 F.4th 674 (5th Cir. 2023) ...................................................................... 36

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................. 14, 19

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................................. 22

*Luminant Generation Co. v. U.S. E.P.A.*,
    757 F.3d 439 (5th Cir. 2014) .............................................................. 25, 26, 27

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ................................................................................. 43

*Martel v. Condos*,
    487 F. Supp. 3d 247 (D. Vt. 2020) ............................................................. 20

*Memphis A. Philip Randolph Inst. v. Hargett*,
    978 F.3d 378 (6th Cir. 2020) ................................................................... 18

*Meyer v. Bush*,
    981 F.2d 1288 (D.C. Cir. 1993) ........................................................... 36, 37

*Moore v. Circosta*,
    494 F. Supp. 3d 289 (M.D.N.C. 2020) ..................................................... 20

*Murthy v. Missouri*,
    144 S. Ct. 1972 (2024) ............................................................................ 44

*Myers v. United States*,
    272 U.S. 52 (1926) ............................................................................. 35, 37

*Nat'l Ass'n For The Advancement of Colored People v. Bureau of the Census*,
    945 F.3d 183 (4th Cir. 2019) .................................................................... 23

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*,
    979 F.2d 227 (D.C. Cir.1992) .................................................................. 33

*Ne. Fla. Ch. of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*,
    896 F.2d 1283 (11th Cir. 1990) ............................................................... 38

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................ 42

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ............................................................................. 22, 26

*Nuziard v. Minority Bus. Dev. Agency*,
    676 F. Supp. 3d 473 (N.D. Tex. 2023) ..................................................... 44

*O'Rourke v. Dominion Voting Sys., Inc.*,
    Case No. 21-1161, 2022 WL 1699425 (10th Cir. May 27, 2022);
    *cert. denied*, 143 S. Ct. 489 (2022) ....................................................... 20

*Orbital ATK, Inc. v. Walker*,
    Case No. 117CV163LMBIDD, 2017 WL 2982010 (E.D. Va. July 12, 2017) ................ 37

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ................................................................................ 16

*Paher v. Cegavske*,
    457 F. Supp. 3d 919 (D. Nev. 2020) ........................................................ 20

*Pastel Cartel, LLC v. FDA*,
   2023 WL 9503484 (W.D. Tex. Dec. 14, 2023) ............................................................. 41

*Pennsylvania Voters All. v. Ctr. Cnty.*,
   496 F. Supp. 3d 861 (M.D. Pa. 2020) ................................................................ 15, 17, 19

*Perez v. Mortgage Bankers Ass'n*,
   135 S. Ct. 1199 (2015) .................................................................................................. 33

*Phillips v. City of Dallas*,
   781 F.3d 772 (5th Cir. 2015) ........................................................................................ 10

*Pub. Serv. Co. of New Hampshire v. Town of W. Newbury*,
   835 F.2d 380 (1st Cir. 1987) ......................................................................................... 39

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) .......................................................................................................... 42

*Republican Nat'l Comm. v. Burgess*,
   Case No. 3:24-CV-00198-MMD-CLB,
   2024 WL 3445254 (D. Nev. July 17, 2024) ..................................................... 15, 18, 20

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
   589 U.S. 423 (2020) ...................................................................................................... 42

*RSR Corp. v. EPA*,
   588 F. Supp. 1251 (5th Cir. 1984) ................................................................................ 44

*Rucho v. Common Cause*,
   139 S. Ct. 2484 (2019) .................................................................................................. 21

*Sambrano v. United Airlines, Inc.*,
   Case No. 21-11159, 2022 WL 486610 (5th Cir. Feb. 17, 2022) .................................... 38

*San Luis Unit Food Producers v. United States*,
   709 F.3d 798 (9th Cir. 2013) ........................................................................................ 24

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
   591 U.S. 197 (2020) ................................................................................................. 35, 36

*Siegel v. LePore*,
   234 F.3d 1163 (11th Cir. 2000) ..................................................................................... 38

*Sierra Club v. Costle*,
   657 F.2d 298 ................................................................................................................. 36

*Sierra Club v. Peterson*,
  185 F.3d 349 (5th Cir. 1999) .......................................................... 44

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ...................................................................... 9

*State of Louisiana v. Biden*,
  45 F.4th 841 (5th Cir. 2022) .......................................................... 45

*Symetra Life Ins. Co. v. Rapid Settlements Ltd.*,
  612 F. Supp. 2d 759 (S.D. Tex. 2007) ............................................ 40

*Tate v. Am. Tugs, Inc.*,
  634 F.2d 869 (5th Cir. 1981) .......................................................... 37

*Tenn. Conf. of the NAACP v. Lee*,
  105 F.4th 888 (6th Cir. 2024) ......................................................... 42

*Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.*,
  201 F.3d 551 (5th Cir. 2000) .......................................................... 34

*Texas v. Equal Emp. Opportunity Comm'n*,
  933 F.3d 433 (5th Cir. 2019) ..................................................... 24, 26

*Texas v. Ysleta del Sur Pueblo*,
  Case No. 17-cv-179, 2018 WL 1566866 (W.D. Tex. Mar. 29, 2018) ............ 47

*Toth v. Chapman*,
  Case No. 1:22-CV-00208, 2022 WL 821175 (M.D. Pa. Mar. 16, 2022) ......... 14

*Tough Traveler, Ltd. v. Outbound Prod.*,
  60 F.3d 964 (2d Cir.1995) .............................................................. 40

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ...................................................................... 9

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ...................................................................... 43

*Trump v. United States*,
  144 S. Ct. 2312 (2024) ................................................................. 35

*U.S. Postal Serv. v. Gregory*,
  534 U.S. 1 (2001) ........................................................................ 44

*U.S. Steel Corp. v. United Mine Workers of Am.*,
   519 F.2d 1236 (5th Cir. 1975) ................................................................ 45

*United States ex rel Johnson v. Raytheon Co.*,
   93 F.4th 776 (5th Cir. 2024) .................................................................... 8

*United States v. Nat'l Treasury Emps. Union*,
   513 U.S. 454 (1995) ............................................................................... 10

*United States v. Texas*,
   599 U.S. 670 (2023) ................................................................................. 9

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981) ............................................................................... 37

*Vill. of Bald Head Island v. U.S. Army Corps of Engineers*,
   714 F.3d 186 (4th Cir. 2013) ............................................................ 22, 23

*Vita-Mix Corp. v. Tristar Prod., Inc.*,
   2008 WL 11383504 (N.D. Ohio Sept. 30, 2008) ...................................... 40

*Walker v. Beaumont Indep. Sch. Dist.*,
   938 F.3d 724 (5th Cir. 2019) .................................................................... 8

*Williams v. Wynne*,
   533 F.3d 360 (5th Cir. 2008) .................................................................... 8

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................................... 38

*Wood v. Raffensperger*,
   981 F.3d 1307 (11th Cir. 2020) ............................................................... 20

**Constitution**

U.S. Const. Art. II ...................................................................................... 35

**Statutes**

5 U.S.C. § 551(13) ..................................................................................... 22

5 U.S.C. § 553(b) ....................................................................................... 33

5 U.S.C. § 7324(a) ..................................................................................... 31

5 U.S.C. § 7324(a)(2) ................................................................................ 10

5 U.S.C. § 7324(a)(3) ............................................................................................ 32

52 U.S.C. § 10307 ................................................................................................. 32

52 U.S.C. § 20501(a)(b)) ........................................................................................ 1

52 U.S.C. § 20506 ................................................................................................. 37

52 U.S.C. § 20506(a)(1) ...................................................................................... 11, 29

52 U.S.C. § 20506(a)(3)(ii) .................................................................................. 29, 45

52 U.S.C. § 20506(b) .......................................................................................... 29, 45

52 U.S.C. § 20506 (4)(a)(III) ................................................................................. 29

52 U.S.C. § 20507 ................................................................................................. 37

52 U.S.C. § 20508(a)(2) ......................................................................................... 37

5 U.S.C. §§ 301-302 .......................................................................................... 36, 46

52 U.S.C. §§ 20301 ............................................................................................... 32

Ga. Code Ann. § 21-2-224(a) ................................................................................ 41

Ohio Rev. Code Ann. § 3503.19(A) ....................................................................... 41

**Rules**

Fed. R. Civ. P. 65(d)(1)(A)-(C) ............................................................................. 45

**Regulations**

34 C.F.R. § 672.22 ................................................................................................ 20

34 C.F.R. § 672.22(b)(5) ....................................................................................... 30

**Other Authorities**

Exec. Order No. 14019 ................................................................................... *passim*

Exec. Order No. 12,866 ......................................................................................... 36

Exec. Order No. 13,279 ......................................................................................... 36

Exec. Order No. 13,563 ................................................................................................ 36

Exec. Order No. 13,798 ................................................................................................ 36

Exec. Order No. 13,990 ................................................................................................ 36

## INTRODUCTION

In passing the National Voter Registration Act (NVRA) over thirty years ago, Congress charged the Federal government with "the duty . . . to promote the exercise of" the right to vote and established a goal to "increase the number of eligible citizens who register to vote in elections for Federal office." Pub. L. No. 103-31, 107 Stat. 77 (1993) (codified at 52 U.S.C. § 20501(a)-(b)). Congress drafted the law to reverse decades of decline in voter participation—and every administration since has endeavored to enforce its provisions. S. REP. 103-6, p. 2 (1993); GAO, *Voter Registration: Information on Federal Enforcement Efforts* (June 2019), available here. The current Administration has followed suit. Shortly after assuming office, President Biden issued an executive order reiterating that it "is the responsibility of the Federal Government to expand access to, and education about, voter registration and election information." Exec. Order 14019, Promoting Access to Voting, 86 Fed. Reg. 13,623 (Mar. 7, 2021). And, to help inform the Administration's "future policy developments on voting access," the order solicited agencies "to brainstorm and identify ways that they 'can promote voter registration and voter participation'" within their statutory frameworks and consistent with the requirements of Federal and State law. *Am. First Legal Found. v. U.S. Dep't of Agric.*, No. CV 22-3029, 2023 WL 4581313, at *7 (D.D.C. July 18, 2023) (quoting EO 14019 § 3). Providing this type of direction to Executive Branch agencies is hardly groundbreaking. Indeed, it reflects the proper role of the President in the Constitutional scheme.

Plaintiffs have a different view. After waiting three and a half years since the issuance of the Executive Order, Plaintiffs filed an omnibus complaint in July of this year challenging agencies' implementation of that Order. *See* Compl., ECF No. 1.; Am. Compl., ECF No. 11 (FAC). And, after waiting two more months, they have run to Court seeking an emergency temporary restraining order and preliminary injunction against the implementation of the Order seemingly across the *entire* Federal government, manufacturing a purported emergency based on nothing more than the long-scheduled beginning of early voting. *See* Pls. Mot. TRO

1

& Prelim. Inj., ECF No. 16 (Pls. Br.).  Fortunately, however, the Court need not get embroiled in Plaintiffs' sprawling effort to reform the activities of "*all* [] federal agencies and officers in the United States Government [that are] taking, *or planning to take*, actions to implement the [Executive Order]"—which Plaintiffs themselves claim are "impractical" to comprehensively list out.  FAC ¶ 45 (emphasis added).  That is because, for all their alarmist rhetoric, Plaintiffs do not come close to establishing any plausible injury that would give them standing to sue.

As the materials Plaintiffs themselves submitted in this case make clear, the types of activities that federal agencies have undertaken in connection with the Executive Order are entirely anodyne.  For example, over the past three years, various agencies have been updating their websites and providing nonpartisan information to the public in all parts of the country—in rural and urban areas alike—about how people could register to vote (something the agencies were doing, planning to do, or had the authority to do even before the Executive Order was issued).  *See generally* ECF No. 11-8 (2021 White House Fact Sheet); ECF No. 11-13 (2022 White House Fact Sheet); ECF No. 11-9 (2023 White House Fact Sheet).  Plaintiffs cannot plausibly claim that providing nonpartisan information about how people can register to vote—or updating the Vote.gov website—creates an injury.  And Plaintiffs' speculation about the supposedly secret motives behind the Executive Order or the likelihood that it will turn out the Administration's supporters—to the detriment of Republican candidates who are named here as Plaintiffs—is just that.  There are too many unsupported and fanciful assumptions in Plaintiffs' theories of injury to bring this case within the ambit of this Court's Article III jurisdiction, and courts have routinely dismissed analogous claims for failure to establish standing.  Indeed, another district court has recently rejected a similar challenge to EO 14019 on standing grounds.  *See Keefer v. Biden*, No. 1:24-CV-00147, 2024 WL 1285538 (M.D. Pa. Mar. 26, 2024).  And this Court should do the same.

Even if Plaintiffs could clear these jurisdictional hurdles, they fail to state a cognizable legal claim.  Plaintiffs seek to bring a sprawling and unbounded challenge to innumerable planned or ongoing agency activities under the framework of the Administrative Procedure

Act (APA).  But Plaintiffs have failed to identify any final agency action that could give rise to an APA claim.  Indeed, their complaint and preliminary injunction motion make clear that they are mounting an impermissible programmatic attack against the implementation of a Presidential policy initiative across the entirety of the government.  The APA does not allow this Court to entertain that.  And if the Court were to reach the merits, it would find that Plaintiffs' arguments do not map on to any recognizable standard for APA review—which is, itself, a good indication that Plaintiffs have gone far astray.

None of the other preliminary-injunction factors favors Plaintiffs either.  Plaintiffs' extended delay in filing their "emergency" motion is itself a basis to conclude that they have not suffered any irreparable harm—which, in any event, they have not established.  And their unbounded request for relief, which would by Plaintiffs' own admission come in the midst of election season, does not come close to being in the public interest or even sufficiently specific to satisfy the requirements of Rule 65.

Tellingly, Plaintiffs have stated that they brought this lawsuit because the Administration has allegedly declined to produce certain deliberative materials to Congress and has also withheld such documents under the Freedom of Information Act.  Pls. Br. 7.  But the agencies have been working to accommodate Congress's legitimate oversight interests in a manner consistent with the separation of powers and the legal obligations of the Executive Branch.  And enjoining the entire government's implementation of a Presidential initiative on the basis of speculative fears about the Executive Branch's compliance with Congressional oversight is not what Article III permits.

Accordingly, the Court should dismiss this lawsuit pursuant to Rule 12(b)(1) and deny Plaintiffs' artificial-emergency motion as moot.

## BACKGROUND

### I.    The Executive Order and Its Ongoing Implementation

In March 2021, President Biden issued Executive Order No. 14019, entitled "Promoting Access to Voting."  86 Fed. Reg. 13,623.  The President declared that "[i]t is the

3

policy of [his] Administration to promote and defend the right to vote for all Americans who are legally entitled to participate in elections." *Id.* § 2. And, in furtherance of that policy, the Order directed federal agencies to "consider ways to expand citizens' opportunities to register to vote and to obtain information about, and participate in, the electoral process." *Id.* § 3. Specifically, the head of each federal agency was to "evaluate ways in which the agency can, as appropriate and consistent with applicable law, promote voter registration and voter participation." *Id.* § 3(a). Each agency was further asked to consider ways that it can "provide relevant information . . . about how to register to vote, how to request a vote-by-mail ballot, and how to cast a ballot in upcoming elections," "facilitate seamless transition from agencies' websites directly to State online voter registration systems or appropriate Federal websites," "provide access to voter registration services and vote-by-mail ballot applications," "promote and expand access to multilingual voter registration and election information," and "promote equal participation in the electoral process for all eligible citizens of all backgrounds." *Id.* § 3(a)(i)-(v). The Order required each agency to submit to the Assistant to the President for Domestic Policy, within 200 days of the Order's issuance, "a strategic plan outlining the ways identified . . . that the agency can promote voter registration and voter participation." *Id.* § 3(b).[1]

Following issuance of the Executive Order, federal agencies submitted their strategic plans to the White House. Decl. of Richard A. Sauber ¶¶ 7-12, *Am. First Legal Found. v. U.S. Dep't of Agric.*, No. 22-cv-3029 (D.D.C.), ECF No. 21-2 (White House Decl.). These "agency strategic plans solicited and received by the White House" generally "described potential agency actions for consideration," as well "possible obstacles and ways to address them." *Id.* ¶ 8. Some agencies indicated that they had already begun undertaking particular initiatives in the preceding six months since Executive Order 14019 was issued. The strategic plans thus

---

[1]   At relevant times, the "Assistant to the President for Domestic Policy" was Ambassador Susan E. Rice, who also served as Director of the Domestic Policy Council. White House Decl. ¶ 7.

offered a "snapshot" at each agency of the "on-going development of potential actions" as of September 2021. Treasury Decl. ¶ 14, *Am. First Legal Found. v. U.S. Dep't of Agric.*, No. 22-cv-3029 (D.D.C.), ECF No. 21-9.  The strategic plans were reviewed by senior White House staff, who used them to provide feedback and guidance to agencies "regarding the content of their plans" and to "discuss the agencies' potential plans for implementation" of Executive Order 14019 generally.  White House Decl. ¶¶ 11-12; *see also* Declaration of Richard A. Sauber, *Found. for Gov't Accountability v. U.S. Dep't of Just.*, No. 2:22-cv-252 (M.D. Fla.), ECF No. 68-1.

Some of the initiatives proposed by the agencies have since been implemented.  *See, e.g.*, ECF No. 11-8 (2021 White House Fact Sheet announcing several early-adopted agency actions).  But not all.  *See Am. First Legal Found.*, 2023 WL 4581313, at *7.  The White House has released regular announcements of the nonpartisan activities that various agencies are undertaking.  *See generally* ECF No. 11-8 (2021 White House Fact Sheet); ECF No. 11-13 (2022 White House Fact Sheet); ECF No. 11-9 (2023 White House Fact Sheet).  These include website updates and communications in which agencies encourage their "field offices to make nonpartisan information about voter registration available in customer service locations" around the country.  ECF No. 11-9 (2023 White House Fact Sheet).

## II.    Related Litigation

After the Executive Order issued, two nonprofit organizations submitted Freedom of Information Act (FOIA) requests to a combined total of fifteen executive agencies, seeking the strategic plan that each agency submitted to the White House.  *See Found. for Gov't Accountability v. U.S. Dep't of Just.*, 688 F. Supp. 3d 1151 (M.D. Fla. 2023); *Am. First Legal Found. v. U.S.D.A.*, No. 22-3029, 2023 WL 4581313 at *2 (D.D.C. July 18, 2023), *appeal filed*, 23-5173 (D.C. Cir.).  Ultimately each agency responded to its FOIA request by informing the requesting organization that the requested plan was exempt from disclosure under FOIA pursuant to Exemption 5 based on presidential communications privilege.  *Ibid*.  The organizations challenged the agencies' responses, resulting in two lawsuits, one currently

before the U.S. Court of Appeals for the D.C. Circuit, *Am. First Legal Found*, and the other pending before the district court in the Middle District of Florida, *Found for Gov't Accountability*.

The D.C. district court upheld the agencies' assertions of Exemption 5. *Am. First Legal Found.*, 2023 WL 4581313 at *7, 10. The court explained that under the plain language of the Executive Order and based on the many declarations submitted by agency officials, the strategic plans that the agencies had submitted to the White House reflected potential "future possible actions" the agencies could take to "promote and defend the right to vote." As such, they were intended simply to aide White House advisors in "formulating the advice to be given to the President." *Id.* at * 6. Accordingly, the court held that the agencies had properly invoked Exemption 5 based on presidential communications privilege.[2] In the other pending litigation, involving a single FOIA request submitted to the Department of Justice, the Middle District of Florida initially found that the Executive Order did not unambiguously demonstrate that the presidential communications privilege applies to the strategic plans but, following in camera review, it invited the government to file a renewed motion for summary judgment, which remains pending. *See Found. for Gov't Accountability*, 688 F. Supp. 3d at 1177.

There are also several cases, similar to this one, in which plaintiffs seek to challenge EO 14019 directly. One district court has already dismissed such a lawsuit filed by Pennsylvania commonwealth legislators for lack of standing. *Keefer v. Biden*, No. 1:24-cv-00147, 2024 WL 1285538 (M.D. Penn. Mar. 26, 2024), *appeal filed*, No. 24-1716 (3d Cir.), *pet. for cert. before judgment filed*, 23-1162. In reaching that decision, the court explained that the plaintiffs lacked standing as individual candidates because they failed to allege any "particularized harm to their candidacies," noting that "[a] vague, generalized allegation that

---

[2] Plaintiffs' appeal to the D.C. Circuit was argued on September 5, 2024.

elections, generally, will be undermined, is not the type of case or controversy that this court may rule on under Article III." *Id.* at * 10.[3]

### III.   <u>This Case</u>

Plaintiffs in this matter consist of a nonprofit organization, the America First Policy Institute (AFPI), along with several members of the United States House of Representatives from multiple states, suing as candidates for office; candidates for state and local office in several states; state elections officials from different states; and Republican Party organizations from three states and one county in Virginia.  They filed this lawsuit on July 11, 2024, ECF No. 1, and an Amended Complaint on July 31, 2024, adding additional plaintiffs, ECF No. 11.  In their First Amended Complaint, Plaintiffs allege that the Executive Order "commandeers every federal agency . . . to use taxpayer money to create voter-registration programs and to design get-out-the-vote . . . initiatives," with the ultimate goal of helping to "elect Democratic candidates."  FAC ¶ 4.

Two months after filing their original Complaint, Plaintiffs moved this court for a temporary restraining order and preliminary injunction on the evening of September 10, 2024. ECF No. 19.  Defendants now oppose Plaintiffs' motion and move to dismiss the Amended Complaint.

### LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" and "warranted only when the movant shows (1) a substantial likelihood of success on the merits, (2) irreparable injury if the injunction is not granted, (3) that the injury outweighs any harm to the other party, and (4) that granting the injunction will not disserve the public interest.'" *CAE Integrated, LLC v. Moov Techs., Inc.*, 44 F.4th 257, 261 (5th Cir. 2022).  "The burden of persuasion on all of the four requirements" is "at all times upon the plaintiff."  *CAE Integrated*, 44 F.4th at 261.

---

[3]  The other pending cases are *Ashcroft v. Biden*, No. 24-cv-1062 (E.D. Mo. 2024); *Missouri v. Biden*, No. 24-cv-1063 (E.D. Mo. 2024); *Montana v. Biden*, 6:24-cv-1141 (D. Kan. Aug. 13, 2024).

The Court applies similar standards in evaluating a motion to dismiss under both Rule 12(b)(1) and 12(b)(6). *Williams v. Wynne*, 533 F.3d 360, 365 n.2 (5th Cir. 2008). A "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," but a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For Rule 12(b)(1) purposes, Plaintiffs have the burden of demonstrating that this Court has jurisdiction, which "may be assessed on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *United States ex rel Johnson v. Raytheon Co.*, 93 F.4th 776, 783 (5th Cir. 2024). For Rule 12(b)(6) purposes, the Court may also consider "documents attached to the complaint" and "matters of which judicial notice may be taken." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019).

## ARGUMENT

The Court should dismiss this case for lack of jurisdiction. Failing that, the Court should dismiss all of Plaintiffs' claims on the merits and deny their preliminary-injunction motion as moot.

## I.    Plaintiffs Are Unlikely to Succeed and the Court Should Dismiss the Complaint Because the Court Lacks Article III Jurisdiction

Plaintiffs' challenge to the three-year-old Executive Order begins and ends with their failure to establish Article III jurisdiction. Federal courts do not "operate as an open forum for citizens to press general complaints about the way in which government goes about its business." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378–79 (2024) (citations omitted). Rather, Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). And "a case or controversy can exist only if a plaintiff has standing to sue." *United States v. Texas*, 599 U.S. 670, 675 (2023). Plaintiffs, however, run aground on this bedrock requirement because their Amended Complaint fails to establish an "injury in fact"

8

that is "concrete and particularized and actual or imminent, not conjectural or hypothetical," and traceable to Defendants' actions. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (cleaned up). Indeed, all the injuries Plaintiffs allege are nothing more than "speculative fear[s]" that rest on a "highly attenuated chain of possibilities" involving an innumerable number of third parties—and thus falls far short of Article III's bar. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 410 (2013).

    A.    *Plaintiffs' Claims of Injury Run Contrary to the Text of the Executive Order and Its Implementation*

The main theory of injury Plaintiffs proffer is that the "EO and its implementing agency actions [will] give Democrats . . . a partisan advantage"—and thereby allegedly hurt the election prospects of the named Republican candidates and state parties. FAC ¶¶ 1-4, 89; *see also* Pls. Br. at 14. But neither the text of the Executive Order nor the details of the limited number of specific agency implementing activities that Plaintiffs actually invoke suggest that the Executive Order has a partisan purpose or effect.

Start with the text of the Executive Order. By its plain terms, the order is strictly *non*partisan. It announces the general purpose of "expand[ing] access to, and education about, voter registration and election information . . . in order to enable *all* eligible Americans to participate" in elections. EO 14019 § 2 (emphasis added). And, consistent with that purpose, it directs agencies to "evaluate ways in which [they] can, *as appropriate and consistent with applicable law*, promote voter registration" in the course of their activities. *Id.* § 3 (emphasis added); *see also id.* § 12(b) ("This order shall be implemented consistent with applicable law."). But, as Plaintiffs themselves recognize, this applicable law includes broad restrictions on federal employees engaging in partisan political activity while on duty. *See, e.g.*, 5 U.S.C. § 7324(a)(2); *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 470 (1995) (noting "the prohibition of the Hatch Act . . . on partisan political activity by all classified federal employees"); *Phillips v. City of Dallas*, 781 F.3d 772, 780 (5th Cir. 2015) (noting that the law "preclude[s] federal government employees from a very broad range of political

9

activity, including (among other political pursuits): raising money for, publicly endorsing, or campaigning for political candidates"). Thus, the Executive Order contemplated that the initiatives agencies undertake *could* include "soliciting and facilitating approved, *nonpartisan* third-party organizations and State officials to provide voter registration services on agency premises." EO 14019 § 3(a)(iii)(C) (emphasis added). But no provision of the Executive Order directs or allows agencies to utilize their resources for the purposes of benefitting a particular party or campaign.

Consistent with that framework, the agency activities actually undertaken under the Executive Order—of which Plaintiffs only reference a small subset—reflect agencies finding ways to provide the public collectively, across all areas of the country, with *nonpartisan* information about elections and the registration process established by relevant state law. *See* FAC ¶ 151-301; *see generally* ECF No. 11-8 (2021 White House Fact Sheet); ECF No. 11-13 (2022 White House Fact Sheet); ECF No. 11-9 (2023 White House Fact Sheet). So, for example, the Department of Agriculture (USDA) has stated that it was "encouraging all USDA agency field offices to make nonpartisan information about voter registration available in customer service locations" around the country. ECF No. 11-9; *see also* ECF No. 11-8 (describing USDA initiative to provide "nonpartisan election information" at offices where "rural Americans can apply for housing, facilities, or business assistance"); ECF No. 11-13 (noting that USDA "issued letters to state agencies administering nutrition assistance programs to *encourage* the promotion of voter registration and non-partisan voting information" and "remind[ing] states of their responsibilities under the National Voter Registration Act" (emphasis added)). These letters, which Plaintiffs extensively cite, make clear that USDA is doing nothing more than "encourag[ing]" State agencies "to provide local program operators with promotional materials, including voter registration and *non-partisan, non-campaign election information*," listing some non-exclusive "[i]deas." Promoting Access to Voting through the Child Nutrition Programs, Pol'y & Program Dev. Div. (Mar. 23, 2022), https://tinyurl.com/USDA-Promoting-Voting-Access. The Department of the Interior

stated that it would "explore options to expand access to voter registration on public lands across the country." ECF No. 11-9 at 3. And so on. *Id.* (describing various agency activities); *see also* ECF No. 11-12 (2022 Fact Sheet) (noting, for example, that DOJ has "produced an accessible, plain-language guide for 50 states and the District of Columbia, which also describes each state's voting rules for individuals with criminal convictions").[4]

Plaintiffs' papers focus extensively on the activities of the Department of Education. But even a cursory review of the materials Plaintiffs cite refutes their characterizations. For example, the Department released a 12-page document, which it calls a "toolkit," identifying resources to help "students and their families learn about civic opportunities" and "encourag[ing] institutions to identify additional opportunities to assist eligible students with voter registration." ECF No. 11-10. It has stated that it will update the "StudentAid.gov" website "to help connect borrowers to voter registration services by linking to vote.gov." ECF No. 11-9 at 2. And it has sent a "dear colleague" letter in April 2022 "remind[ing]" eligible postsecondary institutions that "section 487(a)(23) of the Higher Education Act of 1965 . . . require[s]" them to "make a good faith effort to distribute [] mail voter registration form[s]"— a requirement that was previously outlined in a 2013 letter—and advising that "Federal Work Study [] funds *may* be used to support voter registration activities" subject to the limitations of 34 C.F.R. § 672.22, which prohibits partisan political activity.[5] Requirements for

---

[4] Plaintiffs also reference actions by the Small Business Administration, which executed a Memorandum of Understanding with the Michigan Secretary of State. Pls. Br. at 28. This agreement, however, was a prime example of a federal agency being designated as a "voter registration agency" *by the State*. *See* 52 U.S.C. § 20506(a)(1) (requiring States to "designate agencies for the registration of voters in elections for Federal office"). The specific agency activity Plaintiffs complain about was its agreement to "create a unique URL for the SBA to use to drive online visitors to register to vote" and "allow" state "officials to conduct in-person voter registration at the SBA's small business outreach events." Press Release 24-23, Small Bus. Admin., (Mar. 19, 2024), https://tinyurl.com/4dbptaws. Plaintiffs' allegation that this somehow relates to partisan get-out-the-vote efforts is thus completely unfounded and contradicted by material they cite.

[5] Plaintiffs cite this letter in their complaint and brief but omit this crucial language. *See* FAC ¶ 178.

Distribution of Voter Registration Forms, (Apr. 21, 2022), https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2022-04-21/requirements-distribution-voter-registration-forms (explaining that Federal Work Study "funds cannot be used for . . . work involving partisan or nonpartisan political activity, including party-affiliated voter registration activities, as this is expressly prohibited under 34 CFR 675.22(b)(5)) (2022 DOE Letter); *see generally* 34 C.F.R. § 672.22(b)(5) (Department of Education regulation prohibiting "any partisan or nonpartisan political activity or [activity] associated with a faction in an election for public or party office"). These materials provide no indication that they are meant to target any group based on partisanship or to provide a partisan advantage. To the contrary, these materials—like the Executive Order generally—are plainly designed to include more people in the political process *without* regard to their political preferences or affiliation.

Plaintiffs, of course, cannot plausibly claim that their candidacies or election prospects would be injured by people receiving nonpartisan information about registering to vote—nor can they claim that they are injured by the government generally encouraging more eligible people to vote consistent with the requirements of State law. The inclusion of more eligible voters in the political process presents no harm at all. *See, e.g.*, *Bognet v. Sec'y Commonwealth of Pennsylvania*, 980 F.3d 336, 351 (3d Cir. 2020) (plaintiff "does not explain how counting *more* timely cast votes would lead to a *less* competitive race"), *vacated as moot*, 141 S. Ct. 2508 (2021). And Plaintiffs "face no harms that are unique from their electoral opponents" based on the broad registration of more voters on a nonpartisan basis. *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1003 (D. Nev. 2020).

Notably, another court has recently found that state legislators and candidates for office lack "standing as candidates" to challenge the Executive Order. *Keefer v. Biden*, No. 1:24-CV-00147, 2024 WL 1285538, at *10 (M.D. Pa. Mar. 26, 2024). In doing so, that court rejected the argument—analogous to the one Plaintiffs present here—that implementation of the Executive Order will "resul[t] in the pool of [] voters [being] manipulated," finding that

Plaintiffs had failed to identify any particular way that eligible voters registering to vote caused Plaintiffs injury. *Id.* at *10. The same is true here. Plaintiffs' challenge to the government's efforts to provide non-partisan voter registration information raises "only a generally available grievance about government," and that "does not state an Article III case or controversy." *Lance v. Coffman*, 549 U.S. 437, 439 (2007).

B. <u>Plaintiffs' Fears of Injury Rest on Sheer Speculation About the Independent Actions of Third Parties and Therefore Fail to Show Traceability</u>

Attempting to overcome the plain language of the Executive Order and associated agency activities, Plaintiffs try to make out a theory of injury by piling speculation upon speculation. In particular, they posit that the populations with which Federal agencies interact uniformly "favor Democrats"—and assert that providing those specific populations with nonpartisan registration information may increase turnout for Plaintiffs' Democratic opponents. FAC ¶¶ 92-94; *see also id.* ¶¶ 119-122; *see, e.g.*, Pls' Br at 1, 27-30.[6] But this theory fails several times over.

The Supreme Court has been emphatic that Plaintiffs "generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'" *Clapper*, 568 U.S. at 415, n. 5, (quotation marks omitted). Rather, to show that they have suffered an injury traceable to Defendants, as Article III requires, a "plaintiff must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs." *All. for Hippocratic Med.*, 602 U.S. at 383 (cleaned up)); *See, e.g.*, *Dep't of Com.*, 139 S. Ct. at 2566 (analyzing statistical studies showing predictable effect of census question on respondents' behavior). Even at the pleading stage, when considering "any chain of

---

[6] As a legal matter, it is not clear that this theory can establish a cognizable injury. Plaintiffs see registration efforts as amplifying "the partisan advantage of whichever party has [] greater [] support" in an area. FAC ¶ 183. But case law "strongly suggests" that a "legislator, or potential legislator, has 'no legally cognizable interest in the composition of the district he or she represents'"—so it is unclear how amplifying any aspects of that composition would be injurious. *Toth v. Chapman*, No. 1:22-CV-00208, 2022 WL 821175, at *10 (M.D. Pa. Mar. 16, 2022) (quoting *Corman v. Torres*, 287 F. Supp. 3d 558, 569 (M.D. Pa. 2018)) (three judge court).

allegations for standing purposes," the courts "reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties)." *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015); *Ineos USA v. Fed. Energy Reg. Comm.*, 940 F.3d 1326, 1329 (D.C. Cir. 2019); *Finkelman v. Nat'l Football League*, 810 F.3d 187, 201 (3d Cir. 2016). After all, "[s]tanding is not "an ingenious academic exercise in the conceivable." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 566 (1992). So "the line of causation between the illegal conduct and injury—the links in the chain of causation—must not be too speculative or too attenuated." *All. for Hippocratic Med.*, 602 U.S. at 383 (cleaned up).

Here, however, Plaintiffs' entire theory relies on broad-brush characterizations about the political preferences of people interacting with federal agencies around the country—and those characterizations are speculative and implausible in the extreme. Plaintiffs would have the Court believe that veterans receiving care from the VA in Texas have the same preferences and political views as people receiving loans from the SBA in Michigan—or that all voters interacting with USDA "in thousands of rural, suburban, and urban communities" have the same political views. ECF No. 11-9 (2023 White House Fact Sheet); *see generally* Pls. Br. at 20. Indeed, Plaintiffs' theory is completely dependent on the Court assuming that the country's body politic exhibits no state, regional, or population variability and will act uniformly. Yet courts have rightly declined to make such generalized assumptions about the political preferences of the American public—or their future voting behavior. *Republican Nat'l Comm. v. Burgess*, No. 3:24-CV-00198-MMD-CLB, 2024 WL 3445254, at *2 (D. Nev. July 17, 2024) (Americans "exercise 'broad and legitimate discretion' . . . and their choices will be informed by a cacophony of influences from political parties, candidates, voter advocacy groups, media outlets, friends, family, neighbors, and countless others"); *Pennsylvania Voters All. v. Ctr. Cnty.*, 496 F. Supp. 3d 861, 870 (M.D. Pa. 2020) ("The implication that increased voter turnout is inherently beneficial to progressive candidates is dubious at best.").

But Plaintiffs' speculative chain does not end there. Even if one implausibly assumes that people interacting with federal agencies *everywhere* in the country form some kind of

monolithic political block—a remarkable assumption in its own right—that would still not show that Plaintiffs have suffered any injury caused by Defendants. To make that kind of connection, Plaintiffs would have to credibly allege (and, to obtain a preliminary injunction, offer sufficient evidence to establish) a number of factual predicates. Most obviously, they would have to show: (1) that agencies providing information will lead *some* number of people to register when they otherwise would not have done so; (2) that any such people will then ultimately cast a ballot; (3) that any such ballots will favor Plaintiffs' opponents; and (4) that there will be enough such hypothetical votes *in Plaintiffs' districts* to meaningfully impact Plaintiffs' election prospects. *Bognet*, 980 F.3d at 351–52 (noting that for candidate "to have standing to enjoin the counting of ballots arriving after Election Day, such votes would have to be sufficient in number to change the outcome of the election to [his] detriment"). Yet, for all their claims about supposed get-out-the-vote activities, Plaintiffs do not come close to having plausible allegations, much less evidence, to establish that chain.

To the contrary, although the Executive Order has been in effect since March 2021, Plaintiffs have failed to identify *any* historical data from elections since that time that would support their claims of partisan disadvantage. They have not, for example, identified any increase in registrations attributable to the agency activities they identify; nor have they pointed to any state- or district-wide evidence from the 2022 midterm election or any other election cycle to support any portion of the required causal chain.[7] Instead, their complaint relies on generalized assertions and a white paper from a third party which—without describing its methods in any detail—"estimate[s]" that *"if* several key federal agencies make the most of the directive in [the] EO . . . [that] could result in approximately 3.5 million new

---

[7] To be sure, even if Plaintiffs had presented historical evidence, that would not automatically mean that they have standing now. *See, e.g.*, *O'Shea v. Littleton*, 414 U.S. 488, 496-97 (1974) (finding that, although past harm can have predictive value as to the likelihood of repeated injury, the repetition of plaintiffs' past injury was too speculative to support standing). But it could, at least, give some plausible color to their allegations.

or updated voter registrations per year."  Demos, *Federal Agency Voter Registration Estimates of Annual Impact*, 1 (Feb. 2023), https://tinyurl.com/Demos-FAVREOAI-Archive (emphasis in original); FAC ¶ 95.  Notably, this paper, which came out two years after the Executive Order, *also* does not look to historical data associated with its implementation; instead, it appears to proffer its estimates as a piece of advocacy for *more* federal action.  *Id.* at 1-3 (asserting that the estimates "argue for robust implementation of the" Executive Order).  And it does not even attempt to connect the Executive Order or any implementing agency activity to actual or likely votes for *any* party or candidate in *any* state or district.

The declarations that Plaintiffs submitted along with their preliminary injunction motion are no different.  *See generally* ECF No. 17.  Those declarations make highly generalized and speculative assertions about what *might* happen in response to agencies providing information about voting.  *See, e.g.*, Blackwell Decl. ¶ 11, ECF No. 17 (asserting belief that implementing the Executive Order "would produce duplicate registrations, confuse citizens, and complicate the jobs of public employees tasked with carrying out elections" (citations omitted)); Spakovsky Decl. ¶¶ 10-11, ECF No. 17 (alleging "voter confusion is a likely result of federal employees attempting to facilitate registration or mail-in voting" and speculating that providing information about voting registration "could also intimidate members of the public"); Jacobsen Decl. ¶¶ 6-9, ECF No. 17 (professing "belie[f]" that agency activities will lead more people to cast a ballot and could undermine the state's interest "in voter registration and in conducting elections").  Notably absent from these declarations is any data or indication that the (largely unspecified) agency activities are *actually* leading to a discernable increase in voter registrations, much less ones that could disproportionately favor Plaintiffs' political opponents or that would be somehow deficient or problematic.  As a stark example, Robert Genetski states that his office recently "received *three* voter registrations purportedly from students at Michigan State University," and "was told that the registrations are the result of a voter registration drive conducted on campus."  Genetski Decl. ¶¶ 11-12, ECF No. 17 (emphasis added).  But he makes no attempt to link the purported voter

registration drive to any particular federal agency or employee. *Id.* ¶¶ 11-13. Instead, he simply adds that he is "also aware" of a letter from the Department of Education (which, as noted above, does not actually say what Plaintiffs contend it says). *Id.* ¶ 13.

This absence of any evidence or data connecting the Executive Order or its implementation to actual voter registrations, particularly in any way relevant to Plaintiffs' specific races, means that Plaintiffs' fears about electoral disadvantage are nothing more than "speculation about the unfettered choices made by independent actors not before the courts"—on a nationwide scale. *Clapper*, 568 U.S. at 415, n. 5. Yet courts regularly decline to make assumptions about the voting population in even *one* State. *See, e.g., Pennsylvania Voters All. v. Ctr. Cnty.*, 496 F. Supp. 3d 861, 871 (M.D. Pa. 2020) (voting patterns are "far too dependent on the actions of tens, if not hundreds, of thousands of voters to premise standing"). Indeed, the Supreme Court emphatically cautions against doing so. *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399, 433 (2006) ("[A] State may not assum[e] from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls." (internal quotation marks and citation omitted); *see also Growe v. Emison*, 507 U.S. 25, 41 (1993) ("[A] court may not presume bloc voting within even a single minority group . . . [so] it made no sense for the District Court to (in effect) indulge that presumption as to bloc voting within an agglomeration of distinct minority groups.").

Not surprisingly then, courts regularly refuse to credit speculation that facially-neutral rules—such as those allowing mail-in voting or ballot drop boxes—favor one party over another. *See, e.g.*, *Bruni v. Hughs*, 468 F. Supp. 3d 817, 823 (S.D. Tex. 2020) (Plaintiffs lacked standing to challenge prohibition on "straight ticket voting" because their alleged injuries hinged on speculation that such a change would "reduce[] Democratic-party turnout at polling places" resulting in "fewer votes at polling-places for Democratic-party candidates"); *Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 376, 380 (W.D. Pa. 2020) (rejecting as "too speculative" plaintiffs' claim that use of mail-in voting drop boxes presents "heightened risk of fraud" that would "impact Republicans more than Democrats");

*Republican Nat'l Comm. v. Burgess*, 2024 WL 3445254, at *2 (D. Nev. July 17, 2024) (rejecting speculation "that Democrats are more likely to . . . cast mail ballots that are received after Election Day" and concluding that "effect of the Nevada mail ballot receipt deadline on electoral outcomes is 'not sufficiently predictable' to meet Article III's" requirements); *Donald J. Trump for President, Inc. v. Way*, 2020 WL 6204477, at *6 (D.N.J. Oct. 22, 2020) (explaining that plaintiffs failed to establish standing to challenge mail-ballot provisions based on possibility of past election fraud because "it would [] be speculative to find that because there was mail-in ballot fraud in past New Jersey elections, fraud will also occur in the November 2020 General Election"); *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 387 (6th Cir. 2020) ("[P]laintiffs have clearly not demonstrated that they face an actual, concrete, particularized, and imminent threat of harm" from signature verification requirements where their "allegations involve two layers of speculation about the upcoming election" and lack historical evidence).

Notably, in reaching these results, some of these courts rejected as speculative the very same chains of causation that Plaintiffs seek to draw here. For example, Plaintiffs' complaint and preliminary injunction papers make much of the activities of "one nonprofit organization, the Center for Technology and Civic Life (CTCL)." Pls. Br. at 32, 2. Plaintiffs seem to believe that the activities of this private entity—which distributed monetary grants to local election offices—are somehow analogous to the activities of federal agencies in providing links on their websites. *Id.* at 32-33; FAC ¶¶ 129-36. Yet courts have rejected challenges to states accepting CTCL grants, finding that plaintiffs had presented nothing more than a "highly attenuated causal chain of events" that failed to establish a "certainly impending" injury. *Pennsylvania Voters All. v. Ctr. Cnty.*, 496 F. Supp. 3d 861, 870 (M.D. Pa. 2020) (explaining that Plaintiffs' theory would "require the Court to assume that: (1) CTCL funding will result in higher voter turnout; (2) any higher voter turnout will be in support of progressive candidates; (3) the higher voter turnout will be significant enough to impact the outcome of the election; (4) this turnout will impact the election in favor of progressive candidates"). And Plaintiffs'

18

speculation here stands on no firmer ground.  Like in those cases, Plaintiffs have "present[ed] no concrete evidence to substantiate their . . . conjecture[s] about possible" election disadvantage due to any activity by Defendants.  *Clapper*, 568 U.S. at 420.  Accepting their layer-cake of speculation about the future patterns of behavior of populations in numerous *different* States ranging from Texas to Virginia is wholly incompatible with courts' repeated admonition against "'deciding a case in which no injury would have occurred at all.'"  *Ctr. for Biological Diversity v. EPA,* 937 F.3d 533, 537 (5th Cir. 2019) (quoting *Lujan,* 504 U.S. at 564 n.2)).

C.     *Plaintiffs' Other Miscellaneous Allegations Do Not Establish Standing*

Rejecting Plaintiffs' primary theory of injury leaves little else for the Court to consider. For example, Plaintiffs' complaint makes passing references to possible burdens on state election officials from additional registration.  FAC ¶¶ 27, 28.  Plaintiffs amplify this theory in some of their declarations, which assert speculative fears of supposed burdens from having to process more inaccurate or invalid registrations that people might submit as a result of various agencies' activities.  *See, e.g.* Blackwell Decl. ¶ 11, ECF No. 17; Spakovsky Decl. ¶¶ 10-11, ECF No. 17; Jacobsen Decl. ¶¶ 6-9, ECF No. 17.  But this theory of injury suffers from all the same flaws as the others.

Simply put, Plaintiffs have offered nothing to show that any voters—much less a significant number of them—will register on account of the Executive Order in districts where those officials perform their duties.  Their declarations pointedly do not connect any supposedly incomplete registrations with the actions of federal officials.  *See, e.g.*, Blackwell Decl. ¶ 11, ECF No. 17; Spakovsky Decl. ¶¶ 10-11, ECF No. 17; Jacobsen Decl. ¶¶ 6-9, ECF No. 17.  So the declarants' fear of such burdens is pure speculation.  And, in any event, the Fifth Circuit has declined to find that employees have standing merely based on alleged fear of "the burden of compliance" associated with a new policy or rule.  *Crane v. Johnson*, 783 F.3d 244, 253–54 (5th Cir. 2015) ("[W]e have not found[] any case where a plaintiff has had standing to challenge a department policy merely because it required the employees to change

their practices."); *see also Crane v. Napolitano*, 920 F. Supp. 2d 724, 738 (N.D. Tex. 2013) (simply "chang[ing] the way [plaintiffs] conduct their duties while performing their jobs . . . is not a sufficient injury-in-fact").

Likewise unavailing is Plaintiffs' generalized and unfounded speculation that the Executive Order will "facilitate the registration of noncitizens . . . and citizens who are ineligible to vote." FAC ¶¶ 429-31; *see also* Pls. Br. at 35. In addition to not being supported with any evidence, courts have repeatedly found that alleged "counting of illegitimate or otherwise invalid ballots" is "an insufficient injury in fact to support standing" because it could be raised by any voter and is thus not particularized. *Republican Nat'l Comm. v. Burgess*, No. 3:24-CV-00198-MMD-CLB, 2024 WL 3445254, at *6 (D. Nev. July 17, 2024); *see also Paher v. Cegavske*, 457 F. Supp. 3d 919, 926 (D. Nev. 2020); *Trump for President v. Cegavske*, 488 F. Supp. 3d at 1000; *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 711-12 (D. Ariz. 2020); *Bognet*, 980 F.3d at 352-60; *Wood v. Raffensperger*, 981 F.3d 1307, 1314-15 (11th Cir. 2020); *O'Rourke v. Dominion Voting Sys., Inc.*, No. 21-1161, 2022 WL 1699425, at *2 (10th Cir. May 27, 2022), *cert. denied*, 143 S. Ct. 489 (2022); *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 609-10 (E.D. Wis. 2020); *Bost v. Ill. State Bd. of Elections*, 684 F. Supp. 3d 720, 731-33 (N.D. Ill. 2023); *Moore v. Circosta*, 494 F. Supp. 3d 289, 312-13 (M.D.N.C. 2020); *Martel v. Condos*, 487 F. Supp. 3d 247, 253 (D. Vt. 2020). Indeed, Plaintiffs' claim that potential registration of ineligible voters will lead to vote dilution utterly mixes up the *legal* concept of vote dilution with a purely speculative fear. *See, e.g.*, *Bognet*, 980 F.3d at 355 ("Contrary to the Voter Plaintiffs' conceptualization, vote dilution under the Equal Protection Clause is concerned with votes being weighed differently."); *see also Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019) (" '[V]ote dilution' in the one-person, one-vote cases refers to the idea that each vote must carry *equal weight*." (emphasis added)).

Plaintiffs' allegations on all these grounds thus constitute a paradigmatic complaint "that the law . . . has not been followed"—and this "is precisely the kind of undifferentiated,

generalized grievance about the conduct of government that [courts] have refused to countenance in the past." *Lance*, 549 U.S. at 442.

*     *     *

Throughout their complaint and preliminary injunction motion, Plaintiffs repeatedly reference Congressional hearings and letters, articles in the press, proposed legislation, and statements of State political officials. *See, e.g.*, Pls. Br. at 4-5 (discussing Congressional investigations); Blackwell Decl. ¶¶ 17-20, ECF No. 17 (discussing legislation he supports). These repeated citations merely demonstrate that the Executive Order is being debated in the political arena. By mischaracterizing their policy dispute as a legal one, Plaintiffs improperly ask this Court to step into the role of the political branches. But our "system of government leaves many crucial decisions to the political processes, where democratic debate can occur and a wide variety of interests and views can be weighed." *All. for Hippocratic Med.*, 602 U.S. at 380. This Court should therefore follow the lead of the district court in *Keefer* and dismiss the challenge for lack of jurisdiction. *See Keefer*, 2024 WL 1285538, at *10.

## II.    Plaintiffs Are Unlikely to Succeed and the Court Should Dismiss the Complaint Because Plaintiffs Lack Standing Under the APA

In addition to failing to satisfy Article III, Plaintiffs also fail to meet the statutory pre-requisite for bringing an APA claim. Their plenary complaint and PI motion challenge ongoing implementation of the Executive Order across the entire federal government. In this way, their grievance is not directed towards any proper agency action at all, much less to "final agency action" that the APA makes reviewable. This is a jurisdictional defect, and an independent ground to dismiss Counts II through XI of their Amended Complaint. *See Louisiana State v. United States Army Corps of Engineers*, 834 F.3d 574, 584 (5th Cir. 2016) ("Final agency action . . . is a jurisdictional prerequisite of judicial review" under the APA).

21

A.     *The APA Does Not Provide a Cause of Action to Challenge a Government-Wide Effort to Implement an Executive Order*

The Supreme Court has been clear that a plaintiff cannot invoke the APA to attack the entirety of government programs "consisting principally of . . . many individual" activities. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990).  Rather, to properly invoke a cause of action under the APA, plaintiffs' challenge must target a "circumscribed, discrete agency action[]" that exhibits a "characteristic of discreteness," and not present a "broad programmatic attack" on government operations.  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62-64 (2004).  This requirement derives from the APA's definition of "agency action," which "is a term of art that does not include all conduct such as, for example, constructing a building, operating a program, or performing a contract" but rather "focuses on an agency's determination of rights and obligations."  *Vill. of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186, 193 (4th Cir. 2013); *see* 5 U.S.C. § 551(13) (defining "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.").  Such limitations ensure that changes to government-wide initiatives come from "the halls of Congress, where programmatic improvements are normally made," not from "court decree."  *Id.* at 891; *City of New York v. United States Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (APA's "limitation ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties").

If there were ever a case of an impermissible programmatic challenge, Plaintiffs' attack on the government's "on-going executive policymaking" is it.  *Am. First Legal Found.*, 2023 WL 4581313, at *7.  Their complaint explicitly states that it is challenging the activities of "*all* [] federal agencies and officers in the United States Government [that are] taking, or planning to take, actions to implement the EO, including their agency components, divisions, and offices," regardless of whether they are "specifically named in the EO" or in other sources. FAC ¶ 45 (emphasis added).  So broad and unbounded is this challenge that Plaintiffs

22

themselves assert that a "comprehensive listing" of just the *agencies* at issue—never mind their specific actions—"would be impractical." *Id.* And, true to their word, over the course of the next 400-some paragraphs, Plaintiffs assail a panoply of agency activities related or partially-related to the Executive Order—seemingly both that have been completed and those that are still in development or being contemplated. By the time Plaintiffs get to the actual counts of the complaint, they do not even identify which *agency*, much less which agency activity, the particular count covers. *See* FAC ¶¶ 343-462. And while their motion plucks out a litany of various examples of agency activities that they find particularly objectionable, the injunction Plaintiffs seek confirms that the relief they want is completely unbounded. *See* ECF Nos. 15-1, 15-2 (proposed orders requesting that the Court temporarily restrain or preliminarily enjoin Defendants from "continuing their current actions" and "taking any additional actions implementing Executive Order 14019"). That is, Plaintiffs apparently seek the cessation of EO-related activities government-wide. *Id.*; *see also* FAC at 94-95 (prayer for relief).

This attack on an unspecified and unbounded litany of agencies and completed or planned activities could not be farther from a challenge to discrete and reviewable "agency action." Indeed, courts regularly find that significantly narrower programs operated by a *single* agency are not amenable to APA review. *See, e.g.*, *Nat'l Ass'n For The Advancement of Colored People v. Bureau of the Census*, 945 F.3d 183, 190 (4th Cir. 2019) (declining to review under APA operational plan for the 2020 Census because the plan consisted of "various 'design choices'" and was therefore not a discrete agency action); *City of New York v. United States Dep't of Def.*, 913 F.3d 423, 434 (4th Cir. 2019) (challenge to Department of Defense alleged systemic failure to report certain types of information not cognizable under APA when it sought an order for the agency to "identify all records in its possession, provide the information contained in those records to the Attorney General, conduct a thorough review of [its] records and procedures, [and] submit to the Court for approval a compliance plan" (citations omitted)); *Vill. of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186, 194 (4th Cir. 2013) ("[T]he Corps' implementation of the Wilmington Harbor Project, including

the ongoing periodic maintenance dredging and resulting nourishment of nearby beaches, does not constitute "agency action" within the meaning of the APA."); *see also San Luis Unit Food Producers v. United States*, 709 F.3d 798, 808 (9th Cir. 2013) (holding that "a broad, programmatic challenge to [an agency's] operation and management of [a statutory obligation] . . . [is] not cognizable under the APA"). Plaintiffs' complaint exceeds the scope of those challenges many times over.

Indeed, Defendants are unaware of a single case in which a court invoked the APA to review anything close to the kind of sprawling and unfocused challenge that Plaintiffs assert here. And, if the suit were to proceed, it is entirely unclear how the Court could begin to evaluate whether all of the unspecified agencies and agency activities related to the Executive Order—which, by Plaintiffs' telling, encompass "an all-of-government approach," FAC ¶ 45—should have, for instance, gone through "public notice and comment" (as Plaintiffs allege in Count II); whether those agencies were "intended for an impermissible purpose" or were "pretextual" (Count III); exceeded the agencies' statutory grants (Counts VII) or the constitution (Counts VIII, IX, X, XI). The impossibility of this task is a good indication that "the broad, sweeping nature of the allegations that the plaintiffs have elected to assert" are not cognizable under the APA. *NAACP*, 945 F.3d at 191. A non-exhaustive litany of agencies and activities implementing an Executive Order is simply not the type of "agency action" for which the APA authorizes suit.

B.   *The Agencies' Implementing Activities Are Not Final Agency Action*

Even if Plaintiffs trained their challenge on some specified and limited set of discrete and circumscribed agency activity, that would not solve the problem. "The APA allows judicial review only of a 'final agency action,' meaning an action that (1) 'mark[s] the consummation of the agency's decisionmaking process' and (2) 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 441 (5th Cir. 2019) (quoting *Bennett v. Spear*, 520 U.S. 154,

24

177–78 (1997)).  Plaintiffs do not even reference this test in their brief.  *See* Pls. Br. at 8-9.  And the activities Plaintiffs complain about fail to satisfy those requirements.

*1.*      As an initial matter, as Plaintiffs' complaint makes clear, agency activities related to the Executive Order are "on-going."  *Am. First Legal Found.*, 2023 WL 4581313, at *7; *see generally* FAC ¶ 45.  The declarations the government filed in other cases make clear that "'[t]he White House solicited the strategic plans in order to inform future policy developments on voting access'" and instructed "agencies to submit a subset of potential actions and ideas that may inform the policy developments of his administration."  *Am. First Legal Found.*, 2023 WL 4581313, at *7 (quoting declaration of White House official).  Consistent with that purpose, the White House made clear that, in responding to the order, agencies were "*not* commit[ting] . . . to implementing the [identified] action[s]" and were not producing a "catalog of final agency policies and actions."  *Id.*  And the evolving nature of the agency activities in this space bears this out.  *See generally* ECF No. 11-8 (2021 White House Fact Sheet); ECF No. 11-13 (2022 White House Fact Sheet); ECF No. 11-9 (2023 White House Fact Sheet).  As the declarations submitted by the government in other litigation surrounding the Executive Order make clear, agencies are continuing to contemplate ways in which they may pursue the general goal of providing information to eligible voters.  *See generally Am. First Legal Found. v. U.S. Dep't of Agric.*, No. 22-cv-3029, ECF Nos. 21-1, 21-3 to 21-14 (D.D.C. July 18, 2023).  For many agencies, the "majority of the proposed actions" described in their strategic plans "have not been implemented whatsoever."  *Id.*, USDA Decl. ¶ 18 (ECF No. 21-3); *see also, e.g.*, *id.*, VA Decl. ¶ 20 (ECF No. 21-10) ("majority of the Strategic Plan" has "still … not been decided upon or implemented"); *id.*, DOT Decl. ¶¶ 12 (ECF No. 21-8) ("DOT has implemented only two of the 11 potential actions").

Further, even when it comes to the activities the agencies have completed—many of which involve providing information or updating a website—none of those "commit the [agency] to any particular course of action*." Luminant Generation Co. v. EPA*, 757 F.3d 439, 442 (5th Cir. 2014).  After making one website change or issuing one letter the agency may

issue another one—or it "could choose to withdraw or amend the notice or take no further action." *Id.* In this way, the activities do "not end the [agencies'] decisionmaking." *Id.* So, almost regardless of how narrowly Plaintiffs frame their challenge, they cannot identify something that represents the "culmination" of agency decision-making. Tellingly, they do not even try. *See, e.g.*, Pls. Br. at 8 (referencing agency activities discussed in the complaint but not making any allegation that they reflect the culmination of the agencies' processes).

        *2.* Just as importantly, all of the agency activities about which Plaintiffs complain do "not 'determine rights or obligations' or create 'legal consequences.'" *Louisiana State v. United States Army Corps of Engineers*, 834 F.3d 574, 584 (5th Cir. 2016). The common through-line among all the myriad activities that Plaintiffs reference in the complaint and in their preliminary injunction motion is that they are designed to provide *information* about voting, consistent with the requirements of state law. *See generally* ECF No. 11-8 (2021 White House Fact Sheet); ECF No. 11-13 (2022 White House Fact Sheet); ECF No. 11-9 (2023 White House Fact Sheet). Providing such information "does not regulate [Plaintiffs] and cannot bind" them to anything at all. *Louisiana State*, 834 F.3d at 584; *see also Texas v. EEOC*, 933 F.3d 433, 442 (5th Cir. 2019) (noting that "final agency action" exists where "where agency action withdraws an entity's previously held discretion [because] that action alters the legal regime [and] binds the entity"); *Norton*, 415 F.3d at 15 ("[I]f the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purpose of judicial review.").

        Thus, for example, the "toolkit" issued by the Department of Education—mentioned repeatedly by Plaintiffs—is merely a brochure that lists information about how students can register to vote or otherwise participate in elections, and provides information to schools on how they can help students register to vote or otherwise encourage civic engagement. *See* ECF No. 11-10. The same is true for the "dear colleague" letter that the Education Department sent. That letter—as detailed above—merely advises postsecondary education institutions about their obligations under existing law and regulations. *See* 2022 DOE Letter

(reaffirming requirements of "section 487(a)(23) of the Higher Education Act of 1965" and 34 CFR 675.22(b)(5)).   This information does not in itself purport to create or alter any legal standard or obligation. *Contra* Pls. Br. at 17-18.

So too for other agencies' efforts.   Plaintiffs reference USDA materials about voting. Pls. Br. at 13.   But the USDA document Plaintiffs cite is a memorandum that "*encourages* State agencies administering the Child Nutrition Programs to provide local program operators with *promotional materials* that can be disseminated to Program participants to expand access to, and provide education about, voter registration and election information."   U.S. Dep't of Agric., *Promoting Access to Voting through the Child Nutrition Programs*, Pol'y & Program Dev. Div. (Mar. 23, 2022), https://tinyurl.com/USDA-Promoting-Voting-Access.   And Plaintiffs do not even attempt to explain how letters "encourag[ing] the promotion of voter registration and non-partisan voting information" and "remind[ing] states of their responsibilities under the" NVRA satisfies the test for final agency action.   Pls. Br. at 13.   Similarly, Plaintiffs cite to information the Department of Housing and Urban Development distributed identifying "permissible ways to inform residents of non-partisan voter registration information and services."   ECF No. 11-8 (2021 WH Fact Sheet).   Yet Plaintiffs utterly fail to explain how that information gives rise to legal consequences.   And on and on.   *See generally* Pls. Br. at 18-19 (discussing other agencies providing information about voting).

Indeed, the website updates, letters, and informational bulletins Plaintiffs reference are even less significant than "general policy statements with no legal force," which are not final agency action.   *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 808 (D.C. Cir. 2006).   Yet Courts regularly consider letters of advice or notification "non-final even where they appear [] serious" because the agency provides notice that the recipient is violating the law.   *Luminant Generation*, 757 F.3d at 442; *see, e.g.*, *Holistic Candlers & Consumers Association v. FDA*, 664 F.3d 940, 941–42 (D.C. Cir. 2012) (deeming non-final fifteen "warning letters" sent from FDA to fifteen manufacturers advising them of potential legal violation). There is nothing remotely close to that here.   Agencies informing people about registration

27

and voting opportunities are "purely informational in nature; [they] impose[] no obligations and den[y] no relief." *Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427 (D.C. Cir. 2004); *see also Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 855 (5th Cir. 2022) (distinguishing opinion letters which were final agency action from "[i]nformation letters [that] are 'informational only' and are 'not binding on the Department'"). Such communications are not final agency action under the APA. *Indep. Equip. Dealers*, 372 F.3d at 427 ("purely informational" letter that "[c]ompelled no one to do anything . . . had no binding effect whatsoever" and was not final agency action).

### III.    <u>Plaintiffs' APA Challenges are Unlikely to Succeed on the Merits and Should be Dismissed</u>

Because there is no final agency action there is no basis for the Court to evaluate any of the merits APA arguments that Plaintiffs proffer in their motion. Nor—given the sprawling nature of Plaintiffs' challenge and the extremely expedited briefing schedule—are Defendants able to rebut every allegation and mischaracterization that Plaintiffs make. But several broad points are worth mentioning to underscore why Plaintiffs' APA challenges could not succeed on the merits.

#### A.    <u>*Plaintiffs Fail to Establish that Agency Activities Are Inconsistent with the NVRA or Any Other Source of Law*</u>

Plaintiffs' primary statutory argument is that agencies like the Department of Education and USDA are violating the NVRA because they are engaging in "partisan voter registration drives or [get-out-the-vote] programs" that are designed "to give the party in power an electoral advantage." Pls. Br. at 10-12. But, for all the reasons explained above, that is not what the agencies are doing. As the very sources that Plaintiffs cite make clear, the agencies have merely provided information and reminders about obligations that exist in other sources of law. *See, e.g.*, ECF No. 11-13 (2022 White House Fact Sheet) (noting the activities of various agencies). And mere repetition—or even citation to letters of concern from certain members of Congress or State officials—do not transform Plaintiffs' evidence-

free claim that "many agency actions . . . will specifically register and turn out voters who support Vice President Harris and other Democrats" into fact.  Pls. Br. at 14.

Nor are Plaintiffs correct that "the EO empowers agencies to become voter registration agencies without state designation."   Pls. Br. at 39 (citing 52 U.S.C. §§ 20506(a)(1), (a)(3)(B)(ii), 20506(b)).   As Plaintiffs themselves are aware, a "voter registration agency" under the NVRA is an office at which specific "services [are to] be made available," including "[a]cceptance of competed voter registration application forms for transmittal to the appropriate State election official."   52 U.S.C. § 20506 (4)(a)(III).   This does not limit the ability of entities or individuals to provide similar services without formal designation. *See id.* Nor do Plaintiffs allege that any federal agency has been doing so without state designation. *See* Pls. Br. at 39.  Instead, Plaintiffs weakly aver that something like this "*might* have been [done] in Ohio" and "*[i]f*" that happened it would be "in violation of the NVRA."   *Id.* (emphasis added).  Statutory violations are made of sterner stuff.

Plaintiffs also suggest, in passing, that providing election information on a broad basis "derogate[s] the NVRA's stated goals of election integrity, accuracy, and nondiscrimination." Pls. Br. at 37.  But those broad goals are not a free-standing statutory command—rather, they specifically describe the purpose of some particular NVRA provisions (such as the procedures that States must follow when they remove voters from registration rolls).  *See generally* 52 U.S.C. § 20507 (setting forth procedures to further the statute's purposes).  Plaintiffs cite no authority for the proposition that those goals should be used as a universal cudgel regardless of the activity an agency undertakes.  *See* Pls. Br. at 37.  Nor, for all the reasons described above, do Plaintiffs provide any plausible reason to think that providing broadly available information "*likely* facilitated the registration of noncitizens and ineligible citizens, which *could* result in some unlawfully cast ballots."  *Id.*

Plaintiffs' generalized invocations of Federalism (which they confusingly combine with the major questions doctrine) fail for the same reasons.  *See* Pls. Br. at 10-11, 14.  Plaintiffs do not deny—because they cannot—that the NVRA validly imposes obligations on the States

pursuant to Congress's authority under the Elections Clause in Article I § 4.  *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 9 (2013) ("The power of Congress over the 'Times, Places and Manner' of congressional elections 'is paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith.'" (citation omitted)).  To the extent agencies remind State officials of their obligations under the NVRA or other federal legislation, that cannot encroach on State functions.  *See id.* (explaining that the requirements of the NVRA preempt contrary State law).  So, by necessity, Plaintiffs' assertion that the Executive Order improperly "usurp[s] the prerogatives of the States" is entirely coextensive with their claim that agencies are violating the NVRA by conducting "targeted voter registration" or other partisan activity.  Pls. Br. at 14.  But, again, the agencies are *not* doing that.  So whatever Plaintiffs' policy concern about the implementation of the Executive Order, it does not find its home in the law.

That leaves Plaintiffs' claim that various agencies' information bulletins, brochures, and website updates contravene the "Anti-Deficiency Act" because they are not authorized by specific appropriations.  Pls. Br. at 40-41.  That claim is baseless; the Executive Order expressly declares that it "shall be implemented consistent with applicable law and subject to the availability of appropriations."  EO 14019 § 12(b).  Consistent with that limitation, one example of agency activity Plaintiffs marshal—that of the Department of Education's often-mentioned "dear colleague" letter—expressly *affirms* the very funding limitations Plaintiffs claim to want to enforce.  *Compare id.* (discussing the limitation of 34 C.F.R. § 675.22(b)(5)) *with* 2022 DOE Letter (stating that funds must be expended consistent with 34 C.F.R. § 675.22(b)(5)).  And the other example they offer—purportedly of the Administration "allow[ing] federal employees to take off work on Election Day," Pls. Br. at 41—fares no better.  The Executive Order solicited "recommendations to the President . . . on strategies to expand the Federal Government's policy of granting employees time off to vote in Federal, State, local, Tribal, and territorial elections."  EO 14019 § 6.  But the "Federal Government

has a longstanding policy of granting employees a limited amount of administrative leave to vote in Federal, State, county, or municipal elections or in referendums on any civic matter in their community." *See* U.S. Office of Personnel Mgmt., *Fact Sheet: Administrative Leave*, https://perma.cc/Y22Z-DZWJ. This policy predates the Executive Order by decades. *See* U.S. Office of Personnel Mgmt., *Excused Absence for Voting* (Oct. 27, 2004) (explaining OPM's "tradition[]" of providing agencies "information on the Federal Government's longstanding policy"), https://perma.cc/4GSW-WSQZ. Plaintiffs never suggest that this prior policy is improper or explain how they fear some future new policy could be different. So, once again, their speculation that agencies have improperly "used public funds, appropriated by Congress for other uses" fails on its face. *Id.* at 42.

B. _Providing Voting Registration Information Is Not Arbitrary or Capricious_

Plaintiffs' arbitrary and capricious arguments fare no better. *See* Pls. Br. at 25-35. That entire argument similarly hinges on Plaintiffs' claim that agencies are impermissibly attempting to grant the Democratic party a "partisan advantage in an election." Pls. Br. at 26. But that is not true for all the reasons explained.

Attempting to substantiate their theory, Plaintiffs cite to editorialized descriptions of agency activities by other sources. *See id.* Thus, Plaintiffs highlight an article in Axios stating that the Administration "is partnering with voting rights groups to try to boost turnout among key voting blocs this November." Eugene Scott, VP Harris to announce Biden team's plans to boost voting access, AXIOS (Feb. 27, 2024), https://tinyurl.com/nu77tch6; Pls. Br. at 26. That statement, however, is not even a characterization of the Executive Order: it merely purports to summarize a whole series of Administration efforts, of which the Executive Order is just one. And the statement reflects the reporter's own synthesis of information. So Plaintiffs' attempt to characterize this statement as an admission by "Vice President Harris" of the Executive Order's supposedly-secret "true purpose" falls flat. *See* Pls. Br. at 26.

Similarly unpersuasive is Plaintiffs' categorical invitation for the Court to infer that activities by the Department of Education are inherently partisan because they deal with

"college students," who Plaintiffs' cited sources characterize as "more likely to vote Democrat"—or that activities by the Small Business Administration are partisan because they took place in areas with large numbers of "young voters and Black voters." Pls. Br. at 27-28, 30. Despite the general and long-standing prohibitions in the Hatch Act against federal employees engaging in "political activity" while on duty, 5 U.S.C. § 7324(a), Plaintiffs identify no case supporting their theory that facially nonpartisan activity like providing general voter registration information *becomes* partisan merely because of who receives the information (or who decides to act on it). *See* Pls. Br. 28-29. And Plaintiffs' theory has no bounds. By their logic, any activity undertaken by the Secretary of Defense under the Uniformed and Overseas Citizens Absentee Voting Act, Pub. L. 99-410, could be deemed impermissibly partisan if it were shown that—by some rough aggregate statistic—deployed members of the military voted for one party over another. *Compare, e.g.*, 52 U.S.C. §§ 20301; 20305 (specifying activities that officials must undertake to facilitate voting by members of the military) *with* 5 U.S.C. § 7324(a)(3) (prohibiting "political activity" "while wearing a uniform or official insignia" or on duty). Yet Plaintiffs appear to disclaim that result. *See* FAC ¶ 46 (noting that they do not challenge "longstanding efforts by the Department of Defense" that predate the Executive Order).

The fact that agencies are *not* engaged "in targeted voter registration" and get-out-the-vote efforts means, in turn, that the agencies have not departed from what Plaintiffs assert is the "prior policy" against such efforts. Pls. Br. at 34. Likewise, the fact that agencies are not engaged in such efforts also means that there is no "pretext" to their activities or efforts to somehow obscure alleged "partisan goals." *Id.*; *see generally Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (finding an action arbitrary when the "explanation for agency action [] is incongruent with what the record reveals about the agency's priorities and decisionmaking process"). Agencies making voting information available for people to use or not use as they see fit has no pretext: and the stated reasons in the Executive Order are there for all to see.

Nor were agencies required to consider that providing such information on their websites would "increase[] the risk of noncitizen voting." Pls. Br. at 35. As Plaintiffs must surely know, federal law makes it a crime to provide false information for the purpose of establishing voting eligibility. 52 U.S.C. § 10307 (c), (e). And states have established their own analogous legal frameworks for voting eligibility. *See generally* Pls. Br. at 15. Not surprisingly, reputable studies repeatedly show that voting by non-citizens is incredibly rare. *See, e.g.*, Brennan Center, *Noncitizen Voting: the Missing Millions* (May 5, 2017) available at https://www.brennancenter.org/our-work/research-reports/noncitizen-voting-missing-millions. Nothing in any of the materials that Plaintiffs identify even suggests that agencies were encouraging ineligible people to vote: to the contrary, the Executive Order itself made clear that agencies should provide voter information "consistent with applicable law." EO 14019 § 3. And, once again, Plaintiffs identify no authority for the proposition that agencies are required to consider every speculative possibility that—notwithstanding their efforts—people who may come across their materials may ultimately break the law.

     C.    <u>Providing Letters and Information Does Not Require Notice and Comment</u>

Finally, Plaintiffs contend that the range of agency activities they reference are all deficient because they had to proceed through notice and comment rulemaking. Pls. Br. at 16-24. But, like their other arguments, this one misconceives the relevant standard.

The APA's notice and comment requirements apply only to "substantive" or "legislative" rules, *not* to interpretative statements or general pronouncements of policy. *Mendoza v. Perez*, 754 F.3d 1002, 1020–21 (D.C. Cir. 2014); *see* 5 U.S.C. § 553(b). A "rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy." *Mendoza*, 754 F.3d at 1021. Such rules are the product of an agency exercising its "delegated legislative power" from Congress. *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993). By contrast, actions that "clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or 'merely track' preexisting

33

requirements and explain something the statute or regulation already required," are interpretative. *Id.* (alteration omitted) (quoting *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 236–37 (D.C. Cir.1992)); *see also Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015) ("critical feature of interpretive rules is that they are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers" (quotes and citation omitted)); *Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (agency action determined to be interpretative rule where it was explicitly based upon an analysis of the meaning of the statute). And to distinguish legislative from interpretative rules, courts have traditionally considered several factors: "(1) whether in the absence of the rule there would not be an adequate legislative basis for" agency activity "(2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, [and] (4) whether the rule effectively amends a prior legislative rule." *Am. Mining Cong.*, 995 F.2d at 1112.

Plaintiffs do not—and cannot—show that any of these factors are satisfied in this wholesale attack on government policymaking. For all the reasons explained above, providing information about voting—or even encouraging other entities to make such information available—does not even rise to the level of an interpretative rule because agencies are not setting forth any interpretation about any provision. And providing information about voting under existing rules certainly does not amend or establish any requirement or obligation. In this way, the materials do not themselves "affect individual rights and obligations." *Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd.*, 201 F.3d 551, 556 (5th Cir. 2000). To the extent those documents, like the Department of Education "dear colleague" letter, seek to remind recipients of their obligations under existing laws or regulations, the documents "derive a proposition from an existing document whose meaning compels or logically justifies the proposition." *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010). And Plaintiffs cannot get around this reality by speculating that

34

the agencies' activities might be rendered significant *if* they manage to lead to the registration of more voters.  *See* Pls. Br. at 17.

The absurdity of Plaintiffs' contrary argument—which seeks to hold that providing any kind of information about voting would be a significant rule requiring APA procedures— is aptly illustrated by Plaintiffs' discussion of DOJ's efforts.  Pls. Br. 18-19.  After complaining about various kinds of information guides that DOJ has been developing, Plaintiffs also point to DOJ "filing statements of interest in ongoing litigation" regarding what "federal laws 'require,'" seemingly suggesting that all of these activities would require notice and comment. Pls. Br. at 18-19.  In a sense, the argument is not surprising:  so broad and unrecognizable is Plaintiffs' conception of agency action that DOJ briefs would by necessity fall within it.  But Plaintiffs themselves cannot actually believe that DOJ attorneys must submit their draft briefs to the Federal Register and open them up for public comments before filing them with the Court.

\*     \*     \*

In all these ways, Plaintiffs' substantive APA challenges do not make sense in application to the innumerable agency activities that Plaintiffs have sought to challenge. Counts II through XI of Plaintiffs' Amended Complaint should therefore be dismissed.

## IV.   <u>Plaintiffs are Unlikely to Succeed on Their *Ultra Vires* Claim, Which Should be Dismissed</u>

Disposing of Plaintiffs' misconceived APA challenges leaves only their abbreviated *ultra vires* challenge to the Executive Order itself (Count I).  FAC ¶¶ 338-42.  Plaintiffs claim that the President lacked Constitutional and statutory authority to promulgate the Order.  *Id.* But that misconstrues both the Order and the President's Constitutional authority.

Article II, § 1 of the Constitution provides that the "executive Power shall be vested in a President."  Art. II § 1.  That power, courts have explained, "necessarily encompasses 'general administrative control of those executing the laws' . . . throughout the Executive Branch of government."  *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32

(D.C. Cir. 2002) (quoting *Myers v. United States,* 272 U.S. 52, 164 (1926)); *see also Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 213 (2020) ("[L]esser officers must remain accountable to the President, whose authority they wield."). Indeed, "faithful execution of the laws enacted by the Congress . . . ordinarily allows and frequently requires the President to provide guidance and supervision to his subordinates." *Id.* (quoting *Youngstown*, 343 U.S. at 587); *see also Sierra Club v. Costle,* 657 F.2d 298, 406 n. 524 (D.C. Cir. 1981).

Not surprisingly, Presidents of both parties regularly exercise their "general administrative control" to oversee how agency officials carry out their statutory responsibilities within the bounds of their discretion—including by requiring that agencies submit their rulemaking for review to the Office of Management and Budget, which both "issue[s] guidance to federal agencies" and "ensur[es] agency consistency with broader presidential priorities." *Louisiana v. Biden*, 64 F.4th 674, 678 & n.6 (5th Cir. 2023) (citations omitted); *see, e.g.*, Exec. Order No. 13,990, § 5, 86 Fed. Reg. 7037 (Jan. 20, 2021) ("E.O. 13990"). Exec. Order No. 13,798 (May 4, 2017); Exec. Order No. 12,866, 58 Fed. Reg. 51,735, § 1(b), (Sept. 30, 1993) (directing agencies on how to exercise regulatory authority, "to the extent permitted by law and where applicable"); Exec. Order No. 13,563, 76 Fed. Reg. 3821, § 1(b) (Jan. 18, 2011) (similar); Exec. Order No. 13,279, 67 Fed. Reg. 77,141, § 2 (Dec. 12, 2002) (directing agencies, "to the extent permitted by law," to be guided by certain principles when "formulating and implementing policies that have implications for faith-based and community organizations").

The Executive Order here is of the same ilk. As detailed above, the President issued the Order because he wished agencies to consider what actions they could take consistent with various statutory mandates and the general goals of the NVRA. To that end, the order "'solicited the strategic plans [from agencies] in order to inform future policy developments on voting access.'" *Am. First Legal Found.*, 2023 WL 4581313, at *6. "[S]enior White House advisors" reviewed the information the agencies submitted and used it "to advise the President on further executive decision-making regarding voting matters." *Id.* In this way,

the order was devoted "'to the internal management of the executive branch.'" *California v. Env't Prot. Agency*, 72 F.4th 308, 318 (D.C. Cir. 2023) (quoting *Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993)).  And rather than "create any private rights," the order "simply serve[d] as presidential directives to agency officials to consider certain policies when making regulatory decisions." *California v. Env't Prot. Agency*, 72 F.4th 308, 318 (D.C. Cir. 2023) (quoting *Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993)).

This type of Presidential instruction is entirely unremarkable and required no explicit "statutory mandate or delegation of congressional authority:" it was justified, instead, by the President's "general constitutional powers to direct . . . executive branch officials." *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1338–39 (4th Cir. 1995); *see generally Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981) (the "authority of the President to control and supervise executive policymaking is derived from the Constitution"); *Orbital ATK, Inc. v. Walker*, No. 117CV163LMBIDD, 2017 WL 2982010, at *9 (E.D. Va. July 12, 2017) (noting that the President can act under his "inherent authority to direct Executive Branch officials" without "a delegation of Congress's lawmaking authority").  As the Supreme Court explained a century ago, the President "may properly supervise and guide" his subordinates as part of his efforts "to secure th[e] unitary and uniform execution of the laws." *Myers v. United States*, 272 U.S. 52, 135 (1926).

## V.   Plaintiffs Fail on the Other Preliminary Injunction Factors

The "limited purpose" of a "preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  As a result, an "indispensable prerequisite to issuance of a preliminary injunction is prevention of irreparable injury." *Tate v. Am. Tugs, Inc.*, 634 F.2d 869, 870 (5th Cir. 1981).  No such injury exists here.

*1.*     Plaintiffs' primary argument is that their purported injuries are irreparable because compliance "'with an agency order later held invalid almost *always* produces . . . irreparable harm.'"  Pls. Br. at 45 (quoting *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017).

That argument is doubly flawed.  Plaintiffs do not claim they are subject to some order issued by a federal agency with which they must comply.  *See Burgess*, 871 F.3d at 299 (explaining that the FDIC had "issued an order assessing a civil penalty against Burgess and requiring his withdrawal from the banking industry").  Rather, their claim is that the federal government is engaging in impermissible efforts to register voters without authority to do so.  Nothing about that claim suggests that any Plaintiff is the "object" of any federal regulatory regime. *See* Pls. Br. at 46.  Plaintiffs' argument, moreover, collapses the irreparable harm inquiry with the merits.  And courts, including the Supreme Court, have cautioned against doing so.  *See, e.g.*, *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) ("As a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits."); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy.").

Nor are Plaintiffs correct that an irreparable injury must be presumed here because they have raised the specter of a constitutional violation.  Pls. Br. at 46.  Their argument primarily rests on two cases involving claims of irreparable harm flowing from vaccine mandates, which the Fifth Circuit concluded involved "liberty interests," "not to mention the free religious exercise," of "reluctant individual recipients put to a choice between their job(s) and" mandated vaccination.  *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021); *see also Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *8 (5th Cir. Feb. 17, 2022) (discussing loss of First Amendment freedoms).  Nothing Plaintiffs have alleged here comes close to placing any individual in the dilemma of choosing between bodily autonomy or religious freedom, on the one hand, and employment on the other.  As courts have repeatedly recognized, moreover, not all allegations of constitutional injury necessarily establish irreparable harm.  *See, e.g.*, *Ne. Fla. Ch. of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (explaining that the "only area of constitutional jurisprudence where we have said that an on-going violation constitutes

38

irreparable injury is the area of first amendment and right of privacy jurisprudence"); *Siegel v. LePore*, 234 F.3d 1163, 1177-78 (11th Cir. 2000) ("Plaintiffs [] contend that a violation of constitutional rights always constitutes irreparable harm. Our case law has not gone that far"); *Pub. Serv. Co. of New Hampshire v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987) (rejecting argument that alleged due process violation automatically establishes threat of irreparable injury). And Plaintiffs cite no case establishing that invasion of the specific constitutional principles they assert necessarily causes irreparable harm. *See* Pls. Br. at 46.

Given the breadth of Plaintiffs' attack, they also fail to establish that any relevant federal agency action "interfere[s] with a State's enforcing its statute" in a way that would inflict irreparable harm. Pls. Br. at 46. Neither the Executive Order nor the alleged agency actions implementing it purport to supersede any State statute or policy. The Order itself seeks only to encourage the election participation of those "Americans who are legally entitled to" do so. EO 14019 § 2. Consistent with that limited purpose, it instructs federal agencies to "promote voter registration and voter participation" in ways that are "appropriate and consistent with applicable law." *Id.* § 3(a). And it recognizes the primacy of State laws governing voter eligibility and registration requirements by requiring that any assistance offered in registering voters be done "in a manner consistent with all relevant State laws." *Id.* § 3(a)(iii)(B); *see also id.* § 9(a) (limiting provisions related to individuals in federal custody to those who have the "ability to vote under the laws of the State where the individual resides"); *id.* § 12(b) ("This order shall be implemented consistent with applicable law and subject to the availability of appropriations."). Far from interfering with any State's voter eligibility regime, the challenged conduct acknowledges and incorporates those policies.

*2.* Meanwhile, Plaintiffs' own litigation conduct undermines their assertions of irreparable harm. The Supreme Court has emphasized that "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek*, 585 U.S. at 159; *see also* 11A Wright, Arthur & Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2024) ("A delay by plaintiff after learning of the threatened harm may be taken as an indication that the harm

39

would not be serious enough to justify a preliminary injunction.").   Yet Plaintiffs have displayed no such urgency:  Plaintiffs have known about the Executive Order since it was issued three and a half years ago.

Courts around the country have rejected claims of irreparable harm after delays measured in *months*, not years.  *See, e.g., Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d Cir. 1995) (four months);  *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (ten weeks); *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (three months); *AARP v. U.S. Equal Emp. Opportunity Comm'n*, 226 F. Supp. 3d 7, 22 (D.D.C. 2016) (five months); *Vita-Mix Corp. v. Tristar Prod., Inc.*, 2008 WL 11383504, at *9 (N.D. Ohio Sept. 30, 2008) (collecting cases).  So Plaintiffs' decision to wait more than three years to bring this action categorically "militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief."  *Symetra Life Ins. Co. v. Rapid Settlements Ltd.*, 612 F. Supp. 2d 759, 774 (S.D. Tex. 2007).

None of Plaintiffs' explanations for the timing of their lawsuit hold water.  At various points, Plaintiffs imply that the timing of this lawsuit is related to various congressional requests and FOIA litigation.  *See, e.g.*, Pls. Br. at 4-6.  Stripped of its rhetoric, however, Plaintiffs' claims assert that various agency conduct exceeds statutory authority or otherwise procedurally or substantively violates the APA.  Those claims have been available to Plaintiffs since the Executive Order was issued and the relevant agency conduct undertaken.  Plaintiffs were not in the dark about those activities.  The Executive Order itself was published in the Federal Register, 86 Fed. Reg. 13,623 (Mar. 7, 2021), and much of the agency conduct implementing the Executive Order Plaintiffs now challenge was made contemporaneously public, *see generally* FAC ¶¶ 151-301 (citing various fact sheets and press releases issued from 2021-2023).

Plaintiffs' post-filing conduct also undermines their claim of irreparable harm.  Their dubious suggestions that they were unaware of their objections to the Executive Order and related agency implementation until shortly before filing this lawsuit cannot explain why

Plaintiffs waited two months after filing their initial complaint to move for preliminary relief, only to demand the Court rule on the motion within a week of filing. *See Pastel Cartel, LLC v. FDA*, 2023 WL 9503484, at *4 (W.D. Tex. Dec. 14, 2023) (finding no irreparable harm based in part on fact that plaintiff "waited" six weeks after filing "to request a preliminary injunction"). Plaintiffs were plainly on notice of their objections to the agency conduct at issue here by the time they filed the complaint, just as they were on notice about the election schedule. Indeed, Plaintiffs' claimed surprise at the government's withholdings of presidential communications under FOIA (Pls. Br. at 7, 47-48) is utterly incredible given that those specific withholdings were asserted years ago and, in the *America First* case, were sustained by the district court in July 2023. Plaintiffs could have moved for preliminary relief years ago, notwithstanding any congressional requests or the long-pending FOIA litigation. *See* Pls. Br. at 47-48.

Nor does the imminent commencement of early voting in certain States justify Plaintiffs' claimed emergency. The Executive Order and Plaintiffs' objections to it in large part involve providing access to voter registration and information about elections. *See* EO 14019 §§ 3 ("Expanding Access to Voter Registration and Election Information"), 4 (instructing agencies to agree to State designations as voter registration agencies); Pls. Br. at 12-14 (discussing various agencies' voter registration activities). But federal law permits States to close voter registration up to 30 days before a federal election. 52 U.S.C. § 20507(a)(1). And many States do, including States whose public officials have joined this lawsuit. *See* Ohio Rev. Code Ann. § 3503.19(A) (thirtieth day before an election); Ga. Code Ann. § 21-2-224(a) (fifth Monday prior to a general election); *see generally* National Conf. of State Legislatures, Voter Registration Deadlines (Dec. 11, 2023), https://www.ncsl.org/elections-and-campaigns/voter-registration-deadlines. Those periods are rapidly closing. If Plaintiffs were truly concerned about the impact of the Executive Order on voter *registration*, they would not have waited until now to move for preliminary relief. Instead, Plaintiffs' claim of emergency is tied to the commencement of early voting in certain

states.  But an injunction now against activities related to voter registration is not tethered to early voting periods.

      *3.*      The remaining factors—harm to the opposing party and the public interest—merge when the Government is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 432 (2009). An injunction here would frustrate the public's interest in removing "prohibitively inconvenient" barriers to "voter registration" that "discourage or even prevent qualified voters from registering and participating in elections."  *Ass'n of Cmty. Orgs. For Reform Now v. Miller*, 129 F.3d 833, 834-35 (6th Cir. 1997).

      Further, an injunction would also run against the *Purcell* principle, which counsels "that lower federal courts should ordinarily not alter the election rules on the eve of an election."  *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006)).  As the Supreme Court has repeatedly noted, court "orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls."  *Purcell*, 549 U.S. at 4-5. Courts have applied *Purcell* to disapprove injunctions for all manner of election-related activities, including activities related to voter registration.  *See Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 897 (6th Cir. 2024).

      The concerns underlying *Purcell*—the risk of voter confusion and risk of discouraging voting—apply with full force here, where Plaintiffs seek to terminate various nonpartisan activities that are designed to encourage individuals to register to vote in accordance with State law mere days before election begins in certain States.  To be sure, the federal government and its agencies do not set the rules for any State's election.  But the relief Plaintiffs seek may nevertheless cause nationwide voter confusion regarding the legality of eligible registered voters.  And giving credence to Plaintiffs' speculative claims of voter fraud and non-citizen voting may well discourage legitimate voters from registering and heading to the polls.

## VI.   **Any Injunctive Relief Should be Appropriately Tailored, and Plaintiffs Have Failed to Justify the Vague and Sweeping Relief that They Demand**

For the reasons explained above, Plaintiffs' preliminary-injunction motion should be denied and their case should be dismissed.  But if the Court were to enter an injunction, the scope of the relief that Plaintiffs seek is plainly inappropriate and—indeed—Plaintiffs make no effort to justify it.

The Supreme Court has repeatedly made clear that preliminary relief should be no broader than necessary to remedy any demonstrated harms of the named Plaintiffs.  "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018); *California v. Texas*, 593 U.S. 659, 672 (2021) ("Remedies [] ordinarily 'operate with respect to specific parties.'" (citation omitted)).  And "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

Here, Plaintiffs demand a sweeping, indefinite, government-wide, and universal injunction that is utterly inconsistent with traditional equitable principles.  And rather than provide the kind of extraordinary showing that could justify such an extraordinary demand, Plaintiffs seek to flip the relevant burden by asking the Court to draw a series of adverse inferences against the government.  *See* Pls. Br. at 48-49.[8]  Those demands are improper.

---

[8]  Plaintiffs suggest that the government's withholding of certain documents pursuant to FOIA exemptions somehow amounts to "stonewalling," Pls.' Mot. at 48, and ask the Court to infer some nefarious purposes, FAC ¶ 309.  That suggestion ignores that (1) the government released responsive documents pursuant to the cited FOIA requests, *see Found. for Gov't Accountability v. U.S. Dep't of Just.*, 688 F. Supp. 3d 1151, 1158-59 (M.D. Fla. 2023) (reserving judgment on whether certain withholdings were justified under FOIA), and (2) one court (now on appeal) concluded the government's withholdings were justified, *Am. First Legal Found. v. U.S. Dep't of Agric.*, No. 22-3029, 2023 WL 4581313 (D.D.C. July 18, 2023).  Indeed, Plaintiffs effectively ask this Court to insert itself into pending litigation before other judges in other jurisdictions, in plain disregard of judicial comity.  *W. Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728 (5th Cir. 1985) ("The federal courts have long recognized that the principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs.").  As for the congressional requests referenced by Plaintiffs, agencies are in fact producing responsive

*1.*      To start, when a court orders "the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the court could still be acting in the judicial role of resolving cases and controversies." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring); *Trump v. Hawaii*, 585 U.S. 667, 721 (2018) (Thomas, J., concurring).    Such universal injunctions defy "foundational principles" that "a federal court may not issue an equitable remedy more burdensome to the defendant than necessary to redress the plaintiff's injuries." *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., joined by Thomas & Alito, JJ., concurring); *see also id.* at 931 (Kavanaugh, J., joined by Barrett, J., concurring) ("prohibiting nationwide or statewide injunctions may turn out to be the right rule as a matter of law").    That's why the Fifth Circuit has counseled "judicial restraint" in this area.  *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021); *Nuziard v. Minority Bus. Dev. Agency*, 676 F. Supp. 3d 473, 485 (N.D. Tex. 2023) (Fifth Circuit law allows universal injunctions only "if there's a (1) concern that a geographically limited injunction would fail to prevent a plaintiff's harm or (2) a constitutional command for a consistent national policy").    "At a minimum, a district court should think twice—and perhaps twice again—before granting universal anti-enforcement injunctions against the federal government."   *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring).

Plaintiffs argue that they should be relieved of these burdens because they "come from" a sufficient number of States that represent a large proportion of the country.  Pls. Br. at 50.  This "close enough" argument is antithetical to the proper role of the judiciary, which is limited to resolving "Cases" and "Controversies" to redress the injuries of specific parties.

---

documents on an ongoing basis.  And, certainly, Plaintiffs cannot demand that this Court impose itself into that ongoing accommodation process between the two political branches. *See Trump v. Mazars USA, LLP*, 591 U.S. 848, 858-67 (2020) (explaining that "congressional demands for presidential documents have" historically "been resolved by the political branches without involving" the courts).

*See Murthy v. Missouri*, 144 S. Ct. 1972, 1985 (2024); *Gill*, 585 U.S. at 73 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury.").

No adverse inference is appropriate here. Plaintiffs exclusively bring APA or *ultra vires* claims, none of which call for an evidentiary record made in this court. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("The focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). Only "in rare circumstances" may a court "conduct a *de novo* inquiry into an agency's action." *Sierra Club v. Peterson*, 185 F.3d 349, 369 (5th Cir. 1999). The expansive nature of Plaintiffs' claims here are untethered to any specific agency actions such that it is functionally impossible to create any administrative record, as Plaintiffs themselves seem to admit. *See* FAC ¶ 45. As described above, that fact should lead the Court to the conclusion that Plaintiffs' claims are not proper. Yet Plaintiffs instead ask the Court to simply infer that Defendants' activity is both unlawful and inflicts irreparable harm. *See* Pls. Br. at 49. That radical approach eviscerates the presumption of regularity to which the actions of Government agencies are ordinarily entitled. *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001); *RSR Corp. v. EPA*, 588 F. Supp. 1251, 1254 (5th Cir. 1984).

Plaintiffs' cases do not support that extreme result. *See* Pls. Br. at 49. None of those cases involved an adverse inference against a governmental defendant. None applied an adverse inference in support of the merits of a plaintiff's administrative law claim similar to what Plaintiffs press here. And none stand for the proposition that a plaintiff can obtain the type of expansive injunctive relief Plaintiffs seek here in the absence of proof that relief is justified.

2.     Plaintiffs' proposed injunction fails for another reason: it lacks the required specificity. Rule 65(d)(1) requires "[e]very order granting an injunction" to "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail— and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(A)-(C). "This drafting standard means 'that an ordinary

45

person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed.'" *State of Louisiana v. Biden*, 45 F.4th 841, 846 (5th Cir. 2022) (quoting *U.S. Steel Corp. v. United Mine Workers of Am.*, 519 F.2d 1236, 1246 n.20 (5th Cir. 1975)).

Plaintiffs' proposed orders do not come close to meeting this standard. To begin, the scope of Plaintiffs' requested injunction is entirely unclear. Their proposed orders request that the Court temporarily restrain or preliminarily enjoin Defendants from "continuing their current actions" and "taking any additional actions implementing Executive Order 14019." *See* ECF Nos. 15-1, 15-2. But the nebulous nature of Plaintiffs' claims makes it impossible to know what conduct falls inside or outside that proposed prohibition. To take one example, the Executive Order directs the Secretary of Defense to engage in further efforts to assist military members on active duty to register and vote absentee pursuant to the Uniformed and Overseas Citizens Absentee Voting Act. EO 14019 § 8 (citing 52 U.S.C. § 20301 *et seq.*). Plaintiffs appear to acknowledge this authority and "do not object" to those programs as they have been administered historically, but nevertheless challenge any further implementation of the Order, making it unclear what activity they would like to see enjoined. FAC ¶ 46. Another example: the Executive Order instructs agencies "if requested by a State" to agree "to be designated as a voter registration agency" under the NVRA "to the greatest extent practicable and consistent with applicable law." EO 14019 § 4. The NVRA expressly authorizes federal agencies to agree to such a designation by a State. 52 U.S.C. § 20506(a)(3)(B)(ii), (b). At least three States have designated federal offices as voter registration agencies. One State's designations are the subject of litigation as to whether they were consistent with State law. *See, e.g.*, *Republican Nat'l Comm. v. Whitmer*, No. 1:24-cv-720 (W.D. Mich. filed July 15, 2024). Plaintiffs refer to that litigation as "arising from the EO." Pls. Br. at 6-7 n.1. But there is no way to determine whether the federal agencies' service as voter registration agencies or Department of Defense efforts to help overseas members of the military vote would be prohibited "actions implementing Executive Order 14019," and

therefore enjoined if Plaintiffs' motion is granted, or permitted to continue because the underlying statutory authority long predates the Executive Order.

The problems do not end there. Plaintiffs also fail to specify whether their proposed injunction would cover routine historical practices that are touched on by the Executive Order and for which the Government's authority has never been questioned. For example, as noted above, the "Federal Government has a longstanding policy of granting employees a limited amount of administrative leave to vote in Federal, State, county, or municipal elections or in referendums on any civic matter in their community." *See* U.S. Office of Personnel Mgmt., *Fact Sheet: Administrative Leave*, https://perma.cc/Y22Z-DZWJ. This Federal policy of providing limited paid administrative leave (also known as "excused absence") for the time necessary to vote predates the Executive Order by decades. *See* U.S. Office of Personnel Mgmt., *Excused Absence for Voting* (Oct. 27, 2004) (explaining OPM's "tradition[]" of providing agencies "information on the Federal Government's longstanding policy"), https://perma.cc/4GSW-WSQZ. The Executive Order directs the heads of executive agencies to provide recommendations related to these policies, EO 14109 § 6, but the agencies' authority to grant that leave is not derived from the Executive Order. *See Fact Sheet: Administrative Leave*, https://perma.cc/Y22Z-DZWJ (citing 5 U.S.C. §§ 301-302 for "the inherent authority for heads of agencies to prescribe regulations for the government of their organizations"). Yet Plaintiffs' proposed injunction is unclear about the extent to which it would run to these longstanding practices that are merely touched on by the Executive Order. *See* FAC ¶ 93-94; Pls. Br. at 41.

It is also unclear which government agencies would be bound by any injunction.[9] Plaintiffs' Amended Complaint fails to even identify all of the federal agencies it seeks to have enjoined, claiming that identifying such agencies is "impractical." *See* Am. Compl. ¶ 45 ("In

---

[9] The President, of course, cannot be enjoined. *See Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) ("[I]n general 'th[e] court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" (citation omitted)).

addition to the Departments enumerated above, "United States of America" here includes all other federal agencies and officers in the United States Government taking, or planning to take, actions to implement the EO, including their agency components, divisions, and offices."). Even if that broad scope were permissible, it only exacerbates the lack of specificity of the relief Plaintiffs seek. Is a federal employee who provides a client at a federal office the National Mail Voter Registration Form developed by the Election Assistance Commission implementing the Executive Order and therefore enjoined? *See* 52 U.S.C. § 20508(a)(2); EO 14019 § 3(a)(iii)(B) (directing agencies to consider "assisting applicants in completing voter registration . . . application forms"). Must all federal officials decline to "volunteer to serve as non-partisan poll workers or non-partisan observers"? EO 14019 § 6(b). Plaintiffs' proposed orders do not say.

Further, Plaintiffs' brief requests a *mandatory* preliminary injunction compelling DHS to grant "all State and election administrators" access to its SAVE database. Pls. Br. at 47. The "Fifth Circuit has repeatedly held that mandatory injunctions warrant an even higher standard than prohibitory injunctions." *Texas v. Ysleta del Sur Pueblo*, No. 17-cv-179, 2018 WL 1566866, at *9 (W.D. Tex. Mar. 29, 2018). Plaintiffs "bear[] the burden of showing a clear entitlement to the relief under the facts and the law." *Justin Indus., Inc. v. Choctaw Securities, L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990). Here, Plaintiffs fail to meet that higher standard. Plaintiffs do not explain how the SAVE database is at all connected with any of their claims. Indeed, this request is so untethered from the remainder of Plaintiffs' claims that they do not even include this request in either of their proposed orders. *See* ECF Nos. 15-1, 15-2. Similarly, they make no claim that an injunction compelling DHS to grant access to the SAVE system is necessary to preserve the positions of the parties or avoid any irreparable harm. Nor do Plaintiffs explain how access to that system would remedy any alleged injury it seeks to redress in this lawsuit. Simply put, Plaintiffs nowhere establish *any* entitlement to a mandatory injunction, let alone meet their burden of showing that an injunction is necessary.

## CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' Amended Complaint for lack of subject matter jurisdiction or, in the alternative, for failure to state a claim and deny Plaintiffs' motion for a temporary restraining order and preliminary injunction as moot.


Dated:  September 14, 2024                     Respectfully submitted,

                                              BRIAN M. BOYNTON
                                              Principal Deputy Assistant Attorney General

                                              LESLEY FARBY
                                              Assistant Branch Director

                                              */s/ Alexander V. Sverdlov*
                                              ALEXANDER V. SVERDLOV
                                                (NY Bar No. 4918793)
                                              JACOB S. SILER
                                              GARRETT F. MANNCHEN
                                              Trial Attorneys
                                              U.S. Department of Justice
                                              Civil Division, Federal Programs Branch
                                              1100 L Street NW
                                              Washington, D.C. 20530
                                              Tel: (202) 305-2532
                                              Fax: (202) 616-8470
                                              E-mail: alexander.v.sverdlov@usdoj.gov

                                              *Counsel for Defendants*